# In the United States Court of Appeals for the Third Circuit

## No. 19-2106 & 19-2380

---

UNITED STATES OF AMERICA,

v.

TOYE TUTIS,

Appellant

---

ON APPEAL FROM A FINAL JUDGMENT OF
CONVICTION OF THE
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY
(D.N.J. Crim. No. 14-699 (RMB))

---

BRIEF FOR APPELLANT TOYE TUTIS
and
APPENDIX VOLUME I OF VI (A0001 – A0201)

---

Stanley O. King
King & King LLC
231 South Broad Street
Woodbury, New Jersey 08096
(856)845-3001
stan@kingslaw.com
Attorney for Appellant
Toye Tutis

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Appellant Toye Tutis was charged with committing an offense against the United States for which the United States District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. Appellate jurisdiction is conferred upon the Court of Appeals for the Third Circuit by 28 U.S.C. § 1291.

This appeal is from a final order of judgment that disposes of all the parties' claims. This judgment was entered against Tutis on May 6, 2019. A1527. Tutis filed a timely notice of appeal on May 14, 2019. A0149.

## STATEMENT OF RELATED CASES

Counsel is unaware of any related cases pending before this Court.

## ISSUES PRESENTED FOR REVIEW

I.    Whether the affidavit in support of the September 26, 2014 roving wiretap order lacked probable cause, thereby invalidating the Order under the Fourth Amendment.

This issue was raised by motion (#234) filed on January 19, 2016. A0332-33. The Government submitted a brief in opposition to this motion. Proof of this opposition is attached at A0334-35. The Court addressed this issue by Order (#263) and Opinion (#264) on March 8, 2016. A0001, A0027-31.

This issue was again raised in a supplemental motion (#322) filed on July 29, 2016. A0338-39. Evidence of the Government's objection is attached at A0345-46. The court addressed the issue by Opinion (#587) and Order (#588) issued on May 23, 2019. A0168-175, A0197-199.

1

II.     Whether the Communications Data Warrant of September 26, 2014 was obtained in violation of *Franks v. Delaware*.

This issue was raised as part of an Omnibus motion (#322) filed on July 29, 2016.  A0338, A0342.  Evidence of the Government's objection is attached at A0345-47.  The court addressed the issue by Opinion (587) and Order (#588) on May 23, 2019.  A0175-93, A0197-99.


III.    Whether the affidavit in support of the October 14, 2014 Order authorizing the use of a cell-site simulator lacked probable cause, thereby invalidating the Order under the Fourth Amendment.

This issue was raised as part of an Omnibus motion (#322) filed on July 29, 2016.  A0338-39, A0343.  Evidence of the Government's objection is attached at A0348.  The court addressed the issue by Opinion (#385) and Order (#386) on October 20, 2016.  A0046-58, A0075-76.


IV.     Whether the District Court abused its discretion by not permitting Tutis to withdraw his guilty plea based on the involuntariness of the plea and whether the Court erred in denying Tutis' plea withdrawal based on ineffective assistance of counsel.

This issue was raised by motion (#443) on March 15, 2017. A0768. Evidence of the Government's objection is attached at A0771-73. The court addressed the issue by Opinion (#556) and Order (#557) on November 13, 2018.  A0080-A0130, A0131.

This issue was again raised by motion (#568) on February 22, 2019. A1397-99.  Evidence of the Government's objection is attached at A1402.  The court addressed the issue by Opinion (#580) and Order (#581) on April 26, 2019.  A0132-47, A0148.

## STATEMENT OF THE CASE

Appellant, Toye Tutis ("Tutis"), was named in a two-count indictment on December 10, 2014.   A0306 at #1.   On March 16, 2016, an eighteen-count superseding indictment was filed against Tutis. A0314 at 270.  On September 14, 2016, a twenty-seven count second superseding indictment was filed against Tutis. A0350.  Count One alleged that from February 2010 through about December 10, 2014, Tutis, Ivan Cuellar Naranjo, Torzine Tiller, Kabaka Atiba and Jazmin Vega ("Vega") conspired with each other to possess and distribute five kilograms or more of cocaine and 280 grams or more of crack cocaine, and one kilogram or more of heroin. A0350.  Counts Two through Nine charged that Tutis and other codefendants possessed and distributed cocaine and crack cocaine.  A0352.  Tutis was not named in Counts Ten through Twelve.  Count Thirteen charged that from February 2010 through December 10, 2014, Tutis conspired with his wife, Vega, to conduct unlawful financial transactions affecting interstate commerce by disguising and concealing the nature, source, ownership, and control of the proceeds of his unlawful drug related activities. A0354.  Counts Fourteen through Twenty-five charged Tutis and other codefendants with intentionally using a communication facility—a telephone—to commit and facilitate the drug distribution conspiracy.  A0355.

On January 19, 2016, Tutis filed a motion to suppress wiretap evidence, seeking the suppression of communications intercepted pursuant to a state

judge's order, as well as all evidence derived from those interceptions. A0332. On March 8, 2016, the district judge denied this motion. A0001. On July 29, 2016, Tutis filed an Omnibus motion, seeking the suppression of evidence gathered by electronic surveillance pursuant to state wiretap orders. A0338. He argued that electronic interceptions, including the use of a cell-site simulator, violated the Fourth Amendment. A0339. On October 20, 2016, the district judge denied the motion to suppress evidence stemming from the use of the cell-site simulator. A0075. On October 21, 2016, the district judge issued an Order denying the motion to suppress evidence derived from interceptions made pursuant to the September 26, 2014 wiretap order. A0077-09.

On November 1, 2016, while being represented by Attorney J. Michael Farrell, Tutis pled guilty to Count One (conspiracy to distribute cocaine and heroin) and Count Thirteen (conspiracy to commit money laundering) of the second superseding indictment. A0696-A0697. He understood this negotiated plea to be "tied" or "packaged" with Vega's. A1399-1401, ¶19.

On February 14, 2017 Attorney Farrell was disqualified from this case and Stanley O. King, Esquire was appointed to represent Tutis. A0322 at #434. On March 15, 2017, Tutis filed a motion to withdraw his guilty plea. A0768. He argued that his plea was packaged, and that his agreement was not voluntary and made under duress. He stated that he would not have entered into the plea agreement if this

4

agreement were not tied to that of his wife.  Farrell, who negotiated the plea agreement, stated that the Government always insisted that Tutis agreement be packaged with his wife's.  A0805, ¶4.  At a hearing on this motion, Farrell testified that he failed to notice that the packaged plea language that existed in prior versions of the plea agreement had been excised from the final agreement.  A1025 at 14-15. He testified that he made a mistake by not reading the final version of the plea agreement "word for word."  A1023:23-1024:2, A1203:12-19.  He stated that he never believed the pleas were no longer packaged and never informed Tutis that the agreement was no longer packaged.  A0806 at ¶9.

In an order and opinion entered on November 13, 2018, the district judge denied Tutis' motion, finding that the two pleas were no longer packaged by November 1, 2016 and that even if Tutis was unaware that the pleas were unpackaged, there was no prospect of Tutis rejecting the final negotiated plea. A0108, A0128.

Tutis filed a second motion to withdraw his guilty plea on February 22, 2019, arguing that Farrell provided ineffective assistance by not reading the final version of his plea agreement and not informing him that this agreement was no longer packaged.  A1397, A1399-1401 at ¶¶16, 17.  This motion was denied.  A0148.  The Court rejected Tutis' ineffective assistance of counsel claim, finding that Tutis failed to show that Farrell's representation was not within the range of competence

demanded by attorneys in criminal cases. A0144. The Court also found that even if Farrell were ineffective, Tutis was not prejudiced as he failed to show he would not have accepted the plea if he knew it was unpackaged. A0145-46. The Court also found that Tutis failed to assert his innocence in any plausible way and that the Government would have been prejudiced by the plea withdrawal. A0146-47.

Final Judgment of Sentencing was entered on May 6, 2019. A1527. Tutis was sentenced to 264 months. AA1528. On May 14, 2019, he filed a Notice of Appeal. A0149.

As part of Tutis' November 1, 2016 plea agreement, he agreed to limit any appeal to the denials of his motions to suppress on the issues of: (1) the October 14, 2014 wiretap order authorizing the use of equipment capable of retrieving certain wireless information (subsequently identified as a cell-site simulator); (2) the roving wiretap order of September 26, 2014, (3) the roving wiretap order of October 2, 2104 directed against Codefendant Ivan Naranjo, (4) the September 26, 2014 wiretap order being issued in violation of *Franks v. Delaware*; and (5) the September 26, 2014 and the October 14, 214 wiretap orders being issued in violation of the "silver platter" doctrine. A0710, ¶9 – A0712. Tutis now appeals the Orders of October 20, 2016 and May 23, 2019 addressing Issues (1), (2), and (4) of this paragraph. He also appeals the Orders of November 13, 2018 and April 26, 2019, denying his motions to withdraw his guilty plea.

## SUMMARY OF THE ARGUMENTS

As part of a joint state and federal investigation into drug trafficking in the Atlantic City, New Jersey area, Atlantic County Prosecutor's Office ("ACPO") Detective, Jason E. Dorn, ("Dorn") sought multiple wiretap warrants from Honorable Bernard E. DeLury, J.S.C. of the Atlantic County Superior Court. Appellant challenges the wiretap orders issued on September 26, 2014 and October 14, 2014 which were directed against him. He contends that the affidavits presented by Detective Dorn in support of both orders contained largely conclusory statements and were lacking in probable cause. The appellant seeks to suppress all evidence obtained against him that stemmed from these wiretap orders.

Appellant entered into a plea agreement on November 1, 2016, while represented by Attorney Farrell. On February 3, 2017, Farrell's representation was terminated and Attorney Stanley O. King was appointed to represent the appellant. On March 15, 2017, the appellant sought to withdraw his guilty plea on the basis that it was not voluntary, particularly because he understood the plea agreement to be packaged with the agreement of Vega, his wife and codefendant. He felt pressured to accept his plea offer, understanding that this would result in a more lenient deal for Vega. Appellant's motion was denied. He thereafter again sought to withdraw his plea on the basis of ineffective assistance of counsel on the part of Farrell. At a hearing for his first motion to withdraw his guilty plea, Farrell testified

that the initial plea offer was packaged. He further testified that the excision of the "packaged" language from the final plea agreement was not discussed with the Government and that he failed to notice this change in the final agreement. He testified that he made a mistake in not reading the final agreement, and therefore not advising the appellant that the plea agreements of the appellant and his wife were no longer packaged. The district court also denied Appellant's second motion to withdraw based on ineffective assistance of counsel. The appellant contends that the district court abused its discretion in denying his first plea withdrawal motion and erred in denying the second motion.

## LEGAL ARGUMENTS

**I.     The September 26, 2014 roving wiretap order violated the Fourth Amendment as it was based upon an affidavit that lacked probable cause for the belief that Tutis changed his telephone, which could have had the effect of thwarting interception.**

### *Standard of Review*

The Third Circuit reviews the district court's denial of a motion to suppress for clear error as to the underlying factual determinations but exercises plenary review over the district court's application of law to those facts." *United States v. Murray*, 821 F.3d 386, 390-91 (3d Cir. 2016); *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011).

*Discussion*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." *U.S. Const. Amend. IV*.  This Amendment further requires that warrants be supported by probable cause "particularly describing the place to be searched, and the persons or things to be seized." *Id*.  The Fourth Amendment applies not only to physical searches, but also to electronic interception of phone conversations.  See *Katz v. United States*, 389 U.S. 347, 352-53 (1967).

Title III of the Omnibus Crime Control and Safety Street Act of 1968 (the "federal Wiretap Act") governs the judicial authorization of wire, oral, or electronic communication interceptions. 18 U.S.C. § 2510 *et seq*.  This Act "established minimum standards for federal and state law enforcement officials to follow when seeking to intercept wire, oral, and electronic communications." *State v. Feliciano*, 224 N.J. 351, 368 (2016) (citation omitted).  Pursuant to this Act, a judge may authorize a wiretap if the application establishes that:

(a)    there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense . . .;

(b)    there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

9

(c)     normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d)     there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3).

"When applying for a wiretap, the affiant must provide a full and complete statement of why an affidavit is necessary." *United States v. Heilman*, 377 Fed. Appx. 157, 185 (3d Cir. 2010), citing 18 U.S.C. 2518(1)(c).  "[A]pplications which use 'general declarations and conclusory statements' or 'boiler plate [statements] and the absence of particulars' do not meet the full and complete statement requirement. . . . Such generalized wiretap applications must be denied to prevent wiretapping from becoming a 'routine investigative recourse.'" *Id*. at 186.

"The same Fourth Amendment standards govern finding probable cause for a wiretap order and for a search warrant." *United States v. Kaplan*, 526 Fed. Appx. 208, 212  (3d Cir. 2013) (citation omitted).  To find probable cause, a magistrate "'is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id*.  The Third Circuit further requires that the magistrate be presented with "sufficient information"

10

and not simply "a mere ratification of the bare conclusions of others." *Id*. "A bare-bones affidavit, which makes 'a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause,' is insufficient." *Id*. Examples of bare-bones affidavits include "statements that the affiant 'has cause to suspect and does believe' or that the affiants 'have received reliable information from a credible person and believe." *Id*. (internal citations omitted).

Pursuant to § 2518(11)(b)(ii) of the federal Wiretap Act, applicants for a roving wiretap must show "probable cause to believe that the person's actions could have the effect of thwarting interception from a specified facility." 18 U.S.C.A. § 2518(11)(b)(ii). Here, the affidavit relied upon to issue the September 26, 2014 roving wiretap order lacked this showing of probable cause.

On September 26, 2014, Honorable Bernard E. DeLury, J.S.C. ("Judge DeLury") of Atlantic County Superior Court issued an Order and Communications Data Warrant authorizing, *inter alia*, Detective Dorn of the ACPO and other members of participating law enforcement agencies "to intercept the wire and electronic communications of Toye Tutis and other unidentified individuals acting in concert with him using the Target Cell phone, and other wireless telephone numbers used by Toye Tutis . . . ." A0275.

11

The proposed order submitted by the ACPO and signed by Judge DeLury stated that there was probable cause to believe that "Toye Tutis frequently changes his cell phone number as part of a deliberate effort to thwart detection by law enforcement as envisioned by N.J.S.A. 2A:156A-9(g)(2), and that roving authorization is needed to intercept Toye Tutis' communications from the Target Cell phone, and other wireless telephone numbers used by Toye Tutis . . . ." A0275 at ¶11. In issuing the order, Judge DeLury relied on Dorn's September 26, 2014 affidavit. This affidavit lacked initial probable cause to show that Tutis even engaged in the act of changing his cell phone. Without this showing that the preliminary act of changing phones occurred, there can be no effect of thwarting interception.

In his affidavit, Dorn alleged that he had probable cause to believe that:

A.   Jewell E. Tutis, Toye Tutis, and other as yet unidentified individuals, are engaging and have engaged in, over an undetermined period of time, as part of the continuing criminal activity in, and are committing, have committed, and are about to commit the specified crimes; and

B.   Captioned telephone facility number (424) 646-1761, a wireless telephone facility . . . , is being utilized by Toye Tutis and other as yet unidentified individuals to facilitate the commission of the specified crimes. Toye Tutis has demonstrated a willingness to change his usage of wireless telephone facility numbers with the purpose to thwart interception by law enforcement authorities.

12

A0203 at ¶3.  Dorn's affidavit further stated:

> This application seeks the interception of wire and electronic communications from Toye Tutis captioned wireless facility number (424) 646-1761 and . . . other telephone facilities utilized by Toye Tutis . . . .  [T]his investigation has established that Toye Tutis is a prominent significant member of a narcotics distribution operation within the City of Somers Point and the City of Atlantic City, New Jersey.  Toye Tutis, during this investigation, has changed his prepaid wireless telephone facility number on three (3) occasions, and told CI #607 that he, Toye Tutis, changes his phone number often, including the latest change to captioned wireless telephone facility number (424) 646-1761, the telephone facility number that I have probable cause to believe and to do believe Toye Tutis is currently using in furtherance of the specified crimes.  I believe Toye Tutis utilizes prepaid accounts and frequently changes his telephone facility number as part of a deliberate effort to thwart detection by law enforcement as envisioned by N.J.S.A. 2A:156A-9(g)(2), such that roving authorization is needed to intercept Toye Tutis' communications from captioned wireless telephone facility number (424) 646-1761, as well as other telephone facilities utilized by Toye Tutis.

A0211 at ¶13.

Despite alleging that Tutis changed his cell phone on three occasions, and despite swearing that he was familiar with the investigation, Dorn alleged nothing further to support this bare-bones allegation.  Throughout his affidavit, Dorn cites repeatedly to a single telephone number used by Tutis, (424) 646-1761.  As early August 22, 2014, this investigation intercepted communications from (424) 646-1761, the phone number attributed to Tutis.  A0301.  By September 26, 2014, when the affidavit was submitted, communications to and from this number were still being intercepted.  Dorn described an intercepted call involving this number on

September 25, 2014. A0237.  This number was therefore being intercepted for at least one month—contradicting the allegation that Tutis changes his phone number often.  Although Dorn alleged that Tutis changed his number often, he cited to no evidence that the (424) 646-1761 had been changed even once since interception began.

By contrast, the same affidavit describes at least four occasions that Jewell Tutis, Toye Tutis' brother, changed his phone number.  These changes occurred just about weekly.  Paragraph 22 first identifies that Jewell Tutis provided CI #607 with his phone number, (609) 992-3324.  A0216.  Paragraph 38 alleges that on August 28, 2014, CI #607 told Dorn that Jewell Tutis "dropped his old telephone number" and provided Jewell Tutis with a new number, (609) 742-3786.  A0227.  Dorn further alleges that on September 4, 2014, CI #607 advised him that Jewell Tutis again changed his number.  A0229 at ¶42.  CI #607 provided Dorn with Jewell's new number, (609) 742-7945.  A0228-29.  Dorn further alleges that on September 10, 2014, CI #607 advised him that Jewell Tutis again changed his number—the new number was (609) 626-4282.  A0231.  Dorn further alleges that on September 19, 2014 CI #607 advised him that Jewell Tutis' new telephone number was (609) 742-8469.  A0233.  Similar substantiation for Dorn's allegation that Toye Tutis demonstrated a willingness to change telephone numbers were neither available not included in Dorn's affidavit.

14

To support his request for a roving wiretap of 424-646-1761, Dorn also stated that CI #607 told Dorn that Toye Tutis advised CI #607 that Toye Tutis changes his phone number often.  Dorn again failed to support this material allegation.  Reports of his numerous debriefings of CI #607 also failed to include any record where the confidential informant advised Dorn of this claim.  Dorn describes CI #607 initial alleged conversation with Toye Tutis in Paragraph 19 of his affidavit.  A0214.  Dorn stated that Toye Tutis initially approached CI #607 and provided him with code phrases to use while discussing drug purchases by telephone.  Dorn also alleged Toye Tutis told the informant to communicate with Jewell Tutis if he wanted to purchase CDS.  He alleged that Toye Tutis instructed the informant to use only Toye's alias, "Santana" if he wanted to speak with him by phone.  A0214.  However, there is no record in this account that supports the alleged claim that Toye Tutis told CI #607 that Toye Tutis changes his number often.

In Paragraph 21 of his affidavit, Dorn again discusses the initial contact between Toye Tutis and CI #607.  A0215.  There, he stated that CI #607 had contact with Toye Tutis during the month of July 2014.[1] A0215.  Nowhere in this detailed description, does Dorn state that Toye Tutis told CI #607 that Tutis changes his phone number often.  Dorn's affidavit also alleged an August 5, 2014 meeting with

---

[1]   At a *Franks* hearing, Dorn testified that July 15, 2014 was the confidential informant's first alleged meeting with Toye Tutis. A0489:14-21.

the informant. A0216 at ¶ 23. The description of this meeting also failed to mention this material statement allegedly made by the informant.

Dorn's affidavit described another alleged encounter between Toye Tutis and CI #607 in Paragraph 44 of his affidavit. A0230. Dorn described CI #607 drug purchase from Jewell Tutis at Dave's Store on September 9, 2014. He alleged that the informant stated he observed Toye Tutis in the store and that Toye Tutis told him he could have anything he wanted from the store. A0230-31. In documenting his debriefing with the informant, Dorn did not indicate that Toye Tutis told the informant during this encounter that he changes his number often.[2]

Dorn's statement that he "believe[s] Toye Tutis utilizes prepaid accounts", A0211, is another conclusory statement without substantiation. These statements are the precise bare-bone assertions prescribed by the Third Circuit in *Kaplan*. Like the examples cited in *Kaplan*, Dorn's allegations in support of a roving wiretap also lack probable cause under federal law.

Probable cause is also lacking under New Jersey's Wiretap Act, N.J.S.A. 2A:156A-1, *et seq*. While the federal Wiretap Act requires a roving wiretap applicant to show "that there is probable cause to believe that the person's actions

---

[2] At a Franks hearing, Dorn testified that he also could not confirm that it was Toye Tutis at the store, but that he could ascertain that Jewell, rather than Toye, told CI #607 that he could take anything from the store. A0537:12-19, A0540:10-A0541:4.

could have the effect of thwarting interception from a specified facility," 18 U.S.C.

§ 2518(11)(B)(ii), New Jersey has a "stricter standard that requires the State to show

the target has a 'purpose . . . to thwart interception.'" *Feliciano*, 224 N.J. at 369. To

the extent that probable cause is lacking under the federal statute as discussed above,

it is also lacking under the stricter New Jersey standard.

The September 26, 2014 Order further required:

> [I]n the event that a new telephone facility (beyond the Target Cell phone) is identified as being used by Toye Tutis, and the person implementing the interception Order desires to invoke the authority contained in the interception Order . . . to intercept wire and electronic communications from that new wireless telephone number, the following procedure must be followed before the roving authority is invoked: Detective Jason E. Dorn, Badge # D-64, and his supervisor, along with the Chief Assistant Prosecutor assigned to the case, all of whom shall be familiar with Toye Tutis' voice, shall review the intercepted conversations and all available relevant call data and shall agree that the person to be intercepted on the new wireless telephone number is Toye Tutis. Compliance with this procedure shall be memorialized in the Friday report to the Court;"

A0276. Here, Dorn intercepted additional telephones that he attributed to Toye

Tutis, without first agreeing with his supervisor and Chief Assistant Prosecutor that

the voice on the new facility belonged to Toye Tutis. For example, a Friday report

dated October 24, 2014 described monitoring and interception activity for (267)-

928-6352, described as "Toye Facility 2." However, contrary to the requirement of

the wiretap order, this report does not indicate that Dorn, his supervisor and Chief

Assistant Prosecutor, reviewed the intercepted conversations and jointly agreed that

the wireless facility was being used by Tutis.  A0298-A0300.  There is also no indication that Dorn, his supervisor and the Chief Assistant Prosecutor were familiar with Tutis' voice.  Dorn was not familiar with Tutis' voice despite his bare assertion to the contrary.  His affidavit stated that during the entire investigation, a telephone associated with Toye Tutis had contact with one of the wiretapped telephones only once—and that contact was *via* text message.  A0209-A2010 at ¶11.  There were also no allegations—substantiated or not—of Dorn's supervisor and the Chief Assistant Prosecutor assigned to the case, being familiar with Tutis' voice on September 26, 2014.  Subsequent Friday reports also documented continued monitoring and interception activity of new and existing facility attributed to Toye Tutis, without following the probable cause protocol required by Judge DeLury.  The sum effect of this failure to follow the probable cause protocol, is that the ACPO intercepted and monitored phones purportedly belonging to Toye Tutis without the requisite authority.

## II.     The Communications Data Warrant of September 26, 2014 was obtained in violation of *Franks v. Delaware*.

### *Standard of Review*

The Third Circuit reviews the district court's denial of a motion to suppress for clear error as to the underlying factual determinations but exercises plenary review over the district court's application of law to those facts. *United States v.*

*Murray*, 821 F.3d 386, 390-91 (3d Cir. 2016); *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011).

## *Discussion*

The district court granted Tutis' request for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). The purpose of a *Franks* hearing is to give the defendant an opportunity to overcome the presumption of validity of an affidavit by impeaching the deliberate falsity or reckless disregard of the affiant. *Id.* at 171. Recklessness is measured not by the relevance of the information, but by the demonstration of willingness to distort truth affirmatively. *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000). "An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *United States v. Brown*, 631 F.3d. 638, 645 (3rd Cir. 2011) (citation omitted). There are two distinct ways in which conduct can be found reckless:

> [E]ither the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind. Neither prong involves the application of legal reasoning or judgment. The test simply asks the court to discern whether "serious doubts" or "obvious reasons" existed. The answer to each of those questions is a matter of fact. . . . If either question posed in *Wilson* is answered affirmatively, nothing further need be asked before the officer is found reckless. Thus the *Franks* recklessness determination is an "essentially factual" inquiry.

*Id.* The Third Circuit elaborated:

> [O]rdinarily, a person does not believe something to be true . . . without an affirmative justification.  That justification might come in the form of first hand observation, or from information provided by a third party, or from some textual source, but we do not take seriously someone who claims that X is true but cannot provide any reason for thinking it so. In other words, a reasonable person's default position is to doubt that a proposition is true until there are grounds to believe it. The absence of sufficient grounding to support an averment therefore constitutes an "obvious reason for doubt" under *Wilson*, 212 F.3d at 788.

*Id.* at 648.

An omission is made if an affiant withholds a fact within his knowledge that "any reasonable person would have known that this was the kind of thing the magistrate would wish to know." *Wilson* 212 F.3d at 788.  A determination of whether an officer recklessly disregarded the truth includes consideration of whether the officer recklessly omitted facts that a reasonable person would want to know and whether the officer "has obvious reasons to doubt the truth of what he or she is asserting." *Wilson*, supra.

At a *Franks* hearing, the challenger must establish perjury or reckless disregard by a preponderance of the evidence.  *Franks*, 438 U.S. at 156.  Then, if the false statement is set aside and "the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.  The court assesses materiality by removing

allegedly false statements, inserting omissions, and determining whether probable cause nonetheless remains. <u>See</u>, e.g., *United States v. Yusuf*, 461 F.3d 374, 383-84 (3d Cir. 2006).

Here, Dorn's affidavit of September 26, 2014 contained deliberately and recklessly false statements and material omissions to render the affidavit lacking in probable cause. Obvious reasons existed for Dorn to entertain serious doubt about the following statements made in his affidavit:

1.    Toye Tutis was at Dave's Grocery during the informant's September 9, 2014 drug purchase from Jewell Tutis, and Toye Tutis told the informant to take anything he wanted from the store as it was free.

2.    Toye Tutis, rather than Jewell Tutis, went by the nickname, Santana;

3.    The statement that Tutis was a target in an 18-month federal investigation without also acknowledging this investigation's failure to obtain evidence against Tutis was a material omission.

4.    CI #607/CS-2 was reliable.

5.    Toye Tutis gave CI #607/CS-2 a business card and that this card contained a handwritten telephone number for Toye Tutis under an alias of "Santana"

***Toye Tutis was at the September 9, 2014 drug purchase at Dave's Grocery and he told the confidential informant to take anything he wanted.***

In Paragraph 44 of his affidavit, Dorn described an alleged encounter between CI #607 and Toye Tutis during a September 9, 2014 drug purchase from Jewell Tutis

at Dave's Store.  A0230.  Prior to this encounter, Dorn stated that he equipped CI #607 with an on-body device (audio/video) transmitter.  A0230.  Following the transaction, Dorn stated that the informant was debriefed as follows:

> CI #607 stated to me that he/she met with Jewell E. Tutis and went inside "Dave's Store".  CI #607 stated to me that upon entering Dave's Store, he/she observed Toye Tutis wearing an orange shirt sitting behind a counter.  CI #607 stated to me that Toye told him/her to take anything CI #607 wanted from the store, because it was free. . . .  CI #607 stated he/she and Jewell E. Tutis completed the transaction over by the coffee stand. . . .  CI #607 stated Toye Tutis observed the transaction.

A0231.  Dorn further stated that after debriefing CI #607, he went to the ACPO, "memorialized the two recorded phone calls (9/9/14) and on-body recording (audio/video) onto a compact disk" and stored the evidence. A0231.

At the *Franks* hearing, Dorn testified that a review of the audio/video recordings indicated that it was Jewell Tutis, rather than Toye Tutis, who told CI #607 that he could take anything from the store.  A0537:12-19.  Dorn further testified that after looking at the video, he was also unable to confirm whether the individual wearing an orange shirt was Toye Tutis.  A0540:10-A0541:4.  At the *Franks* hearing, Tutis testified that that the person in an orange shirt alleged to be him, was his brother Joseph.  A0578:4-23.  Dorn knowingly included in his affidavit, false information that Toye Tutis told the informant that the informant could take anything from the store.  Equipping the confidential informant with video and audio recording devices enabled Dorn to corroborate the informant's account of what transpired.  Even

though Dorn's review of the recordings indicated that Jewell Tutis, and not Toye Tutis, told the informant that he could take anything, Dorn failed to advise Judge DeLury of this discrepancy in the informant's account. Particularly in light of the informant's discrepancy, Dorn also should have notified the judge that a review of the video could not confirm that Tutis was present in the store and observed the transaction.

Following the *Franks* hearing, the district judge stated that he did not find that Dorn knowingly, intentionally, or recklessly misstated or omitted facts relating to Tutis' alleged presence at Dave's Store during the informant's drug purchase. A0188-89. The Court found that the video recording used to attempt to corroborate the event was "totally unclear" and the audio quality was similarly compromised, therefore providing little value in challenging the informant's version of events. A0187-88. Furthermore, the Court stated that "Detective Dorn's affidavit clearly states that he was relaying information provided to him by CI #607/CS-2, rather than independently verifying claims made by CI #607/CS-2." A0188. Although the Court found audio quality compromised, Detective Dorn testified that after hearing the recording, he recognized the voice of the person saying to take anything you want, to be that of Jewell Tutis. A0537:12-19. Pursuant to *United States v. Brown*, the subjective state of mind of the affiant is at issue. *Brown*, 631 F.3d at 645. Dorn expressed no doubt as to the voice on the recording. Unlike the district judge, Dorn

was familiar with Jewell Tutis' voice, as there had been numerous interceptions of telephone conversations involving Jewell Tutis. The district court erred in concluding that the audio quality was too compromised to allow Dorn to challenge the informant's version of the events. At best, Dorn was subjectively reckless in advising Judge DeLury of the informant's account of an alleged statement made by Toye Tutis, even though Dorn knew this account was inaccurate. The informant's apparent eagerness to place Toye Tutis at the scene of any drug transaction, should also have created serious doubt as to whether Toye Tutis was also at the store that morning. Moreover, Dorn's reference in his affidavit to the video and audio recording would suggest to Judge DeLury that any account presented on behalf of the informant was corroborated by the body recording devices. Dorn's failure to advise Judge DeLury of his inability to corroborate Toye Tutis' presence at the store was reckless.

### Dorn's statement that Jewell Tutis, rather than Toye Tutis, used the nickname "Santana."

In his affidavit, Dorn stated:

> On August 5, 2014, DSG Kellen, CI #607, and I, Detective Dorn, met at the predetermined meet location to place a recorded telephone call to Toye Tutis. CI #607 handed me a Taja Construction business card with the name "Jewel" and a telephone number of (609) 626-4684, and the name "Santana" with a telephone number (609) 431-2044. CI #607 told me that he/she was given this card by Toye Tutis on Monday August 4, 2014. CI #607 said he was instructed that when calling Toye Tutis, CI #607 was only to address him as "Santana" and use provided code words and terms to reference drugs."

A0216 at ¶23.  Dorn testified that before signing the affidavit, he was aware that Jewell went by the name Santana.  A0455:17-19.  He became aware of this through some four to five intercepted calls where Jewell referred to himself as Santana. A0455:8-A0456:2.  This should have created serious doubt in Dorn's mind as to the accuracy of the informant's account.  Dorn also testified that he attached transcripts of some of the intercepted calls of Jewell Santana to his affidavit, but did not attach transcripts of calls between September 22nd and September 25, where Jewell identified himself as Santana.  A0481:13-A0482:14.  This suggests not merely a reckless disregard for the truth, but rather a knowing attempt to mislead Judge DeLury.  As the Third Circuit stated in *Wilson*, "this was the kind of thing the magistrate would wish to know." *Wilson*, 212 F.3d at 788.

Given the obvious doubt as to whether Toye Tutis was using the alias, "Santana," Dorn could have taken minimal steps to determine the likelihood of this claim before presenting it in his affidavit.  However, Dorn failed to request a pen register for (609) 431-2044, which the informant advised was being used by Toye Tutis.  This number was presented as critical evidence in the investigation as Dorn alleges that his informant called this number requesting to purchase drugs, and the call was answered by Toye Tutis, who said "call my brother."  A0216 at ¶23.  When asked whether he sought to obtain subscriber information for this number, Dorn testified, "I don't know if I sent out subscribers.  That's my normal course of action

is to send out subscribers. But generally when dealing with drug trafficking and drug dealers, they'll come back to Mickey Mouse, Donald Duck, or the person drops the phone faster than you can get the subscriber back." A0524:2–25. This explanation is inconsistent with his affidavit, where Dorn stated that he reviewed various pen registers as part of this large-scale drug trafficking investigation. A0209 at ¶11. There was no apparent hesitation during this investigation to request pen registers.

The district judge also did not find that Dorn knowingly, intentionally, or recklessly misstated or omitted facts related to the identity of "Santana." A0186. The Court stated that "[w]hile evidence has been presented that Detective Dorn had seen evidence that Jewell sometimes referred to himself as "Santana" or "little Santana" prior to signing the affidavit, the Court credits Detective Dorn's testimony that he believed that the nickname referred primarily to Defendant Tutis, but that it may at other times have been used by Jewell Tutis as shorthand for the entire drug ring." A0186. The district court's conclusion is inconsistent with the evidence. Dorn cited to no intercepted calls or other reason that made him believe that Toye Tutis primarily used the alias, Santana. To the contrary, Jewell Tutis was the only person who identified himself as Santana in any of the intercepted calls.

***Toye Tutis gave CI #607 a business card, which contained handwritten telephone number for Toye Tutis under an alias of "Santana"***

Although paragraph 23 of his affidavit states that the confidential informant told him that Toye Tutis gave him the business card (A0216, A0563), Dorn subsequently wrote a report in February 2016 after a telephone interview with CI #607, indicating the informant stated the business card was given to him by Jewell Tutis.  A0562, A0457:7–A0459:5.  Dorn attempted to reconcile this discrepancy by stating that the February 10, 2016 report was "sloppy and inaccurate."  A0504:24 - A505:15.  However, it demonstrates subjective awareness of the source of the business card.  In the 2016 report, Dorn also stated that the confidential informant stated that Jewell Tutis instructed the confidential informant to write the names and numbers on the card.  A0562.  This is consistent with the misspelling of Jewell's name on the card,[3] which, when taken in totality with the other information presented by the informant, raised serious doubts as to the reliability of the informant's information.  No apparent attempt was made by Dorn prior to preparing his affidavit, to ascertain from CI #607 who wrote the names and numbers on the card.

---

[3] "Jewell" was incorrectly spelt as "Jewel" on the business card.

***Statement that Tutis was a target in an 18-month federal investigation without acknowledging this investigation's failure to lead to Tutis' prosecution.***

In his affidavit, Dorn stated:

> The present investigation is part of a long-term continuing joint federal, state and local law enforcement investigation targeted at several large-scale drug traffickers in Atlantic City and the surrounding southern New Jersey region, including Toye Tutis.  As part of this investigation, I am aware that federal law enforcement officers have used investigative techniques and obtained evidence that is not admissible in the New Jersey State Courts.  For example, while investigating targets of the investigation, federal law enforcement officers obtained various pen registers and Title III wiretaps, all of which were authorized by federal judges, but which may not comply with the stricter requirements of the New Jersey State Courts for various reasons, including because telephone records were obtained by subpoena rather than communication data warrant.  In addition, federal law enforcement officers have conducted searches of garbage ("trash pulls") without obtaining a search warrant, which I understand is not permissible under the law of the State of New Jersey.

> I am aware of the use of these various federal investigative techniques because I have participated in the joint investigation and because, in preparing for this application, I have reviewed all of the pen register and Title III wiretap applications affiliated with this investigation beginning in or about January 2012 and continuing through the present, and I have also spoken with federal case agents and confirmed with them the accuracy of the statements contained in this paragraph.  Based upon all of these things, I can state that Toye Tutis was named as Target Interceptee in one or more of the previous federal wiretap applications, and will be intercepted if the Court approves the present wiretap application.  A telephone number believed to have been by [sic] used by Toye Tutis had contact with the one of the wiretapped telephones via text message only, on a previous federal wiretap.

> . . . .

> Because much of the prior evidence obtained in this investigation stems from techniques which are not permissible under New Jersey law . . ., I have not relied upon and do not rely upon any evidence obtained through the use of these techniques in support of this application.
>
> Thus, the probable cause for the present wiretap application stems only from evidence and investigative techniques described in the other paragraphs of this affidavit, including the information provided by CI #607, and the subsequent investigation, including the controlled purchase of crack cocaine, and marijuana from Jewell E. Tutis.

A0209–A0211, ¶11.  Here, Dorn advises Judge DeLury that Toye Tutis was a target in a large-scale drug trafficking enterprise.  In one breath he mentions that the evidence obtained in the federal investigation would be inadmissible in state court as the federal investigative techniques are unlawful under state law.  In the next breath, he states that a telephone number believed to have been used by Toye Tutis had contact with one of the wiretapped phones.  While providing Judge DeLury with this evidence that he acknowledges would be improper in state court, in yet another breath he asks the court not to rely on the evidence obtained from the federal investigation.  Dorn's statements to Judge DeLury, suggests—without substantiation—that the federal investigation produce probable cause for the search warrant.  To counterbalance this effect, Dorn should have advised Judge DeLury that the federal investigation did not lead to the prosecution of Tutis.

In his opinion, the district judge stated that the Court had "no reason to conclude that a federal investigation's lack of evidence would somehow prevent or preclude a state investigation from successfully uncovering evidence by different

means." A0182. Absent the backdrop of Dorn's suggestion that the federal investigation produced probable cause for further investigation, Tutis agrees that this omission may be insignificant. However, because of the suggestion that the federal investigation produced probable cause, failure to advise Judge DeLury that the investigation did not lead to prosecution was a reckless omission.

### Statement that CI #607/CS-2 was reliable.

As to the reliability of the informant, Dorn stated:

> [I]n the world of informants, . . . you have to weigh out what they tell you. And in the case with this informant, he's been utilized before. He was reliable, he had proven that a lot of the stuff that he does or says comes to fruition. Not everything, but in this instance it was about the drugs. That's what I cared about. He may have in his mind correlated everything to Toye Tutis, because in 2012 that's the name he brought to me, that's the case I wanted to do. We went nowhere with it. We closed it out, it went nowhere.

A0511:14-A0512:8. Dorn's application relating to Tutis relied almost exclusively on information provided by CI #607. A0210. However, aside from his conclusory statement that the confidential informant was reliable, he failed to describe any basis for this assertion in his affidavit. Dorn wrote:

> The focus of this investigation has been on the alleged illegal narcotics distribution activities of Jewell E. Tutis, Toye Tutis, and other identified and as yet unidentified individuals, in the City of Somers Point and the City of Atlantic City, Atlantic County, and surrounding areas. Detectives, with the assistance of *a reliable confidential informant*, have conducted a recorded pertinent telephone call with Toye Tutis over the previously mentioned wireless telephone facility numbers (609) 431-2044 calling Toye Tutis by the alias he gave to CI #607, "Santana."

A0238 at ¶55.  When asked at the *Franks* hearing about substantiating the prior reliability of the confidential informant in his affidavit, Dorn explained that he does not include this information in affidavits out of concern for exposing them. A0512:9-20.  He conceded that the reference to the reliability of the informant was in simply stating that he was "a reliable confidential informant." A0512:21-A0513:13).

Dorn's simple statement that the confidential informant was reliable is precisely the mere conclusory statements that *Kaplan* cautions against. *Kaplan*, 526 Fed. Appx. at 212.  In *Kaplan*, the Third Circuit cited as an example of a "bare-bones affidavit," an affiant's statement that he "received reliable information from a credible person." *Id*.    Although Dorn testified that he excluded additional information relating to the informant out of an interest in protecting the identity of the informant, his application also requested—and the Court agreed—to seal the application.  A0251 at ¶78, A0282.  There was therefore no risk of exposing the informant.

In describing the confidential informant as reliable, Dorn ignored the multiple inconsistencies in the information the informant provided.  In an apparent desire to affiliate Toye Tutis with this investigation, the informant falsely placed Toye Tutis at Dave's Store when he made a drug purchase from Jewell Tutis, by falsely stating that Toye told him he can take anything that he wanted from the store.  Dorn was

also aware that the informant told him on one hand that Toye Tutis initially approached the informant, A0214 at ¶19, while on the other hand stated that the informant approached Toye Tutis and asked Tutis whether Tutis had any work available for him. A0215 at ¶21. Also, despite the informant's accounts of having spoken to Toye Tutis, Dorn testified that between his informant's alleged initial July 15, 2014 contact with Toye Tutis to the date of the September 26, 2014 affidavit, surveillance never depicted Toye Tutis and the informant together. A0489:14-A0490:7.

From intercepted calls involving Jewell Tutis, Dorn also knew that Jewell Tutis referred to himself as "Santana," even though the informant had told him that Santana was Toye Tutis' alias. At the *Franks* hearing, Dorn also testified that he used this confidential informant in a 2012 investigation involving Toye Tutis, which "went nowhere," forcing them to "close [the case] out. A0511:14-A0512:8. These all undermine Dorn's conclusory statement that CI #607 was reliable. To the extent that Dorn stated that the probable cause for the wiretap application stemmed from "investigative techniques . . . including the information provided by CI #607," A0210, information relating to CI #607's reliability, or lack thereof, should have been included in Dorn's application.

In his May 23, 2019 opinion, the district judge stated, "Detective Dorn credibly indicated during his testimony that he considered CI #607/CS-2 to be a

reliable source in part due to his prior work as an informant with ACPO and due to his production of verified intelligence in this investigation . . . . Such intelligence included providing investigators with code words used by members of the Tutis drug ring to conceal discussions of types and quantities of certain drugs offered for sale by the ring." A0192.  The Court's findings overlook Dorn's testimony that he attempted to use this informant in a 2012 investigation involving Toye Tutis, which "went nowhere." A0511:14-A0512:8.   Moreover, although the informant successfully purchased drugs and provided verifiable code words for the purchase of these drugs, the code words were used in drug transactions with Jewell Tutis, not Toye Tutis.  The drug purchases were also made from Jewell Tutis, not Toye Tutis. Attempts to confirm  purported interactions between the informant and Toye Tutis were never corroborated.   Surveillance also did not depict Toye Tutis and the informant together.

The district judge found that "Detective Dorn did not make any incorrect statements knowingly, intentionally, or with reckless disregard for the truth. Additionally, the Court [found] that Detective Dorn's alleged false statements or omissions were not necessary to the finding of probable cause for the September 26, 2014 Wiretap Order and that there was a reasonable basis for Detective Dorn's representation." A0176-77.  As to Dorn's credibility, the Court wrote:

> Detective Dorn testified that at the time he signed his affidavit, he believed all the statements contained therein to be truthful and accurate,

including the information provided to him by CI #607/CS-2. . . . . Detective Dorn's testimony at the *Franks* hearing was clear, internally consistent, and consistent with the documentary record. The Court finds he was credible in all material respects. The Court rejects Defendant Tutis' argument attempting to impeach Detective Dorn's credibility and finds Detective Dorn's testimony to be highly credible and worthy of significant weight.

A0181.

The district court also denied Tutis' request to excise paragraphs 19, 21, 23 and 44 from the affidavit. A0189. The Court found that even if those paragraphs contained knowing or reckless incorrect statements, the following statements which remained in the affidavit would provide probable cause:

a.    Defendant Tutis is a prominent member of a narcotics distribution operation in and around Atlantic City, New Jersey. Defendant Tutis changed his phone number on three (3) occasions and that he changed his phone number often, in a deliberate effort to thwart detection by law enforcement.

b.    Defendant Tutis held himself out as a legitimate businessperson, meanwhile he was a "a multi-kilogram distributor of cocaine, and the leader of a large narcotics trafficking network."

c.    Jewell Tutis told CI #607/CS-2 that he worked under his brother Defendant Tutis and that they trafficked in narcotics and in weapons.

d.    Between August 6 and September 23, 2014, CI #607/CS-2 coordinated and engaged in numerous drug purchases from Jewell Tutis, often using the code language communicated to him by Defendant Tutis and often occurring at the apartment complex where Defendant Tutis' company was contracted to do maintenance.

e.    Jewell Tutis told CI #607/CS-2 that he and Defendant Tutis are able to obtain and sell fraudulent driver's licenses from any state and CI #607/CS-2 had a fraudulent Georgia driver's license made for himself.

f.    Numerous conversations were recorded between a phone number that was the subject of a separate wiretap on Jewell Tutis and the target number in this application, (424) 646-1761, regarding the trafficking of fraudulent driver's licenses. Investigators believed that the individual using (424) 646-1761 was Defendant Tutis, Jewell Tutis' brother, who they identified by the character of his voice and the vocabulary that he used, including references to their "mom" and references to "the mat," which investigators took to refer to the Ta'Ja Laundromat owned by Defendant Tutis.

g.    Through Detective Dorn's training and experience, he believed that the Tutises were utilizing the fraudulent driver's licenses to open post office boxes under false names that they could then use to deliver packages of narcotics.

A0189-A0191.  For reasons discussed above, these statements also fail to provide probable cause.  Paragraphs (a) and (b) for example, were merely conclusory statements without substantiation. Paragraph (c) is merely an unsubstantiated allegation from an informant with questionable reliability.  The several drug purchases referenced in paragraph (d) all involved Jewell Tutis, rather than Toye Tutis.  Although the informant attempted to place Toye Tutis at Dave's Store, Dorn discredited the informant's claim that Toye told the informant to take anything he wanted from the store. Paragraphs (f) and (g) also relate to fraudulent driver's licenses as opposed to drug trafficking—the nature of the underlying investigation. With the omission of the proposed recklessly false statements from the affidavit, the

affidavit lacks probable cause to warrant any wiretap authorization against Toye Tutis.

### III.    The October 14, 2014 Order authorizing the use of a cell-site simulator violated the Fourth Amendment as it was based upon an affidavit that lacked probable cause.

#### *Standard of Review*

The Third Circuit reviews the district court's denial of a motion to suppress for clear error as to the underlying factual determinations but exercises plenary review over the district court's application of law to those facts." *United States v. Murray*, 821 F.3d 386, 390-91 (3d Cir. 2016); *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011).

#### *Discussion*

On October 14, 2014, Judge DeLury issued a Communications Data Warrant order authorizing, *inter alia*, Dorn and other law enforcement members who assist in the investigation, to use "electronic equipment" to retrieve Electronic Serial Numbers, Mobile Telephone Numbers or International Mobile Equipment Identification Numbers from all wireless telephone facilities used by Tutis.  A0296-97.

The supporting affidavit did not specifically identify the use of a cell-site simulator, but generically referred to this instrument as "equipment."  A0287 at ¶4. In an apparent effort to describe this "equipment," Detective Dorn stated:

Members of law enforcement have access to equipment, which is capable of retrieving wireless instrument identification information of the said wireless facility or facilities utilized by TOYE TUTIS. The said wireless instrument identification information obtained through the use of the aforesaid equipment will provide the information necessary to enable the person implementing the interception order to ascertain the facility or facilities from which the communication is to be intercepted. The equipment utilized to retrieve Electronic Serial Number (ESN), Mobile Telephone Number (MSISSDN) and International Mobile Subscriber Identification Number (IMSI) will not be used to obtain any written or oral communications. Its only function is to identify the Electronic Serial Number; Mobile Telephone Number or International Mobile Subscriber Identification Number that is unique to a particular cellular telephone facility.

A0293 at ¶9. In requesting the use of this "equipment," Dorn failed to describe the

intrusive nature of the equipment. In its October 20, 2016 opinion, the district court

described a cell-site simulator as follows:

[A] cell-site simulator ("CSS") is a device used by law enforcement to simulate a cell tower in order to obtain information related to the presence of cell phones in an area proximate to a suspect's physical presence. By gathering identifying signals from many cell phones in proximity, and then gathering new samples from other locations where the suspect is present at other times, a law enforcement officer can narrow the list of identified cell phones to those that watch the suspect's locations and eliminate the many that do not appear to follow the suspect from one place to another. By such process of elimination, the officer can deduce the phone numbers which may belong to the suspect, and then match those few numbers to numbers known to be involved in the illegal transactions. Thus, from an array of cell phone identification data at various locations where the suspect is known to be when the CSS is used, the officer can by process of elimination and deduction narrow the field to the data associated with the suspect's cell phone or phones. As one federal court recently described it:

[B]y simulating a cell site, the device causes or forces cell-phones in an area to send their signals – with all the information contained therein –

to the cell-site simulator. Once the cell phones in the area send their signals to the cell-site simulator, the device captures a vast array of information, including, but not limited to, the cell phones' electronic serial number ("ESN") or international mobile subscriber identification ("IMSI"). A cell phone need only be on for the cell-site simulator to capture the cell phone's ESN and IMSI; the cell phone need not be "in use."

A0051-52. (citing *In the Matter of the Application of the of Am. for an Order Relating to Telephones Used by Suppressed*, No. 15-0021, 2015 WL 6871289 at *2 (N.D. Ill. Nov. 9, 2015)).

In this case, the cell-site simulator was used to penetrate the walls of Tutis' home and business. A0064, n. 9. In his affidavit, Dorn failed to advise Judge DeLury of the anticipated invasion into Tutis' home and business. He vaguely stated, that the ACPO would "utilize the equipment in close proximity" to Tutis "at different geographical locations." A0288 at ¶4. In *Osborn v. United States*, 385 U.S. 323 (1966), the Supreme Court stated that the "indiscriminate use of [electronic communication] devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments," and imposes "a heavier responsibility on this Court in its supervision of the fairness of procedures" *Id*. at 329, n. 7.

Although stipulating that the use of the cell-site simulator was a search of Tutis' home and business, the Government claimed it was conducted pursuant to a properly obtained warrant, and was therefore valid under the Fourth Amendment. A0064 n. 9. However, Dorn's failure to forthrightly and adequately describe the

scope of the cell-site simulator invalidated the warrant. See *Horton v. California*, 496 U.S. 128, 140 (1990) ("If the scope of the search exceeds that permitted by the terms of a validly issued warrant . . . the subsequent seizure is unconstitutional without more.")

The district court concluded that the use of the cell-site simulator was reasonable, stating "[w]here a court has authorized the use of the CSS device for the limited purpose of obtaining electronic identifiers from cell phones within the vicinity of the targeted individual, any intrusion by the CSS's electronic signal into the home is both de minimis and reasonable under the Fourth Amendment." A0064-65.   The district court also found that "if in the home one did not wish to communicate identifying data, one need only turn the cell phone off." A0064. However, this evidence was not established in the record.   Moreover, this court can take judicial notice of society's dependence and reliance on cellphones, and conclude that turning off one's cell phone is not a reasonable requirement to protect one's privacy interest.

In support of his request for a warrant to use the cell-site simulator, Dorn also stated his intent to "utilize this technology in an effort to identify additional telephone facility numbers being utilized by TOYE TUTIS or telephone facility numbers that he may utilize during the period of the requested interception." A0293

at ¶9.   He relied extensively on conclusory allegations that Tutis changed his

telephone numbers frequently to thwart interception.  He stated:

> There is probable cause to believe that TOYE TUTIS has demonstrated
> his willingness to change his wireless telephone facility number and
> International Mobile Subscriber Identity (IMSI) number, while
> continuing his criminal conduct, and  will continue  to change wireless
> telephone facilities with the purpose to thwart interception by members
> of   law enforcement. (See Paragraph 8K, infra).   I request this
> Communications Data Warrant because TOYE TUTIS has in the past
> changed wireless telephone facilities or devices and has used multiple
> telephone facilities at the same time with a purpose to thwart detection
> or interception by law enforcement, and has clearly evidenced his
> intention to continue to change wireless telephone facilities or devices
> for that purpose.
>
> . . . .
>
> During the course of this investigation, TOYE TUTIS has utilized at
> least four (4) different telephone facilities in furtherance of the
> specified crimes.   TOYE TUTIS has demonstrated a pattern of
> changing telephone facilities on a frequent basis.  TOYE TUTIS' most
> recent addition of telephone facilities is described in paragraph 8D, E,
> supra. Based on my training and experience, I know that TOYE TUTIS'
> use of various telephones is consistent with common practice among
> dealers in narcotics who do this in an effort to avoid law enforcement
> detection.   Further, TOYE TUTIS uses pre-paid telephone facilities
> with no subscriber information.

A0287 at ¶3A, A0292 at ¶ K. These allegations are similar to the bare-bones

allegations made by Detective Dorn in his September 26, 2014 affidavit.  There, he

stated: "Toye Tutis, during this investigation, has changed his prepaid wireless

telephone facility number on three (3) occasions, and told CI #607 that he, Toye

Tutis, changes his phone number often . . . .  I believe Toye Tutis utilizes prepaid

accounts and frequently changes his telephone facility number as part of a deliberate effort to thwart detection by law enforcement . . . ." A0211 at ¶13.  In his October 14, 2014 affidavit, Dorn describes an intercepted call from Tutis "facility 1" (424-646-1761) as recently as October 7, 2014, just days before the October 14, 2014 affidavit.  A0291 at ¶H.  This facility is the same facility cited in Detective Dorn's September 26, 2014 affidavit, where Dorn requested a roving wiretap based on the same allegation that Tutis frequently changes his phones.  As discussed in Point I above, there was no substantiation of these three changes.  In the October 10, 2014 affidavit, Dorn similarly stated that Tutis had changed his phone number on four occasions.  As with the first three alleged changes, he failed to substantiate the alleged fourth change in this affidavit.  For the same reasons discussed in Point I above, the October 10, 2014 Affidavit lacked probable cause to indicate that Tutis changes his telephone numbers frequently.  Authorizing the use of a cell-site simulator to obtain alleged new numbers was therefore improper.

**IV.    The District Court abused its discretion by not permitting Tutis to withdraw his guilty plea based on the involuntariness of the plea and the Court erred in denying Tutis' plea withdrawal based on the ineffective assistance of counsel.**

### *Standard of Review*

The denial of a motion to withdraw a guilty plea is reviewed for abuse of discretion. *United States v. Huff*, 873 F.2d 709, 712 (3d Cir. 1989). The ineffective assistance of counsel claim is reviewed *de novo. United States v. Cross*, 308 F.3d 308, 314 (3d Cir. 2002).

### *Discussion*

A district court may permit a guilty plea to be withdrawn before sentence is imposed if "the defendant can show a fair and just reason for requesting the withdrawal." *Fed. R. Crim. P.* 11(d)(2)(B). "When determining whether a defendant has shown a 'fair and just reason' for withdrawing a plea, a district court must consider whether: '(1) the defendant asserts his innocence; (2) the defendant proffered strong reasons justifying the withdrawal; and (3) the government would be prejudiced by the withdrawal." *United States v. Siddons*, 660 F.3d 699, 703 (3d Cir. 2011) (citation omitted). Reasons such as "[a] shift in tactics, a change of mind, or the fear of punishment are not adequate" for withdrawing a guilty plea. *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001).

Tutis sought to withdraw his November 1, 2016 guilty plea, arguing that it was involuntary, and based on pressure stemming from the packaged nature of his

and his wife's plea offers. In the course of pleas negotiations, the Government made it clear that Tutis' plea agreement had to be tied to his wife's. One email from the Government containing a plea offer stated, "[t]his must be a package deal: either both plead guilty according to the terms below, or there will be no deal." A0770. Tutis insisted that he only accepted the plea because he wanted to minimize the sentence of his wife and codefendant, Vega. After Tutis rejected a plea offer on October 31, 2016, the Government increased the recommended sentence in Vega's plea from a maximum of 60 months incarceration to a maximum of 78 months. A0807-A0810 at ¶¶ 6, 7. By the next day, Tutis accepted the plea offer made to him. A0696.

The Third Circuit described a packaged plea as a plea deal "where the government accepts a defendant's guilty plea on the condition that his co-defendant(s) also plead guilty." *United States v. Hodge*, 412 F.3d 479, 490 (3d Cir. 2005) (citation omitted). The Third Circuit warned that "[f]amilial or fraternal coercion of putative confederates in package plea deals is a serious concern" and further warned that "offers of leniency or adverse treatment for some person other than the accused . . . might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider." *Id*. at 489 (citations omitted). The Third Circuit provided the following guidance to district courts conducting colloquy within the context of package deals:

At the threshold, a district court notified of a package deal plea bargain should question counsel closely to ensure that the precise terms of the package plea deal are on the record. Fed. R. Crim. P. 11(b)(2), 11(c)(2). Once it is clear exactly how a defendant's plea benefits his confederate(s), it may be helpful to ask who first proposed the package deal, how extensively defense counsel was involved in developing the deal, and what benefit the defendant expects to gain from the deal. When asking whether a plea is a product of force, threats, or inducements and the like, a district court should take care not to ask only whether the prosecutor forced, threatened or coerced the defendant, but whether anyone did so. Having so inquired, the court should be particularly attuned to even mild expressions of reluctance by a defendant. Such expressions always should trigger a more searching inquiry.

*Id.* at 491-92.

At the plea hearing, the parties failed to notify the Court that Tutis' and Vega's pleas were packaged. The Court therefore did not conduct a "thorough and searching" colloquy into the voluntariness of the pleas. Tutis argued that a colloquy consistent with *Hodge*, would have revealed that this guilty plea was not voluntary. Tutis also argued that notwithstanding his plea colloquy professing guilt, he was innocent. His motivation in pleading guilty was to minimize Vega's sentence.

At a June 21, 2017 hearing, Vega testified that on the evening of October 31, 2016 during a telephone conversation with Tutis, Tutis told her "I'm going to end it for you tomorrow. . . . I'll take the stipulated joint." A0860:20 - A0861:8, A0988-1009. Vega interpreted this to mean that Tutis would sign the deal. *Id.* The following day, Tutis accepted the plea offer. A0696-A0714.

Vega also testified that approximately four hours after the plea hearing, she emailed Tutis, stating:

> BABY I LOVE LOVE LOVE ME SOME YOU OH SO VERY MUCH AND I HEART HURT SO BAD BECAUSE I FEEL GUILTY NOW KNOWING YOU ONLY DID WHAT YOU DID FOR ME AND IT SOMETHING YOU DIDN'T WANT TO DO SO I FEEL HORRIBLE TO FEEL THAT ALL YOU DID FOR ME IS IT REALLY WORTH IT :( I'M SO SORRY AND I WILL FOREVER FEEL GUILTY TILL YOU GET OUT OF THERE. I LOVE YOU SO MUCH AND AGAIN I'M SO SORRY YOU FELT PRESSURED TO DO THAT :( . . ."

A0862:23 - A0864:18, A1010.

The Government argued that although the plea negotiations initially involved coupled pleas, by the time the final pleas were signed, they were uncoupled. The Government relied on the November 1, 2016 final version of the plea offer, from which all plea packaging language was removed. The October 27, 2016 plea offer to Tutis stated, this plea "is contingent upon the execution of a plea agreement dated October 27, 2016 by co-defendant Toye Tutis [sic], and the entry of her guilty plea pursuant to that agreement." A0774 at ¶1. A plea offer issued on the same day on behalf of Vega had complementary language. A0788. This language was removed from the final November 1, 2016 plea agreement. A0696. Farrell testified that he was not informed or aware that the Government had decoupled the pleas. He testified that he did not reread the first page of the plea agreement or read the agreement "word for word." A1023:23 - A1024:2. He testified that he "missed" the excision of the "coupling language" from the final agreement. A1025:14-23,

A1126:14-19.  He further testified that he committed a "mistake" by not looking back at other parts of the agreement once each issue was disposed of.  A1203:12-19. Farrell testified that he did not notice the excision until Tutis filed his motion to withdraw his plea.  A1024:17 – A1026:1.  Consequently, he never informed Tutis that his plea was unpackaged and that it had no effect on his wife's plea.

The district court agreed with the Government that the pleas were no longer packaged by November 1, 2016.  A0108.  The Court denied Tutis' motion, finding that Tutis did not assert his innocence in any plausible way and did not present a strong reason justifying the withdrawal of the plea.  The Court also found that the Government would not have been especially prejudiced by withdrawal of the plea. A0128-29.

Tutis filed a second motion to withdraw his guilty plea, arguing that his guilty plea was not knowing.  He argued that Farrell was ineffective by not reading the final version of his plea agreement and not informing him that his plea agreement was no longer packaged.   A1397, A1399-1401 at ¶¶ 16, 17.  He stated:

- On November 1, 2016, Farrell recommended that he accept the offer as that was the only way to help his wife, given the packaged nature of the agreements.

- He was not aware at the time of the plea hearing that Vega's attorney had worked out a decoupled deal for her.

- At the hearing on his initial motion to withdraw his plea, he became aware that the Government had removed "coupling" language from the plea agreement.

- Farrell never advised him that the deal was unpackaged.

- If he knew the deal was unpackaged, he would not have accepted the plea offer and would have immediately opted for a trial.

- Given his age, the final offer was not attractive. It included sentencing recommendation of 15 to 27.5 years. He considered 27.5 years to be a "life sentence," as he would be approximately 70 years old after serving this sentence.

- He accepted the plea offer to help Vega. He relied on Farrell's representation that he had to do this because the plea agreements were packaged.

A1399-1401.

The Sixth Amendment guarantees every defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). That right extends to the plea-bargaining process. *Missouri v. Frye*, 566 U.S. 134, 144 (2012. The Supreme Court has held that "[t]he benchmark of judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [court] cannot be relied on having produced a just result." *Strickland*, 466 U.S. at 686. Under the *Strickland* standard, ineffective assistance of counsel is established when the defendant shows that (1) trial counsel's performance was deficient, i.e., that he or she made errors so egregious that they failed to function as the "counsel guaranteed the defendant by the Sixth Amendment," and (2) the deficient performance prejudiced the defendant enough to deprive him of due process of law. *Id.* at 687. Specifically, "[t]he

47

defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"A convicted defendant making a claim of ineffective assistance must identify the particular acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

In the context of a guilty plea, a successful ineffective assistance of counsel claim requires a defendant to show that (1) "counsel's representation fell below an objective standard of reasonableness," *Hill v. Lockhart*, 474 U.S. 52, 57 (1985) (citations omitted); and (2) "there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.  Here, both prongs are satisfied.

### *Farrell's representation fell below an objective standard of reasonableness.*

Farrell made the unprofessional error of failing to realize that the Government had excised language from Tutis' final plea agreement, essentially unpackaging the agreement.  He failed to thoroughly read the final version of the agreement, and therefore failed to accurately explain to Tutis that the agreement was no longer

packaged. Farrell testified that he "missed" the decoupling language and committed a "mistake" by not looking back at other parts of the agreement once each issue was disposed of. Based on Farrell's misunderstanding that the agreements were coupled, he failed to inform Tutis that the final agreement was no longer coupled—in effect, failing to advise Tutis that it was no longer necessary for him to sign an otherwise unfavorable and unacceptable agreement, for the sole purpose of protecting his wife.

Standard 4-6.2(c) of the American Bar Association Criminal Justice Standards for the Defense Function provides: "Defense counsel should ensure that the client understands any proposed disposition agreement, including its direct and possible collateral consequences." Similarly, Standard 4-6.3(a) provides, "Defense counsel should ensure that any written disposition agreement accurately and completely reflects the precise terms of the agreement, including the prosecution's promises and the client's obligations and whether any dismissal of charges will be with or without prejudice to later reinstatement." ABA Criminal Justice Standards for the Defense Function (4th ed. 2018). Here, Farrell's conduct was below the standard established by the American Bar Association. He failed to ensure that Tutis understood the proposed plea agreement and failed to ensure that this agreement accurately and completely reflected the precise terms of the agreement.

As a consequence of Farrell's ineffectiveness, Tutis was  misinformed about a major component of his final plea agreement. Accordingly, he was unable to make

a knowing and informed  decision in the critical dispositive plea negotiation phase

of his proceedings.  See *Conklin v. Hannoch Weisman*, 145 N.J. 395, 413 (1996) (An

attorney in a counselling situation must advise a client of the risks of the transaction

in terms sufficiently clear to enable the client to assess the client's risks).

### There is a reasonable probability that, but for counsel's errors, Tutis would not have pleaded guilty and would have insisted on going to trial.

Tutis asserted that the only reason he entered the plea agreement was because

he believed it would help Vega.  In the course of negotiations, the recommended

sentencing cap to Vega had increased from 60 months to 78 months.  Tutis perceived

this increase to have stemmed from his unwillingness to accept earlier offers.

Although the final offer did not include everything he hoped for, he ultimately

accepted this offer as he believed every delay worsened the offer being presented to

Vega.  Farrell testified and Tutis states that Tutis was concerned about the sentencing

recommendation in the final offer made to him.  At his age, he considered a 27.5-

year recommended sentence to be a "life sentence."  He stated that if he understood

his plea agreement was no longer tied to that of  Vega, he would not have accepted

the agreement, and would have opted for trial.

Tutis' acceptance of the plea agreement as a result of attorney mistake and

without knowledge of the true terms of the agreement to allow an intelligent

evaluation of the risks, constitutes a strong reason to justify withdrawal under

*Siddons*.  However, the district court denied Tutis' motion based on ineffective

assistance of counsel. The Court rejected Tutis' claim, finding that Tutis failed to show that Farrell's representation surrounding the negotiations, advice, and entry of Tutis' guilty plea was not "within the range of competence demanded by attorneys in criminal case." A0144 . The Court also found that even if Farrell were ineffective, Tutis did not show that he was prejudiced—he failed to show that he would not have entered his plea of guilty if he knew the plea was unpackaged. A0145. The Court found that "[h]is testimony that he would have opted for trial rather than entering the favorable plea that he bargained for is not logical or credible." A0145-46. The Court also found that Tutis failed to assert his innocence in any plausible way and that the Government was prejudiced given the passage of some two and one-half years since the entry of the plea. A0146-47. The Court's finding that Tutis' assertion that he would have opted for trial but for Farrell's advice lacks credibility is inconsistent with Tutis' persistent attempts to withdraw his plea. It is also inconsistent with unguarded communications between Tutis and Vega expressing their mutual sentiments that Tutis did not want to accept the plea offer, but did so under the mistaken belief that he was benefitting Vega.

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that this Court reverse the district court orders denying his suppression motions based on the absence of probable cause for the September 26, 2014 and October 14, 2014 wiretap orders. He further requests that this Court reverse the Orders of the district court denying his motions to withdraw his guilty plea.

Respectfully submitted,

/s/ Stanley O. King
Stanley O. King, Esquire
King & King, LLC
231 S. Broad Street
Woodbury, NJ 08096
(856) 845-3001
(856) 845-3079 (Fax)
Attorneys for Appellant Toye Tutis

Dated: June 4, 2020

## CERTIFICATE OF COUNSEL, SERVICE AND COMPLIANCE

In accordance with Rules 32(a)(7)(B) and (C) of the Federal Rules of Appellate Procedure, the undersigned counsel for appellant certifies that the accompanying brief is printed in 14 point typeface, with serifs, and, including footnotes, contains no more than 13,000 words. According to the word-processing system used to prepare the brief, Microsoft Word, it contains 12,987 words.

Respectfully submitted,

s/ *Stanley O. King*
Stanley O. King

Dated:  June 4, 2020

**Stanley O. King further certifies:**

1.      I am an attorney licensed in the State of New Jersey and I am admitted to practice in the District of New Jersey and before the United States Court of Appeals for the Third Circuit.

2.      I caused electronic copies of Appellant's Brief and Appellant's Appendix to be filed today, June 4, 2020.

3.      I also caused copies of Appellant's Brief and Appellant's Appendix to be served today, June 4, 2020, upon the United States by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system, upon:

Mark Coyne
Assistant United States Attorney
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07102

Mark.coyne@usdoj.gov

4. I will further cause copies of Appellant's Brief and Appellant's Appendix to be served on June 5, 2020, the next business day, upon Appellant Toye Tutis, by personally depositing those items in the United States mail addressed to:

Toye Tutis
Reg. # 67059-050
Federal Correctional Institution-Gilmer
P.O. Box 6000
Glenville, WV 26351

5.    The text of the electronic brief is identical to that in the paper copies.

6.    The brief and appendices have been scanned with Norton AntiVirus software and no virus was detected.

The foregoing is true and correct to the best of my knowledge and information. I am aware that if any of the foregoing is willfully false, I am subject to sanctions.

Respectfully submitted,

s/ *Stanley O. King*
Stanley O. King

Dated:  June 4, 2020

# In the United States Court of Appeals for the Third Circuit

## No. 19-2106 & 19-2380

UNITED STATES OF AMERICA,

v.

TOYE TUTIS,

Appellant

ON APPEAL FROM A FINAL JUDGMENT OF
CONVICTION OF THE
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY
(D.N.J. Crim. No. 14-699 (RMB))

APPENDIX VOLUME I OF VI (A0001 – A0201)

Stanley O. King
King & King LLC
231 South Broad Street
Woodbury, New Jersey 08096
(856)845-3001
stan@kingslaw.com
Attorney for Appellant
Toye Tutis

# TABLE OF CONTENTS

| VOLUME I (Pages A0001 – A0201) (Bound with Brief) | | | |
|---|---|---|---|
| **Docket No.** | **Date** | **Document Description** | **Page No.** |
| 263 | 03/08/16 | Order Denying Defendant Toye Tutis' Motion to Suppress (Docket Item <u>234</u>) | 0001 |
| 264 | 03/08/16 | Opinion as to Toye Tutis, Kabaka Atiba re: <u>222</u> & <u>234</u> motions | 0002-0035 |
| 338 | 09/12/16 | Order Concerning Defendants' Various Pretrial Motions as to Toye Tutis, Kabaka Atiba, Jazmin Vega: Tutis <u>322</u> Motion | 0036-0038 |
| 385 | 10/20/16 | Opinion as to Toye Tutis, Jazmin Vega (denying Motion to Suppress Evidence Obtained by Cell-Site Simulator) | 0039-0074 |
| 386 | 10/20/16 | Order Denying <u>322</u> Motion to Suppress with regard to the cell-site simulator issue as to Toye Tutis | 0075-0076 |
| 388 | 10/21/16 | Order as to Toye Tutis (denying defendant's motion <u>322</u> to suppress evidence intercepted as a result of the September 26, 2014 Wiretap Order) | 0077-0079 |
| 556 | 11/13/18 | Opinion as to Toye Tutis (re: first Motion to Withdraw Guilty Plea) | 0080-0130 |
| 557 | 11/13/18 | Order denying <u>443</u> Motion to Withdraw Plea of Guilty as to Toye Tutis | 0131 |

| 580 | 04/26/19 | Opinion Filed as to Toye Tutis (re: second Motion to Withdraw Guilty Plea) | 0132-0147 |
| 581 | 04/26/19 | Order Denying 568 Second Motion to Withdraw Plea of Guilty | 0148 |
| 585 | 05/14/19 | Notice of Appeal by Toye Tutis | 0149-0150 |
| 587 | 05/23/19 | Opinion Filed as to Toye Tutis, Jazmin Vega | 0151-0196 |
| 588 | 05/23/19 | Order (denying Defendant Toye Tutis' motion to suppress evidence intercepted as a result of the September 26, 2014 Wiretap Order) | 0197-0199 |
| 593 | 06/13/19 | Notice of Cross-Appeal by USA as to Toye Tutis | 0200-0201 |

# TABLE OF CONTENTS

## Appendices I through VI
## (Pages A0001 – A1535)

| | VOLUME I<br>(Pages A0001 – A0201)<br>(Bound with Brief) | | |
|---|---|---|---|
| **Docket No.** | **Date** | **Document Description** | **Page No.** |
| 263 | 03/08/16 | Order Denying Defendant Toye Tutis' Motion to Suppress (Docket Item <u>234</u>) | 0001 |
| 264 | 03/08/16 | Opinion as to Toye Tutis, Kabaka Atiba re: <u>222</u> & <u>234</u> motions | 0002-0035 |
| 338 | 09/12/16 | Order Concerning Defendants' Various Pretrial Motions as to Toye Tutis, Kabaka Atiba, Jazmin Vega: Tutis <u>322</u> Motion | 0036-0038 |
| 385 | 10/20/16 | Opinion as to Toye Tutis, Jazmin Vega (denying Motion to Suppress Evidence Obtained by Cell-Site Simulator) | 0039-0074 |
| 386 | 10/20/16 | Order Denying <u>322</u> Motion to Suppress with regard to the cell-site simulator issue as to Toye Tutis | 0075-0076 |
| 388 | 10/21/16 | Order as to Toye Tutis (denying defendant's motion <u>322</u> to suppress evidence intercepted as a result of the September 26, 2014 Wiretap Order) | 0077-0079 |
| 556 | 11/13/18 | Opinion as to Toye Tutis (re: first Motion to Withdraw Guilty Plea) | 0080-0130 |
| 557 | 11/13/18 | Order denying <u>443</u> Motion to Withdraw Plea of Guilty as to Toye Tutis | 0131 |

| 580 | 04/26/19 | Opinion Filed as to Toye Tutis (re: second Motion to Withdraw Guilty Plea) | 0132-0147 |
| 581 | 04/26/19 | Order Denying <u>568</u> Second Motion to Withdraw Plea of Guilty | 0148 |
| 585 | 05/14/19 | Notice of Appeal by Toye Tutis | 0149-0150 |
| 587 | 05/23/19 | Opinion Filed as to Toye Tutis, Jazmin Vega | 0151-0196 |
| 588 | 05/23/19 | Order (denying Defendant Toye Tutis' motion to suppress evidence intercepted as a result of the September 26, 2014 Wiretap Order) | 0197-0199 |
| 593 | 06/13/19 | Notice of Cross-Appeal by USA as to Toye Tutis | 0200-0201 |

| | | **VOLUME II**<br>**(Pages A0202  - A0301)** | |
|---|---|---|---|
| **Docket No.** | **Date** | **Document Description** | **Page No.** |
| | 09/26/14 | Affidavit in Support of Application for Communications Data Warrant<br>*(Filed Under Seal)* | 0202-0269 |
| | 09/26/14 | Communications Data Warrant Order<br>*(Filed Under Seal)* | 0270-0285 |
| | 10/14/14 | Affidavit in Support of Application for Communications Data Warrant<br>*(Filed Under Seal)* | 0286-0295 |
| | 10/14/14 | Communications Data Warrant Order<br>*(Filed Under Seal)* | 0296-0297 |
| | 10/24/14 | (Friday Report) Letter to Hon. Bernard E. DeLury, J.S.C. from ACPO's Janet Gravitz<br>*(Filed Under Seal)* | 0298-0300 |
| | | Activity Record for Target Phone 424-646-1761<br>*(Filed Under Seal)* | 0301 |

| | | **VOLUME III**<br>**(Pages A0302 – A0687)** | |
|---|---|---|---|
| **Docket No.** | **Date** | **Document Description** | **Page No.** |
| | 03/04/20 | Criminal Docket Report<br>for Case No. 1:14-cr-00699-RMB (D.N.J) | 0302-0331 |
| 234 | 01/19/16 | Motion to Suppress Wiretap Evidence by Toye Tutis | 0332-0333 |
| | 02/10/16 | U.S.'s Memorandum in Response to Defendant's Pretrial Motion Opposing Motion to Suppress (relevant portion) | 0334-0337 |
| 322 | 07/29/16 | Omnibus Motion of Toye Tutis | 0338-0344 |
| | 08/19/16 | Government's Memorandum of Law in Response to Defendant Toye Tutis' 2nd Set of Pretrial Motions by Toye Tutis (relevant portion) | 0345-0349 |
| 339 | 09/14/16 | Second Superseding Indictment as to Toye Tutis, *et al*. | 0350-0375 |
| | 10/17/16 | Transcript of *Franks* Hearing | 0376-0561 |
| | 02/18/16 | ACPO Investigation Report by Det. Jason Dorn, Re: 2/10/16 Narrative<br>(10/17/16 Hearing Exh., JD-33) | 0562 |
| | | TA'JA Construction Business Card<br>(10/17/16 Hearing Exh., 2028) | 0563 |
| | 10/19/16 | Transcript of *Franks* Hearing | 0564-0687 |

| | VOLUME IV<br>(Pages A0688 – A1010) | | |
|---|---|---|---|
| **Docket No.** | **Date** | **Document Description** | **Page No.** |
| 397 | 11/01/16 | Application for permission to enter Plea of Guilty as to Toye Tutis | 0688-0695 |
| 398 | 11/01/16 | Plea Agreement with Toye Tutis | 0696-0714 |
| | 11/01/16 | Transcript of Plea Hearing | 0715-0767 |
| 443 | 03/15/17 | Motion to Withdraw Plea of Guilty by Toye Tutis | 0768-0769 |
| | 10/23/16 | Email from AUSA Howard Weiner to Attorneys J. Michael Farrell & Troy Archie<br>(443 Motion Exhibit) | 0770 |
| 448 | 03/30/17 | U.S.'s Memorandum of Law in Response to Defendant's Motion to Withdraw Plea (relevant portion) | 0771-0773 |
| | 10/27/16 | Letter to J. Michael Farrell, Esq. from AUSA Diana Carrig re: Plea Agreement<br>(443 Motion Exhibit) | 0774-0787 |
| | 10/27/16 | Letter to Troy A. Archie, Esq. from AUSA Diana Carrig re: Plea Agreement<br>(443 Motion Exhibit) | 0788-0804 |
| | 04/19/17 | Certification of J. Michael Farrell, Esq.<br>(443 Motion Exhibit) | 0805-0806 |
| | 04/17/17 | Certification of Troy Archie, Esq.<br>(443 Motion Exhibit) | 807-0810 |
| 489 | 06/21/17 | Transcript of Plea Retraction Hearing | 0811-997 |

| | 10/31/16 | Transcript of Recorded Conversation of Toye Tutis and Jazmin Vega<br>(<u>443</u> Hearing Exhibit, D5) | 0998-1009 |
|---|---|---|---|
| | 11/01/16 | Email from Jazmin Vega to Toye Tutis<br>(<u>443</u> Hearing Exhibit, D6) | 1010 |

| | | **VOLUME V**<br>**(Pages A1011 – A1396)** | |
|---|---|---|---|
| **Docket No.** | **Date** | **Document Description** | **Page No.** |
| | 06/23/17 | Transcript of Plea Retraction Hearing | 1011-1245 |
| | 06/26/17 | Transcript of Plea Retraction Hearing | 1246-1396 |

| | | **VOLUME VI**<br>**(Pages A1397 – A1535)** | |
|---|---|---|---|
| **Docket No.** | **Date** | **Document Description** | **Page No.** |
| 568 | 02/22/19 | Second Motion to Withdraw Plea of Guilty by Toye Tutis | 1397-1398 |
| | | Certification of Toye Tutis (<u>568</u> Motion Exhibit) | 1399-1401 |
| | | U.S.'s Memorandum of Law in Opposition to Defendant's Section 2225 Motion (relevant portion) | 1402 |
| 596 | 04/04/19 | Transcript of Second Plea Withdrawal Hearing | 1403-1526 |
| 584 | 05/06/19 | Judgment as to Toye Tutis | 1527-1531 |
| | 04/19/18 | ABA Criminal Justice Standards for Defense Function | 1532-1535 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

TOYE TUTIS, KABAKA ATIBA, and
JAZMIN VEGA,

Defendants.

HONORABLE JEROME B. SIMANDLE

Criminal Action No.
14-699

**ORDER**

This matter comes before the Court by way of Defendant Toye Tutis' (hereinafter, "Defendant Tutis") motion to suppress certain wiretap evidence [Docket Item 234], and Defendant Kabaka Atiba's (hereinafter, "Defendant Atiba") motion for severance [Docket Item 222]; and the Court having considered the parties' submissions, and having conducted a hearing on the motions on February 24, 2016; and for the reasons explained in the Opinion of today's date; and for good cause shown;

IT IS this __8th__ day of __March__ , **2016**, hereby

**ORDERED** that Defendant Tutis' motion to suppress [Docket Item 234] shall be, and hereby is, **DENIED**; and it is further

**ORDERED** that Defendant Atiba's motion for severance [Docket Item 222] shall be, and hereby is, **DENIED**.

__s/ Jerome B. Simandle__
JEROME B. SIMANDLE
Chief U.S. District Judge

A0001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | HONORABLE JEROME B. SIMANDLE |
| v. | Criminal Action No.<br>14-699 (JBS) |
| TOYE TUTIS, KABAKA ATIBA, and<br>JAZMIN VEGA, | **OPINION** |
| Defendants. |  |

APPEARANCES:

Diana Vondra Carrig, Assistant U.S. Attorney
Howard Weiner, Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
401 Market Street
Camden, NJ 08101

Dennis J. Cogan, Esq.
Christopher D. Warren, Esq.
COGAN PETRONE & ASSOCIATES
2000 Market Street, Suite 2925
Philadelphia, PA 19103
     Attorneys for Defendant Toye Tutis

David S. Rudenstein, Esq.
9411 Evans Street
Philadelphia, PA 19115
     Attorney for Defendant Kabaka Atiba

Troy A. Archie, Esq.
21 Route 130 South
Cinnaminson, NJ 08077
     Attorney for Defendant Jazmin Vega

A0002

**SIMANDLE, Chief Judge:**

## Table of Contents

I. INTRODUCTION ............................................... 2

II. FACTUAL AND PROCEDURAL BACKGROUND .......................... 4

  A. General Case and Investigation Background ................ 4

  B. State Wiretap Authorizations ............................ 6

  C. December 9, 2014 Search Warrants, December 10, 2014
  Indictment, and Arrests ................................. 12

III. SEVERANCE MOTION OF KABAKA ATIBA ........................ 14

  A. Standard of Review Applicable to Severance .............. 14

  B. Defendant Atiba Has Not Demonstrated the Need for Severance
  17

IV. SUPPRESSION MOTION OF TOYE TUTIS ........................ 22

  A. Defendant Tutis' Request for Suppression ................ 24

    1. Standard for Suppression .............................. 24

    2. The Wiretap Evidence Will Not Be Suppressed ........... 26

  B. Defendant Tutis' Request for a Franks Hearing ........... 30

    1. Standard for a Franks Hearing ......................... 30

    2. Defendant Has Not Made the Substantial Showing Necessary
    to Obtain a Franks Hearing ............................ 32

V. CONCLUSION .............................................. 34

## I. INTRODUCTION

The Indictment herein arises from a long-running investigation into an allegedly large scale drug trafficking and money laundering organization. More specifically, the Indictment, filed December 10, 2014, charges Defendants Toye Tutis (hereinafter, "Defendant Tutis" or "Toye Tutis" or "Toye") and Kabaka Atiba (hereinafter, "Defendant Atiba"), among others,

with conspiring to distribute kilogram quantities of heroin and cocaine throughout southern New Jersey.[1] [See generally Docket Item 1.]

As the May 23, 2016 trial date approaches, Defendant Tutis now moves to suppress wiretap evidence, on the grounds that the authorization entered by a New Jersey state court on September 26, 2014 issued without probable cause, and rested upon an affidavit that contained material factual omissions.[2] [See generally Docket Item 234.] Defendant Atiba, in turn, seeks to sever his trial from that of the remaining co-defendants, based upon his belief that the two indicted offenses lack any transactional relationship, and because a joint trial would purportedly cause substantial prejudice to his interests. [See generally Docket Item 222.] The Government opposes both motions for lack of merit.[3]

---

[1] Count I specifically charges Toye Tutis, a/k/a "Ahmad," a/k/a "Mahd," a/k/a "Santana," Kareem Taylor, a/k/a "K-Love," a/k/a "Love," Ivan Cuellar Naranja, a/k/a "Fatboy," a/k/a "Cirilo Ruiz," Francisco Alberto Rascon-Muracami, a/k/a "Francisco Alberto Rascon-Murakami," Phillip Horton, a/k/a "Phil," a/k/a "Doc," Tozine Tiller, a/k/a "To," Talib Tiller, Kabaka Atiba, Ronald Douglas Byrd, a/k/a "Doug Byrd," and John Wellman, a/k/a "Yah-Yah," a/k/a "Yah."
[2] Defendants Atiba and Jazmin Vega join in Defendant Tutis' suppression motion. [See Docket Items 214, 244, & 247.]
[3] Defendants filed no reply briefs.

For the reasons that follow,[4] Defendant Tutis' motion to
suppress and Defendant Atiba's motion for severance will be
denied.[5]

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.    General Case and Investigation Background

The charges contained in the Indictment stem from a long-
running investigation conducted jointly by federal, state, and
local law enforcement officers, targeting an alleged drug-
trafficking organization in Atlantic City and the surrounding
southern New Jersey region.  (See Walsh Aff. at ¶¶ 5-6.)  The
fruits of this investigation purportedly revealed, overall, that
Defendant Tutis sourced supplies of heroin and cocaine from the
Mexican Sinaloa cartel (with the help of alleged cartel broker,
Defendant Ivan Cuellar Naranjo), through contacts in Los
Angeles, California, and relied upon his network of alleged
drug-traffickers in this region (namely, Defendants Tozine
Tiller, Jewell Tutis, and Atiba, among others) to distribute and
sell the drug products.  (See id. at ¶¶ 6-7.)  Defendant Tutis,
with his "paramour" Defendant Jazmin Vega, then allegedly

---

[4] The Court conducted oral argument relative to the pretrial
motions of all defendants on February 24, 2016.  [See Docket
Item 256.]

[5] On the hearing record of February 24, 2016, the Court reserved
decision on Defendant Tutis' motion to suppress, and denied
Defendant Atiba's motion for severance.  The foregoing Opinion
provides the reasoning for this Court's denial of Defendant
Atiba's motion for severance, as well as the disposition of
Defendant Tutis' suppression motion.

4

"launder[ed]" the proceeds of this drug conspiracy through cash deposits into various bank accounts, high-end purchases, and by comingling the drug-trafficking proceedings with the proceeds of his legitimate business (namely, Ta'Ja Construction, LLC, Ta'Ja Construction I, LLC, Real Estate Investors, LLC, Ta'Ja Laundromat, Dave's Grocery, and Integrity Heating & Cooling, LLC). (Id. at ¶¶ 7-9.)

During the course of the investigation, state and federal law enforcement officials learned of the nature of the alleged drug-trafficking conspiracy through a series of drug purchases (namely, controlled buys by confidential sources), package intercepts, trash pulls, authorized property searches and seizures, as well as court authorized "roving wiretaps" of telephones known to be used by various defendants. (Id. at ¶¶ 10-11.) Indeed, the genesis of the electronic-surveillance aspect of this case dates back to an initial federal wiretap obtained on November 21, 2013, and supported by a probable cause affidavit that identified a number of "'target interceptees,'" including Tozine Tiller and Toye Tutis.[6] (Tutis Br. at 1-2; see also Gov'ts Opp'n at 6.)

---

[6] Defendants mount no challenge to the propriety of the various federal wiretaps.

**B.    State Wiretap Authorizations**

As relevant here, the Atlantic County Prosecutor's Office (hereinafter, the "ACPO") obtained a series of wiretaps, authorized by the Honorable Bernard E. DeLury (hereinafter, "Judge DeLury") and supported by the affidavits of Detective Jason E. Dorn (hereinafter, "Detective Dorn"), on cellular telephones known to be used by Defendants Jewell Tutis, Toye Tutis, and Ivan Cuellar Naranjo.  (See Gov't Opp'n at 7; see also Dorn Sept. 19, 2014 Aff. (Gov't Ex. 2); Dorn Sept. 26, 2014 Aff. (Gov't Ex. 3).)

On September 19, 2014, the ACPO obtained its first "roving" wiretap authorization (BED-ATL-21-WT-2014) to intercept communications over the cellular telephone of Jewell Tutis (609-626-4283) (hereinafter, the "Jewell wiretap").  (See Gov't Ex. 2.)  In support of this initial authorization, Detective Dorn informed Judge DeLury of the federal wiretaps targeted at Toye Tutis (among other investigative techniques used in relation to Defendant Tutis), and explained that an ongoing investigation into Toye Tutis had identified Jewell E. Tutis as "an operator/partner of an ongoing criminal narcotics distribution organization."  (Dorn Sept. 19, 2014 Aff. at ¶¶ 11, 19.)  More specifically, the affidavit stated that a confidential informant

6

(hereinafter, "CI #607/CS-2")[7] had a conversation with Toye Tutis
in July 2014, during which time Tutis advised CI #607/CS-2 that
he could supply the individual with cocaine, marijuana, and
heroin in an array of quantities.  (Id. at ¶ 21.)  Toye then
purportedly instructed CI #607/CS-2 to refer to him as
"'Santana'" over the telephone, and provided CI #607/CS-2 with
"a series of code phrases"[8] to use when contacting his brother,
Jewell, to purchase drugs.  (Id.)  CI #607/CS-2, in turn, met
with Jewell, who reiterated that he and his brother, Toye, could
provide narcotics, and other "'hardware.'"  (Id. at ¶ 22.)

Following these initial exchanges, on August 5, 2014,
Detective Dorn met with CI #607/CS-2 at a predetermined location
"to place a recorded telephone call to Toye Tutis."  (Id. at ¶
23.)  At that time, CI #607/CS-2 handed Detective Dorn a Ta'Ja
Construction Real Estate Investor's LLC "business card" he

---

[7] The ACPO materials refer to this confidential source as CI
#607, while the Government identified the same confidential
source as CS-2.  (See Gov't Opp'n at 12 n.8.)  In order to
avoid any ambiguity, this Court will refer to the confidential
informant by both identifiers.

[8] These phrases and their claimed meanings included: (1) "'come
to work early,'" which meant that the confidential source needed
additional drugs; (2) "'bring me a cup of coffee in the
morning,'" which indicated that the informant needed marijuana,
(3) "'[b]ring me a box of doughnuts in the morning,'" which
meant that the source wanted an ounce of cocaine, and (4) a
"whole 'bird,'" which indicated that the informant desired a
kilogram of cocaine.  (Dorn Sept. 19, 2014 Aff. at ¶ 21.)

A0008

claimed to have received from Defendant Tutis on August 4, 2014,[9]
and on which someone had handwritten (on the back) "the name
'Jewel' and a telephone number of (609)626-4684, and the name
'Santana' with a telephone number of (609)431-2044."[10]  (Id.; see
also Ex. 4 to Gov't Opp'n.)[11]  In the presence of Detective
Dorn, the confidential informant then dialed the number for
"'Santana,'" 609-431-2044, and requested "'a box of doughnuts'"
(i.e., an ounce of cocaine).  (Dorn Sept. 19, 2014 Aff. at ¶
23.)  A voice which Detective Dorn recognized as the voice of
Toye Tutis instructed CI #607/CS-2 to "call [his] brother."[12]
(Id.)  CI #607/CS-2, in turn, placed a call to the number for
"'Jewel,'" 609-626-4684, again in the presence of Detective
Dorn, and requested a "'box of doughnuts.'"  (Id.)  The
following day, August 6, 2014, CI #607/CS-2 met with Jewell
Tutis (i.e., Defendant Tutis' brother) and completed the first
in a lengthy series of controlled drug purchases.  (Id. at ¶ 24)

---

[9] The business card itself provides, on its face, only the
contact information for "Toye."  (Ex. 4 to Gov't Opp'n.)
[10] The affidavit provides no detail concerning the source of the
writing on the business card.  On the oral argument record,
however, the Government explained that CI #607/CS-2 revealed,
during a subsequent interview, that the source had inscribed the
contact information on the business card.
[11] The business card itself does not specifically disclose the
area code associated with these telephone numbers, but no party
takes issue with Detective Dorn's inclusion of "609," the area
code that, in any event, prevails in Atlantic City, New Jersey.
[12] In latter portions of his affidavit, Detective Dorn claimed
that he had familiarity with the voice of Toye Tutis, as
explained below.  (See Dorn Sept. 26, 2014 Aff. at ¶ 54.)

Aside from these early encounters, Detective Dorn detailed and recounted the additional drug involvement evidence against Jewell Tutis as provided by the confidential informant through subsequent recorded conversations,[13] and through additional controlled purchases.  (See id. at ¶¶ 11, 20-48.)  Indeed, the affidavit documents no fewer than nine completed drug transactions between CI #607/CS-2 and Jewell Tutis, all of which the ACPO affirmatively identified as drug substances through field tests.[14]  (See, e.g., id. at ¶¶ 26, 28, 30, 34, 36, 39, 41, 44, 47, 52.)

As a result, Detective Dorn expressed his opinion that the evidence gathered at that time demonstrated probable cause that Jewell E. Tutis utilized the cellular device to communicate between co-conspirators in furtherance of an illicit narcotics distribution conspiracy, and that an electronic interception of the communications would enable the state investigators to (1) understand the nature of Jewell Tutis' relationship with his co-conspirators, (2) identify the suppliers of the controlled

---

[13] These recorded conversations include a number of calls to Jewell Tutis, related to purchases of drugs, fraudulent drivers' licenses, and firearms.  (See Dorn Sept. 19, 2014 Aff. at ¶¶ 24-53.)
[14] In its opposition, the Government claims that these controlled buys totaled "29 ounces of crack cocaine and 10 pounds of marijuana" from August 6, 2014 through September 30, 2014.  (Gov'ts Opp'n at 16.)

substances, and (3) determine the location(s) of the drug substances and their proceeds.[15]  (See id. at ¶¶ 49-50.)

After a few days of intercepting communications pursuant to the Jewell wiretap, Detective Dorn (and others) determined that Toye Tutis had used a specific cellular telephone in connection with his alleged drug distribution, 424-646-1761. (See Dorn Sept. 26, 2014 Aff. at ¶¶ 3-5.)  As in the affidavit submitted in connection with the Jewell wiretap,[16] Detective Dorn acknowledged the wide scope of the investigation into Toye Tutis' drug activity, as well as the use of federal wiretaps that identified Toye Tutis as the target interceptee.  (See id. at ¶ 11.)  Nevertheless, Detective Dorn explained that the probable cause for "the present wiretap application" stemmed

---

[15] Judge DeLury authorized two extensions of this original wiretap authorization (BED-ATL-21-WT-2014X (October 9, 2014) and BED-ATL-21-WT-2014XX (October 17, 2014)), and on October 27, 2014, authorized a wiretap order designating Jewell Tutis as a leader of a drug trafficking organization.  (See Gov'ts Opp'n at 8.)  In sum, these electronic interceptions began on or about September 22, 2014 and continued through on or about November 24, 2014.  (See id.)

[16] The second affidavit of Detective Dorn restates and builds upon the evidence and information described in his first affidavit.  (Compare Dorn Sept. 19, 2014 Aff., with Dorn Sept. 26, 2014 Aff.)  In other words, in seeking the wiretap authorization against Toye Tutis, the ACPO continued to rely upon the confidential informant's statements concerning the initial meeting with Defendant Tutis in July 2014, as well as the contents of the recorded telephone call on August 5, 2014, and the subsequently completed drug transactions.  (See Dorn Sept. 26, 2014 Aff. at ¶¶ 21, 23.)

only from his state-based investigations,[17] including the
evidence recited in the affidavit supporting the Jewell wiretap,
together with the fact that the Jewell wiretap had captured
conversations and text messages between Jewell and Toye
allegedly concerning their attempts to obtain fraudulent
drivers' licenses (and that supposedly confirmed Toye Tutis as
the owner of the cellular telephone).[18]   (See id. at ¶¶ 54-55;
see also Ex. A to Dorn Sept. 26, 2014 Aff. (line sheets of
recorded telephone calls concerning fraudulent drivers'
licenses).)

As a result, Detective Dorn again expressed his belief that
the evidence gathered at that time demonstrated probable cause

---

[17] In other words, Detective Dorn specifically declined to detail
the fruits, if any, of the federal investigation, given the
somewhat greater latitude afforded federal law enforcement in
conducting investigations.
[18] As noted by Defendant Toye Tutis, these conversations did not,
at least on the surface, delve into the acquisition of illegal
narcotics, nor did they make mention of any controlled sales to
the confidential informant (i.e., CI #207/CS-2). (See Tutis Br.
at 5; see also Ex. A to Dorn Sept. 26, 2014 Aff.)  Rather, in
the conversations most cited by the parties (i.e., call sessions
131 & 138 on September 24, 2014), a person believed to be Toye
Tutis referenced the purchase of fraudulent California drivers'
licenses to Jewell Tutis, and then stated that "' all [they]
need[ed] to do [was] go in and open up boxes.'"  (Dorn Sept. 26,
2014 Aff. at ¶ 54.)  Despite the brevity of these exchanges,
Detective Dorn explained how drug traffickers, in his
experience, "utilize fraudulent out-of-state driver[s'] licenses
to retrieve packages of suspected contraband through the United
States mail."  (Id.)  In that way, the affidavit of Detective
Dorn plainly connects the conversation concerning fraudulent
drivers' licenses to the overall allegations concerning Toye
Tutis' alleged role in a drug trafficking operation.

A0012

that Toye Tutis continued to be involved in the sale of controlled dangerous substances, and that an electronic interception of the communications of his identified cellular device would enable the state investigators to (1) further understand the nature of Tutis' relationship with his co-conspirators, (2) identify the suppliers of the controlled substances, and (3) determine the location(s) of the drug substances and their proceeds.  (See id. at ¶¶ 56-58.)  In view of the contents of the affidavit, Judge DeLury issued the requested wiretap on September 26, 2014 (BED-ATL-22-WT-14 & BED-ATL-153-CDW-14) (hereinafter, the "Toye wiretap").[19]

### C.  December 9, 2014 Search Warrants, December 10, 2014 Indictment, and Arrests

On December 9, 2014, federal law enforcement agents obtained federal search warrants for approximately seven properties throughout southern New Jersey, all of which bore some claimed relation to the alleged drug trafficking organization.  (See Gov'ts Opp'n at 32; see also Walsh Affidavit at ¶ 7.)

Then, on December 10, 2014, a federal grand jury returned a two-count Indictment charging certain defendants with conspiring

---

[19] On the oral argument record, counsel for the Government raised the prospect that Judge DeLury may have questioned Detective Dorn on the contents of his affidavit in advance of his wiretap authorization.  Nevertheless, the relevant record on the issue of suppression contains no support for this assertion, and so the Court has not considered it.

to traffic in cocaine, heroin, and crack cocaine, and select
others with conspiring to conceal and/or disguise the proceeds
of this unlawful activity. [See generally Docket Item 1.] More
specifically, and as relevant here, the Indictment charges
Defendants Tutis and Atiba with perpetrating a drug-trafficking
conspiracy in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A),
and 846 (hereinafter, "Count I"), and then charges Defendants
Tutis and Vega with perpetrating a money-laundering conspiracy
in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i),
(a)(1)(B)(ii), and (h) (hereinafter, "Count II").

During the execution of the search and arrest warrants,
officers seized additional evidence of drug trafficking and
money laundering, including more than one kilogram of crack
cocaine, lesser amounts of powder cocaine and heroin, eight
firearms, two tasers, more than forty cellular telephones, a
bulletproof vest, and in excess of $100,000 in cash. (See
Gov'ts Opp'n at 32-33.)

Following arraignments, discovery, and pleas,[20] the pending
motions followed.

---

[20] At this point, six of the indicted defendants have pleaded
guilty to the drug trafficking conspiracy charged in Count 1.
These defendants specifically consist of Kareem Taylor, Philip
Horton, Talib Tiller, Ronald Douglas Byrd, John Wellman, and
Francisco Rascon-Muracami.

A0014

## III. SEVERANCE MOTION OF KABAKA ATIBA

In seeking severance, Defendant Atiba takes the position that a consolidated trial would unfairly prejudice his interests, because the allegations against co-defendants concern an array of allegations and conduct without relation to the specific conduct charged against him. (See Atiba Br. at 5-7.) As a result, Defendant Atiba claims that a single presentation of this voluminous evidence would pollute the minds of the jury, invariably resulting in guilt by association. (See id.) Beyond this "spillover" risk, Defendant Atiba claims that this action favors severance as a matter of "common sense," because the remaining defendants may (1) "attempt" to point the finger of blame at a co-defendant, (2) call one of the co-defendants as a witness, and/or (3) otherwise present "irreconcilable and mutually exclusive" defenses. (Id. at 5-6.)

The Government opposes severance on the grounds that Defendant Atiba has not pinpointed any substantial prejudice nor shown that a consolidated trial would otherwise impinge upon his right to fair trial. (See Gov'ts Opp'n Br. at 79-92.)

For the reasons that follow, Defendant Atiba's motion for severance will be denied.

### A.  Standard of Review Applicable to Severance

The joinder of multiple defendants into a single trial aims "to promote economy and efficiency and to avoid a multiplicity

A0015

of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." Burton v. United States, 392 U.S. 123, 131 (1968). Federal Rule of Criminal Procedure 14(a), in turn, provides that, "[i]f the joinder of offenses ... in an indictment ... appears to prejudice a defendant or the government, the court may order separate trials of counts ... or provide any other relief that justice requires."[21]   FED. R. CRIM. P. 14(a).   In other words, the Rule permits severance where a joint trial presents a

_____

[21] Defendant Atiba appears to claim, in a single sentence, that the Government improperly charged the defendants in a single case for drug-trafficking conspiracy and a money-laundering conspiracy, because the two Counts grow out of separate transactions.  (See Atiba Br. at 5.)  Where, as here, the charging document contains multiple defendants and offenses, Federal Rule of Criminal Procedure 8(b) governs both the proper joinder of defendants and the proper joinder of offenses.  See United States v. Irizarry, 341 F.3d 273, 287 (3d Cir. 2003) (citation omitted).  Federal Rule of Criminal Procedure 8(b) generally permits the Government to charge a series of related defendants and offenses in a single indictment, so long as the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses."  FED. R. CRIM. P. 8(b). Stated differently, the offenses and defendants must have a "transactional nexus" or logical relationship.  Irizarry, 341 F.3d at 287 n.4 (citation omitted); see also United States v. Adens, Crim. No. 12-616, 2015 WL 894205, at *1 (E.D. Pa. Feb. 27, 2015) (explaining same).  The Counts at issue here easily meet this requirement, because each Count alleges that the charged defendants participated "in the same series of acts or transactions," and Count II specifically charges Defendants Toye Tutis and Vega with, in essence, conspiring to conceal and disguise the fruits of the drug-trafficking conspiracy charged in Count I.  For that reason, the Court finds the joinder of offenses and defendants permissible under Federal Rule of Criminal Procedure 8(b).

substantial risk of prejudice to the defendant, by "compromis[ing] a specific trial right of one of the defendants, or prevent[ing] the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539-40 (1993);[22] see also United States v. Urban, 404 F.3d 754, 775 (3d Cir. 2005) (internal quotation omitted) (explaining that severance should be granted, only where "clear and substantial prejudice [would result] in a manifestly unfair trial").

Nevertheless, a defendant bears a "heavy burden in gaining severance," United States v. Quintero, 38 F.3d 1317, 1343 (3d Cir. 1994), and must "pinpoint clear and substantial prejudice resulting in an unfair trial." United States v. Riley, 621 F.3d 312, 335 (3d Cir. 2010); see also United States v. McGlory, 968 F.2d 309, 340 (3d Cir. 1992) (same). This burden requires more than a showing that "severance [will increase] the defendant's chances of acquittal." McGlory, 968 F.2d at 340. Rather, "the question of prejudice hinges upon 'whether the jury will be able to compartmentalize the evidence ... in view of its volume and limited admissibility.'" United States v. Walker, 657 F.3d 160,

_____

[22] In Zafiro, the Supreme Court identified three instances of prejudice sufficient to warrant severance: (1) a complex case involving many defendants with "markedly different" degrees of culpability; (2) a case where evidence of one defendant's guilt is admissible only against a co-defendant; and (3) a case where exculpatory evidence is inadmissible in the joint trial. 506 U.S. at 539. No party claims that this action falls within one of these paradigmatic scenarios.

170 (3d Cir. 2011) (quoting United States v. Davis, 397 F.3d 173, 182 (3d Cir. 2005)).

In applying these guideposts to a severance request, this Court must "balance the potential prejudice to the defendant against the advantages of joinder in terms of judicial economy." See United States v. Sandini, 888 F.2d 300, 305-06 (3d Cir. 1989), cert. denied, 494 U.S. 1089 (1990).

### B. Defendant Atiba Has Not Demonstrated the Need for Severance

The Indictment at issue here charges Defendant Atiba with participating in a large, multi-jurisdictional drug distribution conspiracy. [See generally Docket Item 1.] As a result of these circumstances, Defendant Atiba premises his severance motion upon the belief that the jury will be unable to conceptually sever the evidence against him from the evidence against the remaining co-defendants, as well as offering his speculation concerning the various remaining defendants' trial strategies. (See generally Atiba Br. at 5-10.) Nevertheless, the Court finds no risk of prejudice, nor jury confusion, sufficient to warrant severance.

Indeed, any prejudice from a joint trial would be minimal, particularly because the Indictment alleges that Defendant Atiba and his co-defendants (all except Defendant Vega) engaged in a single drug-trafficking conspiracy. [See generally Docket Item

A0018

1.]  Importantly, acts committed by one co-conspirator in furtherance of the conspiracy become admissible against all co-conspirators.  See United States v. Hart, 273 F.3d 363, 370 (3d Cir. 2001) (explaining that, "acts committed by one in furtherance of the conspiracy were admissible against the other"); United States v. Jannotti, 729 F.2d 213, 221 (3d Cir. 1984) ("[T]he declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy.") (internal quotation omitted).

Acts and statements of co-conspirators in furtherance of the charged conspiracy are admissible even against a single, severed defendant at trial, if the government satisfies Fed. R. Evid. 801(d)(2)(E) by proffering evidence of the existence of the conspiracy and the defendant's knowing membership in it.  In that way, even if the Court granted severance, much, if not all, of the evidence concerning his alleged conspirators could still be presented as against him.[23]  See Hart, 729 F.2d at 370.  Any

---

[23] Similarly, even if the Government's evidence against Defendant Atiba remains somewhat weaker than that against any of his co-defendants (an argument Defendant Atiba seems to advance), variation in the quantity of evidence provides no grounds for severance.  See United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991) ("Neither a disparity in evidence, nor introducing evidence more damaging to one defendant than others entitles seemingly less culpable defendants to severance.").

A0019

"'evidentiary spillover'" would, in turn, be "'vitiated,'" and severance would "'rarely, if ever, be required.'" <u>Id.</u> (quoting <u>United States v. DeLuca</u>, 137 F.3d 24, 36 (1st Cir. 1998)) (affirming a district court denial of a request for severance).

Beyond this, although Defendant Atiba raises the "common sense" prospect of inconsistent trial strategies, his arguments rest upon speculation, and fall far short of demonstrating the particularity required for purposes of severance. Indeed, he provides no detail concerning the nature of any inconsistent defenses (<u>see</u> Atiba Br. at 9 (claiming that "the defenses of the codefendants will be inconsistent")), nor any identification of which co-defendants he might call as a witness (much less any assurance that they would actually testify). (See Atiba Br. at 10 (stating that he may, if necessary, call co-defendants as witnesses at trial).) Defendant Atiba likewise offers no preview of his trial strategy and how it could be unfairly thwarted by a joint trial. Nevertheless, "finger-pointing and blame-shifting" alone do not call for severance, <u>United States v. Voigt</u>, 89 F.3d 1050, 1095 (3d Cir. 1996), nor do "bald assertions that co-defendants will testify."[24] <u>United States v.</u>

---

[24] Rather, courts ordinarily consider four factors: "'(1) the likelihood of co-defendant's testifying; (2) the degree to which such testimony would be exculpatory; (3) the degree to which the testifying co-defendants could be impeached; [and] (4) judicial economy.'" <u>Davis</u>, 397 F.3d at 182 (citation omitted). A "defendant's claim that his co-defendants would testify on his

19

A0020

Davis, 397 F.3d 173, 182-83 (3d Cir. 2005) (internal quotation marks and citation omitted). Defendant Atiba's positions here fall squarely within these parameters, and fail to make a case for severance.

The Court reaches a similar conclusion with respect to Defendant Atiba's position on the so-called "spillover prejudice." (See generally Atiba Br. at 5-7.) More specifically, the Court finds no reason to believe that a jury will be unable to conceptually separate the evidence against each defendant, nor that a limiting instruction would prove inadequate to cure any incidental prejudice.[25] See United States v. Williams, No. 06-719-5, 2009 WL 1285519, at *2 (E.D. Pa. May 7, 2009) ("[The Court] can ensure [Defendant] will receive a fair trial because it will issue jury instructions directing the jury to consider the evidence separately as to each defendant and each count."); United States v. Saferstein, No. 07-557, 2009 WL 1046128, at *5 (E.D. Pa. Apr. 17, 2009) ("[Defendant's

---

behalf must," however, be supported by more than the defendant's "'declaration of [his co-defendants'] intent to testify.'" Id. (quoting United States v. Gonzalez, 918 F.2d 1129, 1137 (3d Cir. 1990)). Here, Defendant Atiba does not address these factors, nor has he pointed to any support in the record for his otherwise vague assertions.

[25] The Court will, as always in joint trials, instruct the jury to "'give separate individual consideration to each charge against each defendant.'" Hart, 273 F.3d at 370 (finding such charge appropriate to diminish any prejudice). This instruction will, in turn, amply cure any arguable risk of "spillover" onto a less-involved defendant, as Defendant Atiba claims to be.

A0021

argument] that severance is necessary since a jury will have a difficult time separating or ascertaining which evidence against him is meant to prove which set of charges is also overcome, since the Court is in a position to evaluate each situation should any occur and to respond appropriately with limiting instructions at trial, if necessary.").

Finally, the Court finds that concerns of judicial economy weigh heavily in favor trying Defendant Atiba together with his remaining co-defendants. See Sandini, 888 F.2d at 305. Indeed, a joint trial would "promote efficiency and serve the interest of justice by avoiding the scandal and inequity of inconsistent verdicts." Zafiro, 506 U.S. at 537 (internal quotations marks and citation omitted); see also Eufrasio, 935 F.2d at 568-69 ("The public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy."). In view of the overlapping evidence, and the substantial admissibility of the evidence as against each defendant, a separate trial would, by contrast, be a waste of judicial time and resources. See United States v. Lacerda, No. 12-303, 2013 WL 3177814, at *7 (D.N.J. June 19, 2013) (noting that "separate trials with respect to the same charged conspiracy would be a significant waste of judicial time and resources because participants in a conspiracy should

ordinarily be tried together, even if the evidence against one
is more damaging than it is against another").

For all of these reasons, Defendant Atiba's severance
motion will be denied.

## IV.  SUPPRESSION MOTION OF TOYE TUTIS

In moving to suppress the wire and electronic conversations
captured under the Toye wiretap, Defendant Tutis claims, as
explained above, that the supporting affidavit in the Superior
Court lacked probable cause, because it rested upon the
uncorroborated account of an in-person conversation with
Defendant Tutis, and a series of recorded calls and controlled
drug purchases in which Tutis played no obvious role.  (See
Tutis Br. at 7-9.)  For these reasons, Defendant Tutis submits
that the fruits of the Toye wiretap should be suppressed.

In the alternative, Defendant takes the position that
Detective Dorn omitted material facts from his probable-cause
affidavit, because although he acknowledged the parallel federal
wiretaps (and investigation), he failed to inform Judge DeLury
that the "intensive [parallel] investigation" produced (1) "no
real evidence" of Tutis' involvement in any drug distribution,
(2) no confirmation that he acted under the alias "'Santana'"
(and instead claims that Jewell used that alias), (3) nor any
verification of his voice on the August 5, 2015 telephone call.
(Id. at 10-11.)  For these reasons, Defendant Tutis requests

that the Court convene a Franks hearing to address the alleged

"omissions" with Detective Dorn, and to compare known samples of

Defendant Tutis' voice with that captured in the August 5, 2014

recording.[26]  (Id. at 12.)

The Government opposes suppression, principally on the

ground that Defendant Tutis' challenges fail to consider the

probable-cause affidavit in its entirety.  (See Gov'ts Opp'n at

38-45.)  The Government similarly challenges Defendant Tutis'

entitlement to a Franks hearing, on account of his failure to

make a "substantial showing" of any intentional and/or reckless

omission by Detective Dorn.  (Id. at 59.)  Indeed, the

Government takes the position that Detective Dorn's affidavit

contains no material omissions.  (See generally id. at 38-59.)

For the reasons that follow, Tutis' motion to suppress

and/or for a Franks hearing will be denied.

_____

[26] In Franks v. Delaware, the Supreme Court concluded that the
Fourth Amendment requires a hearing, "where a defendant makes a
substantial preliminary showing that a false statement knowingly
and intentionally, or with reckless disregard for the truth, was
included by the affiant in the warrant affidavit," and where
"the allegedly false statement is necessary to the finding of
probable cause."  438 U.S. 154, 155-56 (1978).  Thus, in simple
terms, when a substantial preliminary showing has been made, a
Franks hearing provides a defendant with an opportunity to take
direct testimony from the affiant involved in the wiretap
application, and then to submit additional argument on the issue
of suppression (accounting for, or ignoring, the false
statements and omissions).  See United States v. Heilman, 377 F.
App'x 157, 193 (3d Cir. 2010) (explaining the Franks procedure).

A0024

A. Defendant Tutis' Request for Suppression

    1. Standard for Suppression

The traditional Fourth Amendment principles that apply to property searches govern probable cause determinations under the federal and/or state wiretap statutes. See United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983); see also 18 U.S.C. § 2518(3) (federal wiretap statute); N.J.S.A. § 2A:156A-10 (state wiretap statute). Under these principles, a finding of probable cause requires a "'fair probability'" of criminal activity, based upon the totality of the circumstances. United States v. Bond, 581 F.3d 128, 139 (3d Cir. 2009) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Stated differently, the issuing court must "make a practical, common-sense decision" concerning whether the circumstances set forth in the supporting affidavit, "including the 'veracity' and 'basis of knowledge' of the persons supplying the hearsay information," demonstrate "a fair probability" that the authorization will result in evidence of a crime. Id. at 238-39.

A reviewing court must afford great deference to the probable cause finding of an issuing court. See United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001); United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993). As a result, the probable cause determination of an issuing court will be upheld so long as the supporting documents provided a substantial basis

24

for the initial probable cause decision.[27]  See United States v.
Hodge, 246 F.3d 301, 305 (3d Cir. 2001); United States v. Jones,

---

[27] Title III of the Omnibus Crime Control and Safety Street Act
of 1968 empowers a judge to enter an ex parte order to authorize
interception of wire communications, if the judge determines on
the basis of the facts submitted by the application that:

> (a) there is probable cause for belief that an individual is
> committing, has committed, or is about to commit [a drug-
> trafficking offense]; (b) there is probable cause for belief that
> particular communications concerning that offense will be
> obtained through such interception; (c) normal investigative
> procedures have been tried and have failed or reasonably appear
> to be unlikely to succeed if tried or to be too dangerous; (d)
> except as provided in subsection (11), there is probable cause
> for belief that the facilities from which, or the place where,
> the wire, oral, or electronic communications are to be
> intercepted are being used, or are about to be used, in
> connection with the commission of such offense, or are leased to,
> listed in the name of, or commonly used by such person.

18 U.S.C. §§ 2518(3)(a)-(d).  The New Jersey Wiretapping and
Electronic Surveillance Control Act, which governed the wiretap
at issue here, contains analogous provisions, and specifically
authorizes the issuance of a wiretap, if the judge finds
probable cause to believe that:

> a. [t]he person whose communication is to be intercepted is
> engaging or was engaged over a period of time as a part of a
> continuing criminal activity or is committing, has or had
> committed or is about to commit an offense as provided in section
> 8 of P.L.1968, c.409 (C.2A:156A-8); b. [p]articular
> communications concerning such offense may be obtained through
> such interception; c. [n]ormal investigative procedures with
> respect to such offense have been tried and have failed or
> reasonably appear to be unlikely to succeed if tried or to be too
> dangerous to employ; d. [e]xcept in the case of an application
> meeting the requirements of subsection g. of section 9 of
> P.L.1968, c.409 (C.2A:156A-9), the facilities from which, or the
> place where, the wire, electronic or oral communications are to
> be intercepted, are or have been used, or are about to be used,
> in connection with the commission of such offense, or are leased
> to, listed in the name of, or commonly used by, such individual;
> e. [t]he investigative or law enforcement officers or agency to
> be authorized to intercept the wire, electronic or oral
> communication are qualified by training and experience to execute
> the interception sought; and f. [i]n the case of an application,
> other than a renewal or extension, for an order to intercept a
> communication of a person or on a facility which was the subject
> of a previous order authorizing interception, the application is
> based upon new evidence or information different from and in

994 F.2d 1051, 1055 (3d Cir. 1993).  This deferential standard

"does not mean that reviewing courts should simply rubber stamp"

the authorizing judge's conclusions," United States v. Tehfe,

722 F.2d 1114, 1117 (3d Cir. 1983) (citing United States v.

Ventresca, 380 U.S. 102, 108 (1965))), but it does counsel that

"resolution of doubtful or marginal cases ... be largely

determined by the preference ... accorded to warrants." United

States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993) (citing

Ventresca, 380 U.S. at 109).  In other words, the standard

encourages that slight doubts concerning the propriety of the

wiretap authorization be resolved in favor of the issuing court.

See generally id.

### 2. The Wiretap Evidence Will Not Be Suppressed

Defendant Tutis' request for suppression hinges, as

explained above, upon his position that (1) an uncorroborated

conversation between a confidential informant and Tutis and (2)

an unauthenticated recording, fall short of demonstrating a fair

probability that an interception of his telephone calls would

reveal evidence of a crime. (See Tutis Br. at 7.)  These

positions, however, ignore the vastness of the evidentiary

---

addition to the evidence or information offered to support the
prior order, regardless of whether such evidence was derived from
prior interceptions or from other sources.

N.J.S.A. § 2A:156A-10.

A0027

proffer set forth by Detective Dorn in his affidavit.[28]  Indeed,
a review of the Dorn Affidavit in its entirety plainly
demonstrates that Judge DeLury had a substantial basis for his
probable cause determination.

In his affidavit, Detective Dorn describes, at the outset,
the ACPO's over "twenty year[]" investigation of Defendant
Tutis' alleged "high level" narcotics distribution, as well as
his belief that Defendant Tutis "utilize[d] prepaid accounts"
and frequently changed his number "as part of a deliberate
effort to thwart detection by law enforcement." (Dorn Sept. 26,
2014 Aff. ¶¶ 13, 20.)

The affidavit then recounts, as described above, the
specifics of an in-person meeting between Defendant Tutis and CI
#607/CS-2, during which he directed CI #607/CS-2 to refer to him
as "'Santana'" and to use "a series of code phrases" when
contacting his brother, Jewell, to purchase drugs. (Dorn Sept.
26, 2014 Aff. at ¶ 21.)  Following this initial encounter, on
August 5, 2014, CI #607/CS-2 produced a Ta'Ja Construction
business card bearing contact information for "Jewel" and

---

[28] Critically, Tutis does not challenge the reliability of the
confidential informant, an individual whom Detective Dorn has
utilized "on multiple occasions" to assist in the investigation
against Tutis and found to be reliable. (See, e.g., Dorn Sept.
26, 2014 Aff. ¶ 20.)

27

A0028

"Santana."[29]   (Id. at ¶ 23; see also Ex. 4 to Gov'ts Opp'n.)   CI

#607/CS-2 then dialed "Santana" at the number listed on the

business card (and in the presence of Detective Dorn), at which

time Defendant Tutis instructed CI #607/CS-2 to "call [his]

brother" for "doughnuts."[30]   (Dorn Sept. 19, 2014 Aff. at ¶23)

CI #607/CS-2, in turn, contacted Jewell, and completed a

controlled buy of cocaine on the following day.   (Id. at ¶ 24.)

The substance of these communications involving Defendant Tutis

then found further corroboration, time and again, by the

---

[29] The Court recognizes that the business card refers to
Defendant Tutis' brother as "Jewel," rather than "Jewell."  (Ex.
4 to Gov'ts Opp'n.)   Nevertheless, in view of the consistency
between the remaining evidence presented in the affidavit of
Detective Dorn, this misspelling casts little, if any, doubt
upon the propriety of the Tutis wiretap.   Beyond this, on the
oral argument record, the Government clarified that CI #607/CS-2
inscribed the contact information on the business card, not
Defendant Tutis.   That the confidential source would have
misspelled "Jewell" as "Jewel" does not detract from probable
cause to believe that Toye Tutis told the confidential source to
contact "Jewell," that Toye's nickname was "Santana," and that
the confidential source made note of both names on the business
card.
[30] The Court finds no support for the notion that the affidavit
must fail because it contains no evidence definitively tying
Defendant Tutis to the August 5, 2014 recording.   (See Tutis Br.
at 8.)   Indeed, Defendant Tutis' position in this respect
entirely ignores Detective Dorn's own familiarity with his
voice.   In his affidavit, Detective Dorn claimed familiarity
"with the voice of Toye Tutis," identified that voice as "the
same voice heard" on the relevant cellular telephone, and
explained his participation in the recorded telephone call.
(Dorn Sept. 26, 2014 Aff. ¶¶ 21, 54.)   In that way, Detective
Dorn's own knowledge (coupled with that of the confidential
informant and other investigators) sufficiently evidences
Defendant Tutis' participation in the August 5, 2014 call, at
least for purposes of the Court's review of probable cause.

A0029

multiple controlled drug purchases involving Defendant Tutis'
brother, one of which occurred in the presence of Defendant
Tutis himself.  (See, e.g., id. at ¶¶ 21, 23, 26, 28, 30, 34,
36, 39, 41, 44, 47, 52.)  The fact that the litany of controlled
buys occurred in accordance with, and immediately following, CI
#607/CS-2's initial conversations with Defendant Tutis
demonstrates a sufficient basis upon which to find probable
cause.  See Heilman, 377 F. App'x at 193 (finding a call log and
a single controlled purchase sufficient to demonstrate probable
cause).

Beyond this, though, the affidavit retraces a number of
conversations and text messages between Defendant Tutis and
Jewell Tutis concerning fraudulent drivers' licenses (see Ex. A
to Dorn Sept. 26, 2015 Aff.), and it squarely presents the
belief that drug traffickers "utilize fraudulent out-of-state
driver[s'] licenses to retrieve packages of suspected contraband
through the United States mail." (Dorn Sept. 26, 2014 Aff. at ¶
54.)  The substance of these conversations, in turn, created at
least a fair probability that the Tutis wiretap would capture
evidence of a drug conspiracy (particularly when coupled with
the interactions involving CI #607/CS-2).  See Heilman, 377 F.
App'x at 193 (citation omitted) (finding that "frequent contact
with drug distributors" creates a fair probability that the
search would result in evidence of a drug-related offense).

29

Against that backdrop, and in view of the deferential standard, this Court finds that Judge DeLury had a substantial basis to find that Detective Dorn's affidavit, viewed in its entirety, demonstrated a "'fair probability'" of Toye Tutis' involvement in criminal activity utilizing the subject communication device.  Bond, 581 F.3d at 139 (citation omitted). Defendant Tutis' request for suppression will, accordingly, be denied.[31]

### B. Defendant Tutis' Request for a Franks Hearing

In the alternative to suppression, Defendant Tutis requests that the Court conduct a Franks hearings regarding alleged omissions in the wiretap affidavit.

#### 1. Standard for a Franks Hearing

The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or the omission of material information) in a search warrant or wiretap affidavit. Yusuf, 461 F.3d at 383-84.  Nevertheless, "a presumption of validity" attaches to the affidavit underpinning a wiretap.  See Franks, 438 U.S. at 171.  For that reason, a defendant seeking a Franks hearing, as here, must make two "substantial preliminary showings:" first, "that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless

---

[31] As a result, the Court need not reach the parties' position on the application of a "good faith" exception to the statutory probable cause requirements.

A0031

disregard for the truth;" and <u>second</u>, "that the false statement
or omission was necessary to the finding of probable cause."
<u>United States v. Rigaud</u>, 684 F.3d 169, 173 (1st Cir. 2012)
(citing <u>Franks</u>, 438 U.S. at 155–56); <u>see also United States v.
Yusuf</u>, 461 F.3d 374, 383 (3d Cir. 2006) (applying the same
framework); <u>Heilman</u>, 377 F. App'x at 177 (following <u>Yusuf</u>, and
discussing the relevant framework in greater detail).  This
demonstration, however, requires "more than conclusory
statements that the affidavit contains false statements or
omissions."  <u>Heilman</u>, 377 F. App'x at 177 (citations omitted);
<u>see also Yusuf</u>, 461 F.3d at 383 n.8 (citation omitted) ("[i]n
order to make this preliminary showing, the defendant cannot
rest on mere conclusory allegations or a 'mere desire to cross-
examine'"); <u>United States v. Taylor</u>, 154 F.3d 675, 680 (7th Cir.
1998) (same); <u>Franks</u>, 438 U.S. at 171 ("To mandate an
evidentiary hearing, the challenger's attack must be more than
conclusory....").  Rather, the "challenger must specifically
identify allegedly false statements or omissions in the
affidavit and provide a statement of reasons supporting the
argument," as well as "an offer of proof or ... a satisfactory
explanation for the absence of proof."  <u>Heilman</u>, 377 F. App'x at
177 (citations omitted); <u>see also Yusuf</u>, 461 F.3d at 383 n.8
(citation omitted) (explaining that a defendant seeking a <u>Franks</u>
hearing "must present an offer of proof contradicting the

31

A0032

affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses").

### 2. Defendant Has Not Made the Substantial Showing Necessary to Obtain a <u>Franks</u> Hearing

In this case, Defendant Tutis' request for a <u>Franks</u> hearing requires no complex inquiry, because he has made no showing (much less a substantial showing) that Detective Dorn knowingly, intentionally, and/or recklessly made a false statement, nor that any arguable false statement provided a necessary ground for the Tutis wiretap. Indeed, although Defendant Tutis takes exception to the manner in which Detective Dorn presented the results of a parallel federal investigation, he ignores the fact that Detective Dorn expressly disclaimed any reliance upon the federal investigation in connection with his evidence on the issue of probable cause. (<u>See</u> Dorn Sept. 26, 2014 Aff. at ¶ 11.) In that way, any omission relative to that prior investigation does not give rise to a <u>Franks</u> hearing, because the pendency and results of the federal investigation had no impact on Judge DeLury's ultimate probable cause determination.

Similarly, although Tutis rejects any association between himself and the nickname "Santana," and to the lack of evidence identifying him as the participation on the August 5, 2014 recorded call (an argument the Court, in any event, rejects for the reasons stated above), he cites to no evidence demonstrating

32

that the connection proffered by Detective Dorn proved false. Rather, Defendant Tutis claims that Detective Dorn should have contextualized his affidavit, by explaining that someone other than Defendant Tutis may have gone by the nickname "Santana." Nevertheless, the law does not require probable cause affidavits to detail every possible fact. Even more critically, though, the sequence of events recounted in Detective Dorn's affidavit – both recorded and otherwise – plainly portrayed Defendant Tutis as having at least some involvement in the claimed drug conspiracy. Indeed, during the recorded conversation on August 5, 2014, Defendant Tutis told CI #607/CS-2 to "call [his] brother" for "doughnuts," and then Jewell Tutis, the brother of Defendant Tutis, provided CI #607/CS-2 with controlled substances in accordance with Defendant Tutis' initial instructions, and on no fewer than nine occasions. (See generally Dorn Sept. 26, 2014 Aff.)

Finally, although Defendant Tutis makes much of the misspelling of "Jewel" on the Ta'Ja Construction business card, the affidavit provided no detail concerning who wrote on the business card, and the affidavit, in any event, amply presented the distinction/error in spelling to Judge DeLury. (Compare id. at ¶ 22 (detailing the contact between CI #607/CS-2 and Jewell E. Tutis), with id. at ¶ 23 (describing the "business card with the name 'Jewel'").)

For all of these reasons, Defendant Tutis' "conclusory" statements of material omissions fail to make a case for a <u>Franks</u> hearing.  <u>Yusuf</u>, 461 F.3d at 383 n.8 (citation omitted); <u>Heilman</u>, 377 F. App'x at 177 (citation omitted).

**V.    CONCLUSION**

For all of these reasons, Defendant Tutis' motion to suppress and Defendant Atiba's motion for severance will be denied.  An accompanying Order will be entered.


**_March 8, 2016_**                           **_s/ Jerome B. Simandle_**
Date                                          JEROME B. SIMANDLE
                                              Chief U.S. District Judge

A0035

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>TOYE TUTIS, KABAKA ATIBA, and<br>JAZMIN VEGA,<br><br>Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>Criminal Action Nos.<br>14-699-1 (JBS)<br>14-699-8 (JBS)<br>14-699-11 (JBS)<br><br>**ORDER CONCERNING DEFENDANTS'<br>VARIOUS PRETRIAL MOTIONS** |

This matter comes before the Court by way of the various
pretrial motions of Defendants Toye Tutis (hereinafter,
"Defendant Tutis"), Kabaka Atiba (hereinafter, "Defendant
Atiba"), and Jazmin Vega (hereinafter, "Defendant Vega") [see
Docket Items 308, 309, 310, 311, 312, 314, & 322]; and the Court
having conducted a hearing on September 8, 2016, with Defendants
and their counsel appearing; and for the reasons expressed on
the hearing record of September 8, 2016; and for other good
cause shown;

IT IS this __12th__ day of __September__, **2016**, hereby

**ORDERED** that the Government shall file a sur-reply to
Defendant Tutis' pretrial motion [Docket Item 322] regarding
Defendant Tutis' motion to suppress evidence obtained by a cell-
site simulator device not later than September 15, 2016; and it
is further

A0036

**ORDERED** that the Government in connection with its sur-reply to the above motion [Docket Item 322] shall provide discovery including:

(a)   When and how the cell-site simulator device was used to gather the evidence which Defendant Tutis seeks to suppress; and

(b)   Whether the cell-site simulator device was utilized to identify the existence of an electronic device within Defendant Tutis' home, and if so, identifying all evidence obtained thereby; and it is further

**ORDERED** that Defendant Tutis' pretrial motion [Docket Item 322] shall be, and hereby is, **DISMISSED AS MOOT** to the extent it seeks to suppress evidence obtained by electronic surveillance and/or consensual electronic interceptions because of fruits of violations of the New Jersey statutes and Constitution, specifically the absence of prosecutorial authorization for August 5, 2014 one way consensual interception and use of evidence directly and indirectly seized in violation of the New Jersey Constitution; and it is further

**ORDERED** that Defendant Tutis' pretrial motion [Docket Item 322] with respect to the release of untainted seized assets for Sixth Amendment purposes pursuant to USA v. Luis, 578 U.S. \_\_\_\_ (2016), is continued as the parties have ongoing discussions.

A0037

**ORDERED** that Defendant Tutis' pretrial motion [Docket Item 322] shall be, and hereby is, **DISMISSED AS MOOT** to the extent it seek that government agents retain rough notes and writings; and it is further

**ORDERED** that Defendant Tutis' pretrial motion [Docket Item 322] shall be, and hereby is, **DISMISSED** to the extent it seeks to compel discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure; and it is further

**ORDERED** that Defendant Tutis' pretrial motion [Docket Item 322] shall be, and hereby is, **GRANTED** to the extent it seeks to join in the pretrial motions of his co-Defendants; and it is further

**ORDERED** that Defendant Vega's motion to suppress statements of February 23, 2012 and physical evidence [Docket Item 310] shall be, and hereby is, **DENIED**.


**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge

A0038

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | HONORABLE JEROME B. SIMANDLE |
| v. | Crim. No.<br>14-699 (JBS) |
| TOYE TUTIS and JAZMIN VEGA,<br><br>Defendants. | **OPINION** |

APPEARANCES:

Diana Vondra Carrig, Assistant U.S. Attorney
Howard Weiner, Assistant U.S. Attorney
Jonathan Peck, Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
401 Market Street
Camden, NJ 08101

J. Michael Farrell, Esq.
718 Arch Street
Suite 402N
Philadelphia, PA 19106
     Attorney for Defendant Toye Tutis

Troy A. Archie, Esq.
21 Route 130 South
Cinnaminson, NJ 08077
     Attorney for Defendant Jazmin Vega

**SIMANDLE, Chief Judge:**

# I.   INTRODUCTION

The Second Superseding Indictment herein arises from a long-running investigation into an allegedly large scale drug trafficking and money laundering organization.  More

specifically, the First Superseding Indictment, filed March 16,
2016, charges Defendants Toye Tutis (hereinafter, "Defendant
Tutis" or "Toye Tutis") and Jazmin Vega (hereinafter "Defendant
Vega" or "Vega"), among others, with conspiring to distribute
kilogram quantities of heroin and cocaine throughout southern
New Jersey, and other crimes related to such drug distribution.
The charges were refined in a Second Superseding Indictment
filed September 14, 2016, and Defendants Tutis and Vega are the
sole remaining defendants. [See generally Docket Item 339.]

In the present motions, Defendant Tutis now moves to
suppress evidence obtained by electronic surveillance, on the
grounds that the Government unconstitutionally obtained the
evidence through the use of a cell-site simulator that was
unlawfully authorized under a communications data warrant on
October 14, 2014. [See Docket Items 322, 331, 350.]  Defendant
Vega seeks a bill of particulars pursuant to Fed. R. Crim. P.
7(f).  The Government opposes all motions.

For the reasons that follow,[1] Defendant Tutis's motion to
suppress evidence obtained by a cell-site simulator pursuant to
the October 14, 2014 communications data warrant and Defendant
Vega's motion for a bill of particulars will be denied.

---

[1] The Court conducted oral argument relative to the pretrial
motions of all defendants on September 8, 2016 [see Docket Item
337], supplemented by a hearing concerning the cell-site
simulator issues on September 27, 2016. [see Docket Item 352.]

A0040

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Investigation Background and CDW Authorization

The charges contained in the Superseding Indictment and Second Superseding Indictment stem from a long-running investigation conducted jointly by federal, state, and local law enforcement officers, targeting an alleged drug-trafficking organization in Atlantic City and the surrounding southern New Jersey region.  (See Walsh Aff. at ¶¶ 5-6.)  This Court has thoroughly discussed the background of this case in United States v. Tutis, No. 14-699, 2016 WL 885044 (D.N.J. Mar. 8, 2016) [Docket Item 264], and will assume the reader's familiarity with that discussion.

As relevant here, the Atlantic County Prosecutor's Office (hereinafter, the "ACPO") obtained a series of wiretaps, authorized by the Honorable Bernard E. DeLury (hereinafter, "Judge DeLury") and supported by the affidavits of Detective Jason E. Dorn (hereinafter, "Detective Dorn"), on cellular telephones known to be used by Defendant Tutis.  (See Gov't Opp'n to Def. Tutis's First Set of Pretrial Motions at 7; see also Dorn Sept. 19, 2014 Aff. (Gov't Ex. 2); Dorn Sept. 26, 2014 Aff. (Gov't Ex. 3).)  On September 19, 2014, the ACPO obtained its first "roving" wiretap authorization (BED-ATL-21-WT-2014) to intercept communications over the cellular telephone of Jewell Tutis.  After a few days of intercepting communications pursuant

3

to that wiretap, Detective Dorn (and others) determined that
Toye Tutis had used a specific cellular telephone in connection
with his alleged drug distribution, namely 424-646-1761, and
requested roving wiretap authorization to intercept
communications of Toye Tutis. (See Dorn Sept. 26, 2014 Aff. at
¶¶ 3-5.)

     After reviewing the Affidavit, Judge DeLury issued the
requested wiretap on September 26, 2014 (BED-ATL-22-WT-14 & BED-
ATL-153-CDW-14).  Then, in the matter at issue in the present
opinion, on October 14, 2014, Detective Dorn applied for and
Judge DeLury approved a Communications Data Warrant (BED-ATL-
162-CDW-14) (hereinafter "the Tutis CDW") which authorized the
use of "wireless interrogation equipment" that was "capable of
retrieving wireless instrument identification information" of
cell phones utilized by Tutis. (See Ex. 1, ¶ 7K, ¶ 9, to Gov't
Sur-Reply.)  The "wireless interrogation equipment" referred to
in the Tutis CDW is a cell-site simulator device ("CSS"). (See
Gov't Sur-Reply at 1.)  In his Affidavit for the Tutis CDW,
Detective Dorn explains that he applied for permission to use
the CSS because he believed that Tutis "ha[d] demonstrated a
willingness to change" his cell phone number, and would
"continue to change" numbers "with the purpose to thwart
interception by members of law enforcement." (Id. at ¶ 3A.)
Additionally, Tutis "used multiple telephone facilities at the

4

same time with a purpose to thwart detection or interception by law enforcement, and ha[d] clearly evidenced his intention to continue to change wireless telephone facilities, or devices for that purpose." (Id.)  As a result, the data obtained by the CSS would "assist law enforcement in ascertaining the additional [cell phones] utilized by Toye Tutis." (Id. at ¶ 8K.)

Regarding the scope of the use of the CSS, the Affidavit explains that the CSS device would only retrieve the Electronic Serial Number ("ESN"), Mobile Telephone Number ("MSISDN"), and International Mobile Subscriber Identification Number ("IMSI") from any phones associated with Tutis. (Id. at ¶ 9.)  The "only function" of the device regarding this investigation was to identify those data points, as it was "not [to be] used to obtain any written or oral communications." (Id. at ¶ 4A, ¶ 9.) To obtain the data, the ACPO would "utiliz[e] the equipment in close proximity" to Tutis "at different geographical locations," and since the ESN, MSISDN, and ISMI "are unique," Tutis's cell phones "may be identified by a process of elimination." (Id. at ¶ 4A.)  ACPO would then confirm Tutis's usage of each cell phone by "analysis of the Call Detail Records and subscriber information" for the cell phones identified by the CSS.  The CSS, in other words, would not itself identify Tutis' cell phone but it would instead canvass all cell phones within close proximity to Tutis at one location and then do so again at other

5

known Tutis locations, yielding lists of identifying data for each vicinity's cell phones.  Then by "process of elimination" the detectives could focus upon the common cell phone number(s) that showed up at each Tutis location, which logically would be highly probably possessed by Tutis, and thus lead to the identification of a new Tutis cell phone.  The CSS, as used in this case, would not be directed at a Tutis phone, since his new numbers were unknown when the device would be used to canvass the vicinities.  Judge DeLury granted ACPO's request to use "electronic equipment to retrieve certain cellular telephone information" for 30 days on a 24 hour, 7 day per week basis." (See Tutis CDW Order, Ex. 1 to Gov't Sur-Reply.)  Judge DeLury also approved another CDW based upon an affidavit reciting the same information regarding the use of the "electronic equipment," on December 2, 2014 (BED-ATL-190-CDW-14). (See Ex. 2 to Gov't Sur-Reply.)  The latter CDW did not result in obtaining usable electronic data according to the Government. (Gov't Sur-Reply at 2.)

## B.   December 9, 2014 Search Warrants, December 10, 2014 Indictment, and Arrests

Thereafter, on December 9, 2014, federal law enforcement agents obtained federal search warrants for approximately seven properties throughout southern New Jersey, all of which bore some claimed relation to the alleged drug trafficking

A0044

organization.  (See Gov't Opp'n to Defendant Tutis's First Set of Pretrial Motions at 32; see also Walsh Aff. at ¶ 7.)

Then, on December 10, 2014, a federal grand jury returned a two-count Indictment charging certain defendants with conspiring to traffic in cocaine, heroin, and crack cocaine, and certain others with conspiring to conceal and/or disguise the proceeds of this unlawful activity, followed by the First and Second Superseding Indictments as above.  During the execution of the search and arrest warrants, officers seized additional evidence of drug trafficking and money laundering, including more than one kilogram of crack cocaine, lesser amounts of powder cocaine and heroin, eight firearms, two tasers, more than forty cellular telephones, a bulletproof vest, and in excess of $100,000 in cash.  (See Gov't Opp'n to Defendant Tutis's First Set of Pretrial Motions at 32-33.)

## C.    Defendant's First Set of Pretrial Motions

This Court, in its March 8, 2016 Opinion addressing Defendants' first set of pretrial motions, denied Defendant Tutis's motion to suppress the wire and electronic conversations captured under the September 26, 2014 wiretap because it found that Judge DeLury had a substantial basis to find that Detective Dorn's Affidavit, viewed in its entirety, demonstrated a "fair probability" of Toye Tutis's involvement in criminal activity. See Tutis, 2016 WL 885044 at *11.  The undersigned also denied

Defendant Tutis's request that the Court conduct a <u>Franks</u>
hearing regarding omissions in the September 26, 2014 wiretap
Affidavit, because he made no showing that Detective Dorn
knowingly, intentionally, and/or recklessly made a false
statement. <u>Id.</u> at *12.  The decision denying a <u>Franks</u> hearing
has been reconsidered at hearings on September 27, 2016 and
October 13, 2016, and a <u>Franks</u> hearing commenced on October 17,
2016 that will be the subject of a forthcoming separate Opinion
addressing all objections to the September 26, 2014 wiretap.[2]

## III. MOTION OF TOYE TUTIS TO SUPPRESS EVIDENCE OBTAINED THROUGH CELL-SITE SIMULATOR PURSUANT TO WARRANT

In moving to suppress the wire and electronic conversations
captured under various Tutis wiretaps, Defendant Tutis, relying
on eight separate bases, claims that the supporting Affidavits
filed in the Superior Court lacked probable cause; thus, any
fruits of the Tutis wiretaps should be suppressed.  The
Government opposes suppression, principally on the grounds that
Judge DeLury had a substantial basis for authorizing the Tutis
wiretaps based on the totality of the circumstances.  The Court
addresses only one of the bases in this Opinion--suppression

---

[2] At this point, nine of the indicted defendants have pleaded
guilty to the drug trafficking conspiracy or other drug
distribution charges.  These defendants are Kareem Taylor,
Philip Horton, Talib Tiller, Ronald Douglas Byrd, John Wellman,
and Francisco Rascon-Muracami, Tejohn Cooper, Tozine Tiller, and
Kabaka Atiba.

based on the use of a cell-site simulator which Judge DeLury permitted in the communications data warrant of October 14, 2014.

## A. Standard for Suppression

The traditional Fourth Amendment principles that apply to property searches govern probable cause determinations under the federal and/or state wiretap statutes. See United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983); see also 18 U.S.C. § 2518(3) (federal wiretap statute); N.J.S.A. § 2A:156A-10 (state wiretap statute). The same Fourth Amendment standards govern finding probable cause for a wiretap order and for a search warrant. United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983). Under these principles, a finding of probable cause requires a "'fair probability'" of criminal activity, based upon the totality of the circumstances. United States v. Bond, 581 F.3d 128, 139 (3d Cir. 2009) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The reviewing court need not determine whether probable cause actually existed, but only whether there was "a 'substantial basis' for finding probable cause." United States v. Jones, 994 F.2d 1051, 1054 (3d Cir. 1993). Stated differently, the issuing court must "make a practical, common-sense decision" concerning whether the circumstances set forth in the supporting Affidavit, "including the 'veracity' and 'basis of knowledge' of the persons supplying the hearsay

9

information," demonstrate "a fair probability" that the authorization will result in evidence of a crime. Id. at 238-39.

A reviewing court must afford great deference to the probable cause finding of an issuing court. See United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001); United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993). As a result, the probable cause determination of an issuing court will be upheld so long as the supporting documents provided a substantial basis for the initial probable cause decision.[3] See United States v.

---

[3] Title III of the Omnibus Crime Control and Safety Street Act of 1968 empowers a judge to enter an ex parte order to authorize interception of wire communications, if the judge determines on the basis of the facts submitted by the application that:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit [a drug-trafficking offense]; (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. §§ 2518(3)(a)-(d). The New Jersey Wiretapping and Electronic Surveillance Control Act, which governed the wiretap at issue here, contains analogous provisions, and specifically authorizes the issuance of a wiretap, if the judge finds probable cause to believe that:

> a. [t]he person whose communication is to be intercepted is engaging or was engaged over a period of time as a part of a continuing criminal activity or is committing, has or had committed or is about to commit an offense as provided in section 8 of P.L.1968, c.409 (C.2A:156A-8); b. [p]articular

10

A0048

Hodge, 246 F.3d 301, 305 (3d Cir. 2001); United States v. Jones,

994 F.2d 1051, 1055 (3d Cir. 1993) ("[T]he resolution of

doubtful or marginal cases in this area should be largely

determined by the preference to be accorded to warrants.").

This deferential standard "does not mean that reviewing courts

should simply rubber stamp" the authorizing judge's conclusions,

United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1983)

(citing United States v. Ventresca, 380 U.S. 102, 108 (1965)),

but it does counsel that "resolution of doubtful or marginal

cases ... be largely determined by the preference ... accorded

to warrants." United States v. Jones, 994 F.2d 1051, 1055 (3d

Cir. 1993) (citing Ventresca, 380 U.S. at 109). In other words,

the standard encourages slight doubts concerning the propriety

---

communications concerning such offense may be obtained through
such interception; c. [n]ormal investigative procedures with
respect to such offense have been tried and have failed or
reasonably appear to be unlikely to succeed if tried or to be too
dangerous to employ; d. [e]xcept in the case of an application
meeting the requirements of subsection g. of section 9 of
P.L.1968, c.409 (C.2A:156A-9), the facilities from which, or the
place where, the wire, electronic or oral communications are to
be intercepted, are or have been used, or are about to be used,
in connection with the commission of such offense, or are leased
to, listed in the name of, or commonly used by, such individual;
e. [t]he investigative or law enforcement officers or agency to
be authorized to intercept the wire, electronic or oral
communication are qualified by training and experience to execute
the interception sought; and f. [i]n the case of an application,
other than a renewal or extension, for an order to intercept a
communication of a person or on a facility which was the subject
of a previous order authorizing interception, the application is
based upon new evidence or information different from and in
addition to the evidence or information offered to support the
prior order, regardless of whether such evidence was derived from
prior interceptions or from other sources.

N.J.S.A. § 2A:156A-10.

of the wiretap authorization to be resolved in favor of the issuing court. Id. Finally, "[s]tatements in an affidavit may not be read in isolation—the affidavit must be read as a whole." United States v. Kaplan, 526 F. App'x 208, 212 (3d Cir. 2013).

### B. Tutis's Motion to Suppress Evidence Obtained By a Cell-Site Simulator Pursuant to Communications Data Warrant of October 14, 2014

Tutis argues that the wiretap evidence should be suppressed because it was illegally obtained by prior use of a Stingray, or cell-site simulator, pursuant to an allegedly defective communications data warrant issued by Judge DeLury on October 14, 2014, and that an evidentiary hearing should be held to probe into the use of the device and the technical process employed.[4]  The Court did not convene a testimonial hearing, because Tutis did not identify issues of fact material to his motion. United States v. Hines, 628 F.3d 101, 105 (3d Cir. 2010) ("A motion to suppress requires an evidentiary hearing only if ... there are disputed issues of material fact that will affect the outcome of the motion to suppress.").  The Court, however,

---

[4] Following oral argument on Defendant's second set of pretrial motions, on September 12, 2016, the Court issued an Order Concerning Defendants' Various Pretrial Motions, which specifically directed the Government to (a) file a sur-reply to the [CSS] suppression motion, and (b) provide discovery as to "when and how the [CSS] was used to gather the evidence which Defendant Tutis seeks to suppress; and . . . whether the [CSS] was utilized to identify the existence of an electronic device within [his] home . . . ." [See Docket Item 338.]

required the Government to provide additional information about the use of the cell-site simulator, which was received on September 15, 2016, and a hearing addressed these issues on September 27. As discussed below, the Court finds that no Fourth Amendment or state law violations occurred in this particular case, and will deny the motion to suppress regarding the use of the cell-site simulator.

### 1. Background Regarding Cell Site Simulator in this Case

As discussed further below, a cell-site simulator ("CSS") is a device used by law enforcement to simulate a cell tower in order to obtain information related to the presence of cell phones in an area proximate to a suspect's physical presence. By gathering identifying signals from many cell phones in proximity, and then gathering new samples from other locations where the suspect is present at other times, a law enforcement officer can narrow the list of identified cell phones to those that watch the suspect's locations and eliminate the many that do not appear to follow the suspect from one place to another. By such process of elimination, the officer can deduce the phone numbers which may belong to the suspect, and then match those few numbers to numbers known to be involved in the illegal transactions. Thus, from an array of cell phone identification data at various locations where the suspect is known to be when the CSS is used, the officer can by process of elimination and

13

deduction narrow the field to the data associated with the
suspect's cell phone or phones.  As one federal court recently
described it:

> [B]y simulating a cell site, the device causes or forces cell-
> phones in an area to send their signals – with all the
> information contained therein – to the cell-site simulator.
> Once the cell phones in the area send their signals to the
> cell-site simulator, the device captures a vast array of
> information, including, but not limited to, the cell phones'
> electronic serial number ("ESN") or international mobile
> subscriber identification ("IMSI"). A cell phone need only be
> on for the cell-site simulator to capture the cell phone's
> ESN and IMSI; the cell phone need not be "in use."

In the Matter of the Application of the of Am. for an Order Relating
to Telephones Used by Suppressed, No. 15-0021, 2015 WL 6871289 at
*2 (N.D. Ill. Nov. 9, 2015).  Despite the prevalent use of cell-
site simulators by law enforcement, there are few reported cases
regarding its use. See, e.g., id.; United States v. Lambis, No.
15-734, 2016 WL 3870940 (S.D.N.Y. July 12, 2016); United States v.
Rigmaiden, No. 08-814, 2013 WL 1932800 (D. Az. May 8, 2013); In re
U.S. for an Order Auth. the Installation and Use of a Pen Register
and Trap and Trace Device, 890 F. Supp. 2d 747 (S.D. Tex. 2012).

In the instant action, ACPO investigators knew that Tutis
was using cell phones to further his criminal activities, but
they were unable to determine his specific cell phone numbers or
other electronic identification information. (Ex. 1 to Gov't
Sur-Reply.)  As a result, they sought and obtained judicial
authorization to use the CSS.  The October 14, 2014

Communications Data Warrant ("CDW") (No. BED-ATL-162-CDW-14), which Judge DeLury issued and which authorized the use of the CSS for 30 days, resulted in the use of a CSS on three dates: October 16, November 5, and November 10. (Gov't Sur-Reply at 2.) A second CDW was obtained on December 2, 2014, but that did not result in any information being collected that was used in this case. (Id.)  Furthermore, the October 14, 2014 CDW was a "hybrid" warrant, in that it combined a request for authorization to use the CSS with a request that the telephone service provider ("TSP") be ordered to provide subscriber information to law enforcement. (Gov't Sur-Reply at 3, n. 3; Ex. 1.)

On the three aforementioned dates, law enforcement took the CSS to multiple separate locations where Tutis was known to be, conducted surveillance to establish that he was present at a particular location, and then used the CSS at that location to capture electronic signals (IMSI and mobile station ID) emanating from cell phones in that area. (Id. at 4.)  The Government explains that the CSS was used to "canvass" several locations where Tutis was located, in an attempt to determine the IMSI and/or mobile station ID of the phone(s) he had in his possession. (Id. at 4, n. 4.)  The CSS was "used in the vicinity of a building at which Tutis was observed, or based upon prior knowledge was believed to be located at the time of canvassing."

15

(Id. at 14.)  More specifically, the CSS "emitted a signal omnidirectionally, so that it could be picked up by cell phones in the general vicinity," and "received signals emanating from any phone(s) inside buildings and any other telephones in the area that were turned on and sending electronic signals to the nearest cell tower." (Id.)  After using the device at several locations, law enforcement determined the common IMSIs and subpoenaed the TSPs for subscriber names and information of common IMSIs and mobile station IDs, and looked for connections to Tutis.

### 2. The Fourth Amendment Implications of the Use of the Cell-Site Simulator

Tutis argues that (1) the Government should have obtained a search warrant to use the CSS instead of a CDW, (2) the CDW was deficient, and (3) the Government exceeded the scope of the CDW when carrying out its investigation.  Moreover, Tutis argues that where the Tutis cell phone was in his home, the Fourth Amendment provides enhanced protection from the alleged electronic intrusion.  The Government argues in response that the CDW is the functional equivalent to a search warrant because it satisfies the federal requirements for a search warrant, and alternatively that even if there were a deficiency in the CDW, the evidence obtained from Defendant should not be excluded because investigators acted in good faith.  The Government does

A0054

not deny that its use of a CSS was a search under the Fourth Amendment, but it argues that it obtained a proper warrant under federal and state law.[5]

According to the Supreme Court, a search warrant complies with the Fourth Amendment when it meets three criteria: (1) it was issued by a neutral and detached magistrate; (2) it was based on a showing of "probable cause" to believe that "the evidence sought will aid in a particular apprehension or conviction for a particular offense," and (3) it satisfies the particularity requirement. Dalia v. United States, 441 U.S. 238, 255 (1979).  The parties do not dispute that Judge DeLury was a neutral magistrate, so the Court will focus on the remaining two criteria.

### a. Probable Cause

There was a substantial basis for Judge DeLury's finding that there was probable cause under the CDW.  The Government notes that by October 14, the roving wiretap on Tutis's known phones had been in operation for over two weeks, and it had produced more evidence that Tutis had been dropping phones and using multiple phones simultaneously. (Gov't Sur-Reply at 9-10.)

---

[5] The Court will decide the instant motion based on federal, rather than state law. See United States v. Rickus, 737 F.2d 360, 363-64 (3d Cir. 1984) ("[F]ederal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law.").

A0055

Judge DeLury specifically found that probable cause existed for
ACPO to utilize the device in his CDW Order. See Ex. 1 to Gov't
Sur-Reply ("Probable Cause having appeared for the entry of this
Order.").

Tutis cites to United States v. Lambis, No. 15-734, 2016 WL
3870940 (S.D.N.Y. July 12, 2016) for the proposition that law
enforcement needed a search warrant based on probable cause to
use the CSS, but that case can be distinguished. There, the DEA
employed a cell-site simulator to investigate an international
drug-trafficking organization, but only sought a warrant for pen
register information and cell site location information ("CSLI")
for a target cell phone. Id. at *1. In Lambis, the agents'
primary objective in using the CSS was to identify a "specific
apartment" of a suspect by pinpointing "the most likely location
of the target cell phone" through forcing the phone to transmit
"pings" to the CSS. Id. The Court found that the use of the CSS
exceeded the scope of the warrant because "[a]bsent a search
warrant, the Government may not turn a citizen's cell phone into
a tracking device." Id. at *3. Unlike Lambis, however, the CSS
here was not used to "ping" a known telephone of Tutis in order
to locate him or his particular residence, but only to try to
identify other cell phones that Tutis may have been using

A0056

("canvassing"). (Gov't Sur-Reply at 4, 13.)[6]  Moreover, in
Lambis, the CSS was used "to obtain more precise information
about the target phone's location [that] was not contemplated by
the original warrant application." 2016 WL 3870940 at *3.  The
court there noted that "[i]f the Government had wished to use a
cell-site simulator, it could have obtained a warrant." Id.

    In this instant matter, Detective Dorn did contemplate the
use of the CSS in the CDW, as he described the equipment in
sufficient detail in the Affidavit, despite not actually calling
the equipment a "cell-site simulator." See Ex. 1 to Gov't Sur-
Reply at ¶ 4A (describing how the "only function" of equipment
would be used to obtain ESN, MSISDN, and IMSI information, and
that it would "not be used to obtain any written or oral
communications"); id. (describing the way in which the CSS would
obtain the data points); id. at ¶ 9 ("I will utilize this
technology in an effort to identify additional telephone
facility numbers being utilized by [Tutis] or telephone facility
numbers that he may utilize during the period of the requested
interception.").  It was well documented prior to October 14th,
2014, and summarized in the Affidavit, that Tutis was engaged in

---

[6] The Government alleges that the CSS was used on a particular
date to "canvass" several locations where defendant was located,
in an attempt to determine the IMSI and/or mobile station ID of
the phone(s) Tutis had in his possession.  The Government
turned over investigation documents regarding the use of the CSS in
this investigation. (See Ex. 3 to Gov't Sur-Reply.)

A0057

illegal drug transactions through the use of numerous cell phones and that the numbers of some of those phones could not be determined as he continually switched and added cell phones. The Affidavit therefore establishes a "fair probability" that locating the additional cell phone numbers would lead to evidence of a crime. See United States v. Gatson, No. 13-705, 2014 WL 7182275 (D.N.J. Dec. 16, 2014) (denying defendant's motion to suppress where state law enforcement obtained a court-authorized CDW supported by a showing of probable cause for all cell phone GPS data).

### b. Particularity of CDW

The Fourth Amendment requires all warrants to contain a "particular description" of the items to be seized. Doe v. Groody, 361 F.3d 232, 239 (3d. Cir 2004). This requirement invalidates "general warrants"--or warrants that "vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57), 307 F.3d 137, 149 (3d Cir. 2002) (quoting United States v. Christine, 687 F.2d 749, 753 (3d Cir. 1982)). As now discussed, the Court finds the CDW met the requirement for reasonable particularity of the items to be seized, namely, the electronic

signals containing the identifiers of cell phones in Tutis's near proximity.

The Government argues that the CDW included a "rather detailed description" of how the equipment would be utilized, and relies on United States v. Rigmaiden, 2013 WL 1932800 (D. Az. May 8, 2013) to demonstrate that the CDW did not need to include more specific details about the use of the CSS in order to satisfy the particularity requirement. (Gov't Sur-Reply at 11, Ex. 1 at ¶ 4A.)[7]  In that case, the Government located and arrested the defendant, who devised a scheme to obtain fraudulent tax refunds, through a CSS that tracked the location of an aircard connected to his laptop computer. 2013 WL 1932800 at *1.  In holding that the warrant obtained for that search was sufficiently particular, the court in Rigmaiden explained that "[t]here is no legal requirement that a search warrant specify the precise manner in which the search is to be executed," and "[t]here is no precedent suggesting that the agent was required to include in his warrant application technical details about the operation of the mobile tracking device." Id. at *16-*17,

---

[7] ¶ 4A of the Affidavit notes that law enforcement can retrieve additional numbers "by utilizing the equipment in close proximity to [Tutis] at different geographical locations." Later, the CDW notes that the ACPO and FBI "presently have access to equipment that is capable of retrieving the Electronic Serial Numbers and/or International Subscriber Identity Numbers from wireless telephones facilities." (Ex. 1 to Gov't Sur-Reply.)

*32. As a result, in that case, even though the warrant did not disclose that the CSS would capture signals from other cell phones and aircards in the area of Defendant's apartment, this was a "detail of execution which need not be specified under Dalia." Id. at *20. Similarly, in the instant matter, it was not necessary for the Government to include a detailed description in the CDW of how the CSS technology worked. While it might have been helpful to include the words "cell-site simulator" in the warrant and attach instruction manuals, that is simply not required under the Fourth Amendment.[8] The Government's application sufficiently described the device's capabilities, what it would do in terms of receiving electronic signals from cell phones in all directions, and what it would not do in terms of not intercepting communications on such cell phones. The CDW reflected those understandings and limitations.

Next, Tutis explores the distinction between the word "retrieve," which the CDW Affidavit and warrant use frequently, and "interception," which is a different concept in that it

---

[8] Nonetheless, the Court shares Defendant Tutis's concern about how the "use of a [CSS] must be strictly overseen by the courts due to the invasion of privacy of the home." (Reply Br. at 19.) While the inner workings of this new technology are difficult to obtain, see In the Matter of the Application, 2015 WL 6871289 at *1 (noting that the manufacturers of CSSs are "extremely protective about information regarding its device"), the Court has thoroughly reviewed the various submissions to Judge DeLury and finds that they conform to the requirements of the Fourth Amendment.

"implies the real time seizure of evidence or information in the manner in which it was done in this case." (Def. CSS Reply at 3-4.)  As a result, he argues that the CDW "simply does not contemplate the real time 'capture' of information from the defendant's cell phone while he was in his home or place of business." (Id. at 3.)  This distinction is insignificant, as the Affidavit and CDW read as a whole make clear what the equipment was intended to do and how it would do it, despite not employing Defendant's preferred choice of words in every instance.  According to the Affidavit, the CSS would obtain the ESN, MSISDN, and IMSI from each device, which, as "electronic identifying numbers assigned to a specific cellular facility," are fixed characteristics of a cell phone. (Ex. 1 to Gov't Sur-Reply ¶ 4A); see United States v. Oliva, 705 F.3d 390, 396 n. 4 (9th Cir. 2012) (explaining that an ESN "is a unique number hardwired into every cell phone" and that IMSI numbers are the "unique identifying numbers assigned to the computer chips installed on cellular phones" (citations omitted)); State v. Alexander, 2014 WL 6991736 at *2 (N.J. Super. Dec. 12, 2014) (noting that the MSISDN "is a phone number that is assigned to a particular SIM card").  The purpose of using the CSS was specifically stated in the CDW -- to obtain ESN, MSISDN, and ISMI numbers from phones used by Tutis (see CDW Order at 1-2), and this same purpose was specifically stated in the Affidavit.

23

(Ex. 1 to Gov't Sur-Reply ¶ 4A, ¶ 9.)  Thus, retrieval of the numbers as described in the Affidavit and CDW is a fair characterization of CSS's use here.  The authorizing judge was not misled and would have no ambiguity about what he was authorizing in the CDW.

Defendant further argues that the CDW did not satisfy the particularity requirement of a valid search warrant because it did not authorize any search of the defendant's home, or particularly describe the place to be searched, despite the fact that Detective Dorn was "well aware" of Tutis's residence and place of business. (Reply Br. at 7.)  The Fourth Amendment specifies only two matters that the warrant must particularly describe: "the place to be searched" and "the persons or things to be seized." United States v. Grubbs, 547 U.S. 90, 97 (2006). As the Government notes, the CSS "emitted a signal omnidirectionally, so that it could be picked up by cell phones in the general vicinity" of the location of the CSS, including any nearby place at which Tutis was observed. (Gov't Sur-Reply at 14.)  And in the affidavit applying for the CDW, Detective Dorn explains that in order to "ascertain[] the additional cellular telephone facilities utilized" by Tutis, ACPO would utilize "the equipment in close proximity to [Tutis] at different geographical locations." (Ex. 1 to Gov't Sur-Reply ¶ 4A.)  It was clear not only that the CSS would be used at

24

A0062

different locations where Tutis was located, but also that it was necessary to do so in order to determine which cell device(s) were in Tutis's possession as he moved about from place to place.  This CSS device was used for the limited purpose of obtaining electronic signals from which one might deduce the identifying data of additional cell phones used by Tutis, and the CDW was very clear about its intended purpose. The CSS was not to be used as a tracking device as in Lambis, or to extract any content from the phones.  It was not directed at any known cell phone.  It was collecting electronic signals of the very type emitted by all cell phones as they keep in touch with the nearest cell tower or, in this case, the nearest cell-site simulator.  It would be used only in "close proximity" of a place where Tutis was known to be.  Thus, given "the nature of the crime and the limitation on the items to be searched," the Court concludes that the CDW was sufficiently particular for Fourth Amendment purposes. United States v. Yusuf, 461 F.3d 374, 395 (3d Cir. 2006).

That the CSS could be used near Tutis's home or business, and the notion that the search of a home is subject to stringent restraints, does not alter the result.  It is acknowledged that the CSS was deployed in the vicinity of Tutis's home and his

A0063

business.[9]  The nature of the intrusion into Tutis's home was slight and it was shared with the incidental intrusion into other buildings in the near vicinity: namely, the CSS emitted a wireless signal simulating a cell tower and thereby "inviting" all operating cell phones to make contact electronically.  The CSS merely activates a signal inviting nearby cell phones to identify themselves.  Whether a Tutis cell phone is on a sidewalk, in a restaurant, or in a home does not change the user's expectation of privacy because the cell phone will make the same response and reveal its existence to the cell tower so long as it is in operating mode.  If the device is "off," there will be no signal to the cell tower.  The CSS, according to the Dorn Affidavit, would invite its electronic signal exchange only from active cell phones; if in the home one did not wish to communicate identifying data, one need only turn the cell phone off.  Where a court has authorized the use of the CSS device for

---

[9] The Government stipulated at oral argument that its use of the CSS was a search of Tutis's home and business, but claims that it was a valid search under the Fourth Amendment because it properly obtained a warrant. See Sept. 27, 2016 Tr. 10: 4-6 ("We concede for the purposes of this debate, that law enforcement needed a warrant. We got a warrant.")  As noted previously, the CDW was not used to seize any cell phone or to seize any communication – it was only used to seize data that identifies the existence of the phone and nothing more.  Moreover, Kyllo v. United States, 533 U.S. 27 (2001), which Defendant cites to in his briefing, is inapposite because there, law enforcement failed to obtain a warrant to use the thermal-imaging device. Id. at 40.

A0064

the limited purpose of obtaining electronic identifiers from cell phones within the vicinity of the targeted individual, any intrusion by the CSS's electronic signal into the home is both de minimis and reasonable under the Fourth Amendment.

### c. Good Faith

Finally, even assuming arguendo that the CDW in this case was invalid due to a lack of probable cause or particularity, the Court nevertheless would find that the evidence seized pursuant to the CDW should not be suppressed because the good faith exception would apply.

In United States v. Hodge, 246 F.3d 301 (3d Cir. 2001), the court stated that the "test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 307 (quoting United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999)). The court there continued: "The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." Hodge, 246 F.3d at 307-308 (citing United States v. Leon, 468 U.S. 897, 922 (1984) and United States v. Williams, 3 F. 3d 69, 74 (3d Cir. 1999)). Nonetheless, an officer's reliance on a warrant would be unreasonable:

(1)  when the magistrate judge issued the warrant in reliance
     on a deliberately or recklessly false affidavit;

(2)  when the magistrate judge abandoned his judicial role and
     failed to perform his neutral and detached function;

(3)  when the warrant was based on an affidavit "so lacking in
     indicia of probable cause as to render official belief in
     its existence entirely unreasonable"; or

(4)  when the warrant was so facially deficient that it failed
     to particularize the place to be searched or the things
     to be seized.

Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-

Seven Cents, 307 F.3d at 146 (quoting Williams, 3 F.3d at 74 n.

4).

The Government argues that the good faith exception applies

because a "reasonably well trained officer" would not have known

that the use of the CSS "was illegal despite the magistrate's

authorization." (Gov't Sur-Reply at 16-17.) Tutis argues that

the good faith exception does not apply because "Detective Dorn

did everything possible to hide from Judge DeLury his intention

to use a cell-site simulator," because it is not mentioned in

the Affidavit or warrant, he used the word "retrieve" as opposed

to "intercept,"[10] and only mentioned once in the Friday Reports

that he was using a "sensitive technique." (Def. CSS Reply at

11.) As a result, the "only conceivable basis" for failing to

---

[10] Tutis argues that the CDW misled Judge DeLury into believing
that it was a seizure of post-transmission information versus
the real-time interception of information.

28

A0066

specify the intention to use a CSS was "to mislead Judge DeLury" into thinking that the CDW was not intended for the interception of identifying information regarding Tutis. (Id.)

Defendant's argument that the Dorn Affidavit applying for the CDW was misleading is not persuasive. While the Affidavit does not explicitly mention the term "cell-site simulator," it does disclose (1) that ACPO was going to use "wireless interrogation equipment," (2) how the device would be used in collecting the data, (3) how the device would not be used, in that it would not be used to obtain any written or oral communications, (4) that its only function would be to identify the electronic signals unique to Tutis's phones, and (5) that ACPO would go to multiple locations known to be frequented by Tutis, based upon a belief that he was dealing drugs and using multiple cellular devices. (Ex. 1 to Gov't Sur-Reply.)

Furthermore, defense counsel properly conceded at oral argument that the Affidavit did not call for, and ACPO did not collect, information about incoming or outgoing numbers from Tutis's phone. (Sept. 27, 2016 Tr. 14: 14-16.) Like Rigmaiden, where the court was persuaded that "agents were using a relatively new technology, and they faced a lack of legal precedent regarding the proper form of a warrant to obtain the location information they sought," here, the ACPO officers likely thought that the CDW was the best way to proceed in using

29

a CSS under New Jersey law. 2013 WL 1932800 at *31; see also
United States v. Wellman, No. 08-0043, 2009 WL 37184, at *7 n. 8
(S.D.W.Va. Jan. 7, 2009) (explaining that "law enforcement
officers utilizing relatively new technology and innovative
techniques in good faith should not be penalized with
suppression of important evidence simply because they are at the
beginning of a learning curve and have not yet been apprised of
the preferences of courts on novel questions"). Moreover, in
September and October 2014, when Judge DeLury approved the
roving wiretap and CDW at issue, courts and other stakeholders
had just begun to opine on the issue of cell-site simulators and
their Fourth Amendment implications. The Department of Justice
did not release its policy requiring agencies wishing to use a
CSS to obtain a search warrant supported by probable cause until
September 2015. Department of Justice Policy Guidance: Use of
Cell-Site Simulator Technology (Sept. 3, 2015),
http://www.justice.gov/opa/file/767321/ download. Indeed, the
first federal court decision to suppress evidence obtained by
CSS for lack of a search warrant did not occur until July 2016,
in the Lambis case, 2016 WL 3870940, which is in any event
addressing circumstances quite different from the present case,
as discussed above. Additionally, New Jersey courts have not
yet opined on the constitutionality of cell-site simulators. As
a result, the ACPO officers should not be penalized for

obtaining a CDW in October 2014 that explains how the CSS would work for the limited purpose of obtaining additional cell phone identifiers that through process of elimination would lead to the number for Tutis's new cell phone(s). This is not a case like Lambis where officers used a CSS "not contemplated by the original warrant application" – here, law enforcement obtained a CDW, which, as explained infra, under state law, is equivalent to a search warrant, and which, as determined above, satisfied the Fourth Amendment's requirement for a search warrant.

### d. A Communications Data Warrant is Equivalent to a Search Warrant Under State Law

Finally, the Government argues that under New Jersey law, a CDW, not a search warrant, was the proper vehicle for the authorization to use a CSS; thus, there is no basis for suppression. Defendant argues that the CDW did not rise to the level of a search warrant and thus did not authorize the use of a CSS under New Jersey law because the New Jersey Wiretap Act does not mention the use of a CSS, and a search warrant is required because "there is simply no case in which a CSS was used when authorized by a CDW." (Def. CSS Reply at 10.)

The New Jersey Supreme Court has recently instructed that a communications data warrant is "the equivalent of a search warrant." State v. Lunsford, 226 N.J. 129, 133 (2016). Given that New Jersey law enforcement's use of CDWs are not well known

31

A0069

to the public, the Government has explained to the Court that
the State of New Jersey uses CDWs instead of search warrants to
make recordkeeping easier to deal with, and to ensure that only
specially-trained judges issue the warrants. (Gov't Sur-Reply at
19, n. 11.)  The Government notes that New Jersey law
enforcement obtained a September 2013 CDW authorizing the use of
a CSS, so this demonstrates that prior to the Tutis CDW, the
"proper procedural vehicle" to apply for authorization to use a
CSS was indeed a CDW. (Id.)[11]  The Government also submitted an
August 1999 Directive ("Directive 9-99") called "Procedures to
be Followed in Handling Applications for Communications Data
Warrants and Communications Information Order." (Ex. 4 to Gov't
Sur-Reply.)  While the Directive does not define a CDW, it does
explain that "the standard to be applied in deciding
communications data warrant applications is that of probable
cause." (Id.)  Thus, since both a CDW and a search warrant
require a showing and finding of probable cause, there is "no
material difference" between them under the Fourth Amendment.
(Id. at 20-21, n. 13.)

---

[11] The Government further notes that "[g]iven that a CSS
will be utilized in a number of locations to try to locate cell
phone(s), the difficulties in drafting a search warrant
authorizing the use of a CSS, when a search warrant normally is
used to search a particular location, make it obvious why the
ACPO used the procedural mechanism of a CDW, rather than a
search warrant, to obtain authorization to use a CSS." (CSS Sur-
Reply at 20, n. 13.)

A0070

Additionally, Defendant argues that CDWs under state law can only be used to obtain stored electronic records, but the Government responds that nothing in the New Jersey wiretap statute limits the use of a CDW to stored electronic records. (Id. at 22; Def. CSS Reply Br. at 10.)  Defendant relies on State v. Finesmith, 408 N.J. Super. 206, 208 (App. Div. 2009) for the proposition that a "CDW is directed to acquisition of post-transmission electronic storage kept by an electronic communication service or remote computing service for reasons of backup protection for the communication."  But other courts interpreting New Jersey law have noted that a CDW can be used for interception of a communication contemporaneous with transmission.  See, e.g., Badillo v. Stopko, No. 11-4815, 2012 WL 1565303 at *1 (D.N.J. May 2, 2012) ("intercepts of telephone calls through Communications Data Warrants"); State v. Edwards, 2011 WL 1466152 at *1 (N.J. Super. Apr. 19, 2011) ("[T]elephone conversations were intercepted and recorded pursuant to a communications data warrant issued by a Superior Court Judge.").  Given the current practices of New Jersey law enforcement, the lack of precision in the New Jersey wiretap statute, and the uncertainty in the caselaw regarding this issue, the Court therefore finds persuasive the Government's argument that nothing limits the use of a CDW to obtaining stored electronic records and information.

## III. MOTION FOR A BILL OF PARTICULARS BY JAZMIN VEGA

Jazmin Vega argues that there is insufficient information in the Indictment and in discovery to put her on notice as to exactly what the Government is alluding to regarding her drug involvement; thus, she asks the Government to provide her with a bill of particulars. A bill of particulars is "[a] formal, detailed statement of the claims or charges brought by a plaintiff or a prosecutor, usu[ally] filed in response to the defendant's request for a more specific complaint." Black's Law Dictionary (10th ed. 2014). See N. Jersey Media Grp. Inc. v. United States, ____ F.3d ____, 2016 WL 4651386 at *6 (3d Cir. Sept. 7, 2016) (noting that a bill of particulars "effectively narrows the government's case at trial in the same way as the formal charging document"). A district court has broad discretion in granting or denying a criminal defendant's motion for a bill of particulars. United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989). Among the purposes of a bill of particulars is to inform the defendant of the nature of the charges brought against him so that he is able to adequately prepare a defense. United States v. Moyer, 674 F.3d 192, 203 (3d Cir. 2012) (citing United States v. Addonizio, 451 F.2d 49, 63 (3d Cir. 1971)).

A district court should only grant a motion seeking a bill of particulars when an indictment's failure to provide factual

A0072

or legal information "significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." Rosa, 891 F.2d at 1066. However, a defendant is not entitled to general discovery of the government's case, evidence or witnesses. United States v. Armocida, 515 F.2d 49, 54 (3d Cir. 1975)). In ruling on a request for a bill of particulars, a court should consider all information that has been disclosed to a defendant in the course of the prosecution, whether or not included in the indictment. United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir. 1972).

A bill of particulars is not appropriate in a case such as this, where Defendant Vega has been given substantial access to discovery. United States v. Urban, 404 F.3d 754, 772 (3d Cir. 2005) ("[A]ccess to discovery further weakens the case for a bill of particulars."). While she claims that she will be "lost in a sea of accounting and business transactions, conversations with co-workers and relatives, and literally thousands of documents without having any idea which of these are alleged to constitute crimes against" her, she omits the extensive discovery that the Government has already provided to her. (Def. Br. at 3.) This primarily includes (1) a "show and tell" meeting where the Government has already explained the case to her and her attorney and disclosed what the Government regards as substantial evidence of criminality, (2) an exhibit list

A0073

where Vega can identify the conversations in which she participated which the Government seeks to use at trial, (3) various demonstrative exhibits, and (4) recorded conversations pursuant to wiretaps, among other items. (Gov't Br. at 6.)

The Superseding Indictment and Second Superseding Indictment combined with this extensive discovery already disclosed to Vega provides her with more than sufficient information to understand the nature of the charges against her, prepare her defenses, and to avoid surprise at trial. The Court therefore finds that Defendant Vega has sufficient information from the Government to know what she is charged with and to prepare for trial, and it will not require the Government to particularize all of its evidence. Vega's request for a bill of particulars is therefore denied.

## IV. CONCLUSION

For all of these reasons, Defendant Tutis's motion to suppress evidence obtained by deploying the cell-site simulator pursuant to the October 14, 2014 CDW, as well as Defendant Vega's motion for a bill of particulars will be denied. An accompanying Order will be entered.


<u>October 20, 2016</u>                     <u>s/ Jerome B. Simandle</u>
Date                                         JEROME B. SIMANDLE
                                             Chief U.S. District Judge

36

A0074

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | HONORABLE JEROME B. SIMANDLE |
| v. | Criminal Action No. 14-699 |
| | **ORDER** |
| TOYE TUTIS and JAZMIN VEGA, | |
| Defendants. | |

This matter comes before the Court by way of Defendant Toye Tutis's (hereinafter, "Defendant Tutis") motion to suppress certain wiretap evidence [Docket Items 322, 331, 350] and Defendant Jazmin Vega's (hereinafter, "Defendant Vega") motion for a bill of particulars [Docket Item 309]; and the Court having considered the parties' submissions, and having conducted hearings on the motions on September 8, 2016 and September 27, 2016; and for the reasons explained in the Opinion of today's date; and for good cause shown;

IT IS this ___20th___ day of ___October___, hereby

**ORDERED** that Defendant Tutis's motion to suppress with regard to the cell-site simulator issue [Docket Items 322, 331, 350] shall be, and hereby is, **DENIED**; and it is further

A0075

**ORDERED** that Defendant Vega's motion for a bill of particulars [Docket Item 309] shall be, and hereby is, **DENIED**.


 **s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

TOYE TUTIS and JAZMIN VEGA,

Defendants.

HONORABLE JEROME B. SIMANDLE

Criminal Action Nos.
14-699-1 (JBS)
14-699-11 (JBS)

**ORDER**

This matter comes before the Court upon several motions of Defendant Toye Tutis, as part of Defendant's Omnibus Pretrial Motions filed July 29, 2016 [Docket Item 322], seeking to suppress evidence obtained pursuant to a September 26, 2014 Wiretap Order on grounds that:

- The Wiretap Order was an unconstitutional general warrant and unlawful roving wiretap;

- The Wiretap Order was obtained in violation of Franks v. Delaware;

- The Government has violated the "Silver Platter" Doctrine; and

Upon the part of Defendant's Omnibus Pretrial Motions [Docket Item 322] asserting that evidence obtained by electronic surveillance and/or consensual electronic interceptions of Ivan

A0077

Cuellar Naranjo where communications involved Defendant Toye
Tutis; and

The Court has considered the parties' submissions in
support and opposition, including the parties' arguments at
hearings on September 8, 2016; September 27, 2016; October 13,
2016; and October 17 and 19, 2016 [Franks hearing], and having
received testimony, documentary evidence, and arguments at the
Franks hearing; and

The Court finding for reasons to be set forth in an Opinion
forthcoming soon, that the Wiretap Order of September 26, 2014
was not an unconstitutional general warrant, and that it was not
obtained in violation of Franks v. Delaware,[1] and that the
Government has not violated the "Silver Platter" Doctrine;

---

[1] More specifically, as the forthcoming Opinion will explain, the
Court has reconsidered its denial of the Defendant's request for
a Franks hearing in the Opinion of March 8, 2016 at pp. 30-34,
has convened a Franks hearing to reconsider evidence and receive
new evidence on October 17 & 19, 2016, and concludes that the
September 26, 2014 Wiretap Order will be upheld because
incorrect statements included by Det. Dorn in his Affidavit in
Support of the Wiretap Order were not made by Det. Dorn
knowingly and intentionally or with reckless disregard for the
truth; and moreover, given the accurate evidence of the high
probability of criminal conduct by Toye Tutis and his use of the
target cell phone, the false statements or omissions of which
Defendant complains were not necessary to the finding of
probable cause in the September 26, 2014 Wiretap Order. It will
further be explained that Det. Dorn's representation in his
Affidavit that the informant CI-607 (CS-2) was "reliable" had a
reasonable basis in facts known to Det. Dorn as of September 26,
2014, such that his reliance on information provided by CI-607,

A0078

IT IS this **21st** day of **October** , **2016**, hereby

**ORDERED** that Defendant Toye Tutis' motion to suppress

evidence intercepted as a result of the September 26, 2014

Wiretap Order shall be, and hereby is, **DENIED**.


**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge

---

much of which was corroborated, was reasonable and not reckless
or deliberately ignorant.

A0079

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 14-699-1 (JBS) |
| TOYE TUTIS, | **OPINION** |
| Defendant. | |

**APPEARANCES**:

CRAIG CARPENITO
United States Attorney
    By:  DIANA VONDRA CARRIG,
        Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
401 Market Street, 4th Floor
P.O. Box 2098
Camden, NJ  08101-2098

STANLEY O. KING, ESQ.
KING & KING, LLC
231 Broad Street
Woodbury, NJ  08096
    Attorney for Defendant


**SIMANDLE, District Judge**:

I.    **INTRODUCTION**

On November 1, 2016, after the jury had been selected and
as the trial was about to begin, following extensive plea
negotiations between counsel over a period of one week,
Defendant Toye Tutis entered a plea of guilty to Count 1 (drug-
trafficking conspiracy) and Count 13 (money laundering
conspiracy) of the Second Superseding Indictment.  The only co-

defendant then remaining was his wife, Jazmin Vega, who also entered her plea of guilty to Count 13 of the Second Superseding Indictment (money laundering conspiracy).

Thereafter, Defendant Tutis, through new counsel,[1] filed the present motion to withdraw his plea of guilty pursuant to Rule

_____

[1] Defendant Tutis was originally represented by retained counsel, Dennis J. Cogan, Esq. and Christopher D. Warren, Esq. On June 29, 2016, the Court had a hearing upon Defendant Tutis' request to substitute J. Michael Farrell, III, as his new retained attorney, notwithstanding the fact that Farrell was under indictment for unrelated charges in the U.S. District Court for the District of Maryland. Defendant Tutis testified that he was aware of Farrell's charges and of the potential conflict it created by Farrell representing Tutis while being himself under indictment (albeit represented by counsel in Maryland), and the Court granted Tutis' request honoring his choice of counsel, being satisfied that his waiver of conflict-free counsel was knowing and voluntary. [Docket Item 299.] About four months after Farrell entered the case, Tutis entered his plea of guilty on November 1, 2016. Two months after Tutis entered his guilty plea, Farrell's case went to trial in January 2017, and a jury found him guilty of multiple counts, including money laundering, money laundering conspiracy, tampering with official proceedings, and witness tampering. (Tr. 6/23/17 at 149.) Farrell awaited his sentencing scheduled for July 17, 2017, and he was expected to go to prison. (Id. at 149-50.) When Farrell's case was going to trial, new counsel Stanley O. King, Esq. was appointed pursuant to the Criminal Justice Act on January 3, 2017 as temporary standby counsel [Docket Item 428], and on February 14, 2017 as plenary counsel [Docket Item 435], when, at a hearing, the Court also disqualified Farrell due to his felony convictions. The appointment of Mr. King followed this Court's determination that Tutis was no longer able to afford private counsel due to his agreement in his guilty plea to forfeit his interest in very substantial assets, pursuant to which a Consent Judgment and Preliminary Order of Forfeiture as to Tutis has been entered on January 6, 2017. [Docket Item 423.] Farrell confirmed at the February 14, 2017 hearing, however, that his fees had been paid by Tutis and nothing further was due. Mr. King has very ably represented Tutis in the present matter.

2

A0081

11(d)(1)(B), Fed. R. Crim. P. [Docket Item 443].  Co-defendant
Jazmin Vega does not seek to withdraw her guilty plea.
Defendant Tutis moves to withdraw his plea of guilty on the
ground that "Mr. Tutis' Guilty Plea was not voluntary and the
Court was not advised that the plea was part of a 'Package
Deal'" requiring Tutis to plead guilty or Vega would not be
permitted to plead guilty.  [Docket Item 443-1 at 4.]  Tutis
alleges that, because Tutis' and Vega's pleas were allegedly a
"package deal," the Rule 11 hearing violated the rule of United
States v. Hodge, 412 F.3d 479, 450 (3d Cir. 2005), requiring
"full disclosure to the district court of the material terms of
the plea agreements" so that the court can conduct a "colloquy
[that] is thorough and searching as to the defendant's knowing,
intelligent, and voluntary waiver of the right, among others, to
a jury trial."  Id.  Tutis argues that the court failed to ask
him the special questions related to his decision to accept the
alleged package deal, as required by Hodge, 412 F.3d at 491-92.
The defense brief asserts that Tutis was "advised by attorney
[Farrell] that he should accept the plea and appeal this
acceptance post sentencing," and he now alleges he "did not
understand the heightened standard of withdrawing a guilty plea
post sentencing."  [Def. Br., Docket Item 443-1 at 5.]

Contrary to Tutis' assertions, the Government has argued that the Tutis and Vega pleas were not a "package deal" by the time the plea agreements were executed and the Rule 11 hearings for both defendants were held on November 1, 2016.  The Government acknowledged that previous written versions of the Tutis and Vega agreements in late October had contained such language packaging the agreements, conditioning entry of one upon entry of the other.  The actual written plea agreements, signed by Tutis and Vega and entered at the hearing on November 1, 2016, had no such coupling language, and were in fact not coupled or "packaged."

As explained in more detail below, during plea negotiations, Tutis had at least twice rejected proposed packaged agreements.  The prosecutors then proposed uncoupled agreements in late October 2016, whereby Vega could plead guilty independent of her husband's decision, and the final plea agreements were not a "package deal" and the coupling language was removed from both defendants' proposed agreements.  After Tutis won major concessions in the final plea agreement such as preserving his right to appeal certain pretrial suppression motion rulings and diminishing the amount of his assets subject to forfeiture, he accepted the plea agreement.  Tutis' plea agreement, preserving his right to contest certain pretrial

A0083

suppression motion rulings on appeal, was thus entered as a "conditional plea" under Rule 11(a)(2), Fed. R. Crim. P.

The Tutis and Vega plea agreements, entered independently on November 1, 2016, were indeed uncoupled. Because the defendants were husband and wife, there was overlapping language only as to the interests each defendant was forfeiting in the properties that were jointly owned, or at least as to which a spouse might otherwise claim an interest even if not titled in both names. Accordingly, neither the prosecutors nor the defense attorneys suggested to the Court that a special <u>Hodge</u> colloquy was needed, nor did the court regard them as a package deal, as will be discussed below.

This motion also requires that the defendant's somewhat revised position be addressed -- namely, that Tutis nonetheless thought that the pleas remained coupled, and that he still felt pressured to enter an involuntary plea in order to set up an issue for appeal, namely, the alleged denial of a <u>Hodge</u> colloquy at the Rule 11 hearing. Although Tutis elected not to testify at the evidentiary hearing on this motion, this alternative hypothesis was advanced by former attorney Farrell, who did testify. As explored further, the defense has failed to demonstrate that any <u>Hodge</u> colloquy was required or that if such a colloquy had been undertaken, Tutis would have decided to go

A0084

to trial or his attempt to plead guilty would have been seen as involuntary. Indeed, Tutis faced multiple counts that pegged him as the leader of a major conspiracy to distribute very large quantities of cocaine, heroin, and crack cocaine in the Atlantic City area over a period of years, together with the prospect of an enhanced sentencing information under 21 U.S.C. § 851 that the Government had delayed filing as plea negotiations continued which, in the event of conviction, would have doubled the mandatory minimum sentences upon the drug distribution charges he faced. See 21 U.S.C. § 841(b)(1)(A). Moreover, Tutis affirmed, in his signed plea agreement, his Application for Permission to Enter Plea of Guilty, and in his Rule 11 colloquy with the Court, that his decision to accept the Government's plea bargain was voluntary, entered of his own free will, and not coerced.

Moreover, as discussed in Parts II.G and III below, the record in general, and this motion in particular, is bereft of any doubt of Tutis' guilt of the crimes to which he has pled guilty. Other than conclusory statements such as that he "continues to maintain his innocence as to the charges brought against him" [Docket Item 443-1 at 2], he has not buttressed this assertion by facts in the record supporting a defense;

indeed, no defense to guilt has been proffered, which, as explained below, also weighs against the relief he seeks.

For the reasons found herein, the motion will be denied.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   The Hearing on this Motion

The facts pertaining to this motion are derived from the docket of this case and from the evidentiary hearing on the motion conducted June 21, 23, and 26, 2017, including exhibits received into the record from the Government and from Defendant Tutis.[2] The hearing witnesses were Jazmin Vega (Tr. 6/21/17 at 13-119); former Tutis attorney J. Michael Farrell (Tr. 6/21/17 at 121-186 and Tr. 6/23/17 at 1-230); and Jazmin Vega's attorney Troy Archie (Tr. 6/26/17 at 4-145).  Defendant Tutis waived his right to testify (Tr. 6/26/17 at 148-150), which the Court accepted, (id. at 150:12-14), so Tutis has offered no testimony in support of his motion.  No AUSA or case agent testified.

### B.   The Charges in the Second Superseding Indictment

Defendants Toye Tutis and his wife Jazmin Vega, together with others who entered pleas of guilty on related charges, were

---

[2] The Government's exhibits included Exs. G-7, 8, 11, 13, 21, 22, 30, 33, 35, 36, and 36A (as a transcript aiding understanding of taped conversation).  The Defendant's exhibits included Exs. D-1 through 18.

A0086

charged in a Second Superseding Indictment.  [Docket Item 339.][3]
Tutis faced the following charges as the alleged leader of major
drug distribution and money laundering conspiracies:

> Count 1 –    drug trafficking conspiracy in Atlantic County, NJ, from February 2010 through December 10, 2014, with Jazmin Vega and others to distribute cocaine (5 kg. or more), and heroin (1 kg. or more), contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), in violation of 21 U.S.C. § 846;

> Counts 7-9 – drug distribution of more than 500 g. cocaine on October 1, November 17, and November 26, 2014, in violation of 21 U.S.C. § 841(b)(1)(B);

> Count 13 –   money laundering conspiracy in Atlantic County, NJ, from February 2010 through December 10, 2014, with Jazmin Vega with intent to promote carrying on drug distribution activity, to conceal and disguise the nature and source of the proceeds of the unlawful activity, and to avoid the currency transaction reporting requirement set forth in 31 U.S.C. § 5313(a), contrary to 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(a)(1)(B)(ii), all in violation of 18 U.S.C. § 1956(h);

> Counts 21-25 - use of telephone to further a drug offense on various occasions in 2014, in violation of 21 U.S.C. § 843(b); and

---

[3] Altogether, 12 defendants had been charged in this case, of which all 11 others (except one fugitive) pled guilty at various times before jury selection herein.

                    Counts 26-27 – unlawful possession of firearms
                          by a felon, in violation of 18
                          U.S.C. § 922(g)(1).

     Jazmin Vega was charged in Counts 1, 13, 24, and 25 above.

     In addition, the Second Superseding Indictment contained
forfeiture allegations pertaining to the interests, if any, of
Tutis and Vega in certain cash and firearms found in Tutis' home
in a search warrant, as well as various bank accounts, vehicles,
and over 30 pieces of real estate that were alleged to be the
proceeds of the charged criminal activity.[4]  Further, the
Government reserved its right to file an enhanced penalty
information pursuant to 21 U.S.C. § 851 in the event no plea
agreement was reached.  The deadline date for filing the
enhanced penalty information was enlarged with Tutis' consent
even after jury selection as plea negotiations continued in late
October 2016.  [Docket Item 391.]

     This Second Superseding Indictment [Docket Item 339], filed
in September 2016, a month before the scheduled trial date, was

---

[4] The Second Superseding Indictment contained two separate sets of
forfeiture allegations against Tutis and Vega, the First
Forfeiture Allegation and the Second Forfeiture Allegation, each
containing lengthy and largely identical lists of assets and
property to be forfeited as allegedly a result of the money
laundering offense in Count 13 (First Forfeiture Allegation) and
the controlled substance offense alleged in Count 1 (Second
Forfeiture Allegation).  [Docket Item 339 at p. 10-25.]
Differences between the items listed in the First and Second
Forfeiture Allegations do not matter for purposes of the present
motion.

the culmination of several years of investigation including court-authorized electronic interceptions resulting in thousands of intercepted calls and text messages pertaining to drug distribution, money laundering, and other crimes among the alleged co-conspirators.  It had taken counsel almost two years to prepare for trial, given the volume of discovery, pretrial motions, substitution of counsel, charges and guilty pleas by other defendants, and the complexity of the case.  All co-defendants except Tutis and Vega had entered pleas of guilty prior to trial.

### C.  Preparation for Trial and Plea Negotiations – Late October 2016

Leading up to the trial date of October 18, 2016, all counsel indicated that the case would benefit from having some delay after jury selection and before opening statements to better prepare for trial and attend to recently-filed evidentiary motions.  Such a delay would also enable either defendant to attempt to negotiate a satisfactory guilty pleas, if desired, before trial actually commenced.  The jury selection process was completed on October 18 and 19, 2016, and the jury was instructed to return on Monday, October 31, 2016 to begin trial.  Meanwhile, in addition to the motion practice and hearings on October 19 and 31, 2016, the parties continued plea negotiations among themselves, with Mr. Farrell representing

A0089

Toye Tutis, Troy Archie, Esq., representing Jazmin Vega, and AUSA's Howard Wiener and Diana Carrig representing the United States.

In short, the Government offered written plea agreements dated October 27, 2016 to Vega (Ex. D-1) and Tutis (Ex. D-8) which were linked to each other, that is "packaged," providing that fully executed copies of plea agreements for both Vega and Tutis had to be received by 9:00 P.M. on October 27, 2016 or both agreements would be null and void. (Id.) The initial coupling of the Tutis and Vega pleas was prominently mentioned in the proposed plea agreements' first paragraph in the same sentence stating the deadline for acceptance, which stated:

> This plea agreement supersedes all prior plea offers and is contingent upon the execution of a plea agreement dated October 27, 2016 by co-defendant Toye Tutis [sic: Jazmin Vega], and the entry of her guilty plea pursuant to that agreement.

(Ex. D-8 at p.1.) Similar language appeared prominently in Vega's proposed plea agreement linking it to Tutis'. (Ex. D-1 at p.1.) Vega accepted and signed the October 27th plea agreement on that date (Ex. D-2), but Tutis did not. As a result, Vega's acceptance became a nullity. Tutis told Farrell he did not accept the October 27th plea offer because it did not preserve his right to appeal the suppression rulings and because it did not preserve sufficient assets from forfeiture. (Farrell

11

Testimony, Tr. 6/23/17 at 49:2 to 50:6.) Tutis sought to
negotiate a more favorable agreement for himself, including
forfeiture of fewer properties and preservation of rights to
appeal certain pretrial rulings. (Farrell Testimony, Tr. 6/2/17
at 136:5 to 137:6.) Tutis likewise told Vega he rejected the
package deal of October 27th due to Tutis' concerns about the
forfeiture of too many properties and to preserve his
conditional appeal. (Vega Testimony, Tr. 6/21/17 at 69:10-15.)

On Friday, October 28th, the Court conferred with all
counsel who requested that the jury should not be asked to
return on October 31st because a resolution of the cases with
Vega and Tutis was still possible; Mr. Farrell advised that if a
suitable plea agreement was not negotiated with the Government,
that his client might be amenable to a stipulated non-jury trial
to preserve rights to appeal pretrial suppression motion
denials. (Farrell Testimony, Tr. 6/21/17 at 136:12-22.)
Counsel asked for more time over the weekend to see if Tutis and
the Government could arrive at a stipulation for an abbreviated
non-jury trial on all counts; Jazmin Vega was not to be part of
the stipulated trial of Toye Tutis. (See Archie Testimony, Tr.
6/26/17 at 29-32.) That Vega would be free to enter her own
plea -- and thus be decoupled from Tutis, who would have a

12

A0091

stipulated non-jury trial -- became clear from these procedural developments as of October 28th.

At a hearing on October 31st, in the presence of all counsel and both defendants, it was revealed that Farrell and AUSA Carrig communicated over the weekend of October 28th-30th, exchanging proposed stipulations for the Tutis-only consent trial, while Farrell and AUSA Wiener resumed plea negotiations regarding Tutis. (Tr. 10/31/16, Ex. D-17 at 3:19 to 8:16.) Farrell's testimony also confirmed that he spent considerable effort with AUSA Carrig over the weekend working on these consent trial stipulations. (Tr. 6/23/17 at 77-79.) The October 31st conference included some discussions of how the stipulated trial of Tutis would be conducted. (Tr. 10/31/16, Ex. D-17, at 3-5, 8.) This is, of course, strong evidence that the fates of Tutis and Vega were diverging and uncoupled by October 31st. The substance of the parties' plea negotiations was not disclosed at that time, since final written agreements had not been made. The undersigned, consistent with Fed. R. Crim. P. 11(c)(1), did not participate in any plea negotiations; the Court's interest at that time was solely in managing the waiting jury and the Court's calendar, and determining whether the parties' requests to defer the start of trial for further negotiations should be accommodated.

A0092

### D. **The Proposed Plea Agreements are Unpackaged**

By October 31st, the Government agreed with Mr. Archie that Vega should be permitted to plead guilty independently of her husband's decision.  AUSA's Wiener and Carrig negotiated the uncoupled plea with Mr. Archie, who also assured Vega that she would be permitted to plead guilty even if Tutis did not.

Thus, Mr. Archie texted his client, Ms. Vega, on the morning of November 1st, that the Government had agreed that Vega could plead guilty even if Tutis did not -- in other words, that the pleas were not coupled.  Archie's text stated:  "I still have you worked if Toye is acting crazy."  (Ex. G-11.) Mr. Archie testified that this was meant to reassure Vega that she could still plead guilty regardless of what Tutis decided to do.  (Tr. 6/26/17 at 7-10.)  Mr. Archie explained that he had asked AUSA Carrig to let Vega plead without being tied to Tutis because he thought Tutis did not have Vega's best interests at heart.  (Id. at 26-27.)  Ms. Vega also recalled in her testimony that she met with Mr. Archie and AUSA Carrig in a small conference room in the courthouse, and that AUSA Carrig also told her she would be allowed to plead guilty, for which Ms. Vega thanked AUSA Carrig.  (Tr. 6/21/17 at 94:4 to 95:1.) Attorney Archie also recalled the conversation with AUSA Carrig and his client Jazmin Vega, the substance of which was that the

14

A0093

Government would accept a guilty plea from Vega "no matter what Toye Tutis did" (Tr. 6/26/17 at 31:20 to 32:16), for which Jazmin Vega expressed thanks. (Id. at 32:17-18.)

On the evening of October 31st, consistent with this understanding that Vega could plead guilty whether or not Tutis chose to do so, the Government provided uncoupled plea agreements to counsel for both defendants, with the prominent coupling language of previous drafts deleted. Because of the uncertainty of Tutis' situation, as Tutis pressed for more concessions, the Government had demanded slightly more onerous terms in Vega's new uncoupled plea agreement of October 31st (Ex. G-5) compared with the earlier coupled version of October 27th (Ex. D-1). (Vega's October 31st draft plea agreement is set forth in Ex. G-5, while the draft agreement proposed to Tutis on October 31st appears at Ex. G-4.) No coupling language appeared in defendants' drafts. (Id.)

At the October 31st status hearing, AUSA Wiener also revealed that the new draft agreements were the product of discussions with counsel but did not yet bear signatures of their clients. (Tr. 10/31/16, Ex. D-17 at 13.) The Government, as noted, had a new agreement in principle with Mr. Archie (Ex. D-17 at 13:2-7), but Ms. Vega herself needed to review and accept the new terms. (Id.) On the other hand, the course to

15

be chosen by Mr. Tutis -- whether a guilty plea, a negotiated disposition (i.e., a non-jury stipulated trial), or a jury trial -- was still unknown on October 31st, according to AUSA Wiener, who said that the Government was preparing for all three possibilities. [Ex. D-17 at 24:10-12.] Also, Mr. Farrell indicated that one unsettled aspect of the negotiations pertained to forfeitures and obtaining agreements from two individuals -- Amanda Tutis and Kyle McHuge -- to quitclaim any interests they had in several of the properties to be forfeited. (Id. at 4:6-24.) This was part of a larger compromise on forfeitures whereby some of the subject properties would be returned to Tutis and Vega.

Also, at the October 31st hearing, in the context of expressing appreciation to the Marshal's Office and the General Counsel of FDC Philadelphia for permitting joint discussions with Tutis and Vega for plea negotiation purposes, Farrell observed "these are tied pleas" (Tr. 10/31/16 at 6:1-20.) At that time in the afternoon of October 31st, no one corrected Farrell's statement as it was not known what path the negotiations might take. Indeed, the decoupling of the pleas was not confirmed until later that evening, when AUSA Wiener, at 8:29 PM, emailed Farrell a newly drafted proposed plea for Tutis to sign, with no language tying Tutis' plea to Vega's. (Ex. D-

16

A0095

13.)  AUSA Wiener enlarged the deadline for Tutis to accept
until 11:00 A.M. on November 1st.  (Id.)  Farrell attempts in his
testimony to vest great significance into his remark about the
pleas being "tied" at that earlier time.  (See, e.g., Tr.
6/23/17 at 7, 17.)  Farrell claimed he did not notice, and no
one informed him, that the agreements were now uncoupled (id. at
12-15), and he in fact testified that "if I had noticed that
that language was excised, it probably would not have changed my
view that it was coupled, that they were continuing to be tied"
(id. at 16:18-20), which this Court finds to be incredible as
well as illogical.

### E.    Final Negotiations on November 1st

Negotiations on the Tutis plea continued on November 1st at
the courthouse.  Even though Tutis and attorney Farrell knew
Jazmin Vega had reached agreement and was ready to plead guilty,
Tutis declined and pressed, through Farrell, for more
concessions in his own plea decreasing the list of properties to
be forfeited as well as preserving his right to appeal certain
pretrial suppression rulings.  Mr. Archie testified that Farrell
told him on November 1st that Tutis would not plead guilty if
the Government did not make more forfeiture concessions,
including "carve-back" provisions.  (Tr. 6/26/17 at 51.)
Everyone also recognized that the final lists of forfeited

17

A0096

properties and "carve-backs" (i.e., properties seized by the Government from Tutis and Vega and to be returned to them as a condition of their pleas) should be identical if both decided to plead guilty, or it would complicate the Government's forfeiture process on any jointly-held properties. Thus, as Farrell negotiated for Tutis with the Government on November 1st, Archie waited to enter Vega's plea until the final forfeiture language could be inserted in Vega's plea agreement. (Id. at 39-41, 68.) Vega's separate plea was worked out in principle on October 28th (id. at 89) and only the forfeiture piece remained for last-minute adjustments on November 1st, according to Mr. Archie, whose testimony I credit in its entirety.[5] (Id. at 92:21.) If Tutis did not plead guilty, Mr. Archie was prepared to put Jazmin Vega's plea through on its own, since it was decoupled from Tutis. (Id. at 116.) There was no reason that Vega and the Government would not proceed with Vega's separate guilty

---

[5] In his testimony, Mr. Archie was called upon to explain prior inconsistent statements he made in a certification he prepared in connection with this motion (Docket Item 452-3), including his recollection that the final pleas of Vega and Tutis were packaged. (Id. ¶ 15.) Mr. Archie explained why that was not accurate and how his recollection of events was sharpened by preparing for the hearing, including reviewing his file and being interviewed by the Assistant U.S. Attorneys. (Archie Testimony, Tr. 6/26/17 at 67:16 to 69:10; 93:14-21.) Mr. Archie's explanations for why his hearing testimony was more accurate than his prehearing certification prepared from memory ring true and consistent with the circumstances. By his demeanor and non-combative responses, Mr. Archie was a highly credible witness.

A0097

plea on November 1st if Tutis didn't enter a plea agreement.
(Id. at 121.)

### F.  **Final Agreements are Reached on November 1st**

Late in the afternoon on November 1st, following more Tutis
demands and negotiations, the plea agreements were in final
form, uncoupled and not conditioned upon entry of a plea by the
other spouse.  Vega's final plea agreement of November 1st (Ex.
G-7), uncoupled from Tutis', pertained only to Count 13 and
increased the amount of money laundering activity for which she
accepted responsibility, from $1.5 million to $3.5 million,
which increased her projected Sentencing Guideline range
compared with the earlier coupled agreement.  Mr. Archie
believed the Government had a strong case after he reviewed
several hundred tapes of conversations and surveillance reports
pertaining to drug distribution and money laundering
conspiracies.  (Tr. 6/26/17 at 146.)  Vega agreed that this
higher figure reflected her actual criminal conduct in this
case.  (Tr. 6/21/17 at 78:13.)  Mr. Archie had explained to Vega
that in the earlier package deal, the Government was willing to
give her a break as an inducement to Tutis to plead guilty (Tr.
6/21/17 at 78:8), as to which the Government agreed to advocate
for a sentence for Vega no greater than 60 months.  Now that the
pleas were unpackaged, the projected Guideline range increased

somewhat with the enhanced money-laundering amount, and the
Government would only agree to advocate for a sentence no
greater than 78 months.  (Id. at 78:13; 83:15.)  The final
agreement was more favorable to Vega in other respects, for
example, in obtaining a carve-out for her laundromat property at
1011 Arctic Avenue, which was expected to be a source of her
future employment and income, and several other properties.
(Id. at 88:15 to 89:14; Ex. G-7 at p. 13.)  Between the October
31st draft plea agreement (Ex. G-3) and the final plea agreement
for Vega (Ex. G-7), only the forfeiture provisions changed, in a
manner that was favorable to Vega by excluding several
properties.  (Tr. 6/21/18 at 90:19 - 94:3.)  Vega testified that
she still thought her final, unpackaged agreement was fair and
that she was satisfied with it.  (Id. at 101.)  That Vega's
exposure increased in the renegotiated, unpackaged plea
agreement is further strong evidence that her plea and Tutis'
were not packaged when entered on November 1st because the
"volume discount" for packaged pleas was no longer in play.

Tutis' separate final plea agreement, also unpackaged (Ex.
D-14), was also dated, signed, and entered on November 1, 2016.
The language coupling his plea with Vega was deleted from the
first paragraph (Ex. D-14), and nobody from the Government
indicated that the two pleas were dependent on each other.

Tutis entered his plea first, before Vega, not because the pleas were packaged requiring him to plead guilty first, but simply because his name was first on the case caption and the Marshals had to take him back to his place of confinement in FDC Philadelphia, as it was about 5:40 PM, while Vega remained free on conditions of release. (See Tr. 11/1/16 at 11:19-25; and Archie Testimony, Tr. 6/26/17 at 59:25 to 60:13, and colloquy with Mr. King in Tr. 6/26/17 at 110-113.)

### G. Tutis' Rule 11 Hearing on November 1st; Farrell's and Tutis' Statements

The plea which Tutis now seeks to set aside was presented in a 17-page letter (Ex. D-14), which he and Farrell signed on November 1st, accompanied by an Application for Permission to Enter Plea of Guilty, also signed by both Tutis and Farrell on November 1st. (Ex. G-8.) The 53-page transcript of Tutis' hearing on November 1st (Ex. D-16) established that all requirements of Rule 11, Fed. R. Crim. P., were easily met, especially including Tutis' voluntariness in deciding to enter this agreement. Defendant Tutis' written plea agreement was entered as Ex. C-1 at the November 1st hearing, while Defendant's Application for Permission to Enter Plea of Guilty (hereafter "Tutis Application") was entered as Ex. C-2. (See Tr. 11/1/16 (Ex. D-16) at 13:25; 18:23; 20:21.) For example, the hearing began with the Government identifying the written plea

agreement, which also included an addendum stipulated issues and
of language reserving the right to appeal certain issues, as the
parties' complete plea agreement. (Id. at 2:16-4:8.) The
Government orally paraphrased the terms of the written agreement
at length. (Id. at 4:18-8:7.) Terms regarding waiver of
certain appeal rights and preservation of others were clarified
by counsel on the record. (Id. at 8:11-13:24.)

Farrell confirmed on several occasions that the document,
including the various interlineations carefully added and
initialed by him and by Tutis, was the complete plea agreement
(id. at 13:22-24), that he believed that Tutis' decision to
plead guilty was knowing and voluntary (id. at 12:20-22), that
he knew of no reason the Court should not accept Tutis' plea of
guilty (id. at 15:23-25; 16:21-23; 51:4-7), and that he believed
it was in Tutis' best interest to enter this plea (id. at 16:24-
17:1.)

Tutis was sworn and understood he should raise questions
about anything he did not understand and to feel free to discuss
any matter confidentially with his attorney (id. at 17:18-18:1),
because he "can never come back another day and say, Judge, I
didn't know what I was doing back on November 1st, or Judge, I
don't want to plead guilty anymore." (Id. at 18:2-7.) That
scenario, of course, is exactly what Tutis is attempting to do

22

A0101

in his present motion to withdraw his guilty plea on the ground
of involuntariness.

The Tutis plea colloquy, with Farrell's participation,
could scarcely have been more exacting on November 1st. Before
the hearing even began, Tutis had been in continuing discussions
with Farrell and negotiations with the Assistant U.S. Attorneys,
capping a week of talks. Tutis completed his Application with
the assistance of Farrell. Tutis impresses as an intelligent,
articulate, and self-directed person, which Farrell has
confirmed in his testimony. (Tr. 6/23/17 at 39:22 to 41:19.)
He had been a businessman who, prior to 2014, had run an HVAC
company, a construction company, and a real estate management
company. (Id. at 39:7-21.) He was very involved in his own
defense, discussing case law and seeming familiar with the legal
concepts. (Id. at 40:2 to 42:14.) In other words, Tutis made
up his own mind about decisions with Farrell in plea
negotiations.

Significantly for present purposes, Tutis indicated in his
Application (Ex. G-8) that "I have not been forced, coerced or
threatened in any manner by any person to plead GUILTY to these
charges. Nor have I been told that if I refuse to plead GUILTY,
other persons will be prosecuted." (Ex. G-8 at ¶ 36, emphasis
added.) This declaration was further acknowledgement by Tutis

23

A0102

that his decision to plead guilty was uncoerced and he could decide to refuse to plead guilty without consequences to the prosecution of "other persons," i.e., Jazmin Vega. Tutis also declared that "I have read [my plea agreement] or had it read to me" (id. ¶ 37) and that "I offer my plea of GUILTY freely and voluntarily and of my own accord with full understanding of all matters set forth in the ... Indictment..., in this application, and in the certification of my lawyer which is attached to this application." (Id. at ¶ 44.) Farrell's "Certification of Counsel" upon the Application likewise declared, among other things, that Tutis' declarations "are in all respects accurate and true" and that Tutis' plea of guilty "is voluntarily made with understanding of the consequences of the plea. I recommend that the Court accept the plea of GUILTY." (Id., "Certification of Counsel" 3 & 9.) Farrell, of course, tried to negate these very certifications in his testimony upon the present motion, as discussed.

In his oral testimony at the November 1st hearing, Tutis indicated he was "pleading guilty of [his] own free will" and that nobody "forced [him] to plead guilty or threatened [him] to make [him] plead guilty." (Tr. 11/1/16, Ex. D-16, at 19:19-24.) Tutis confirmed that he read his plea agreement and went over it carefully with Farrell before deciding what to do in the course

24

of a week of back-and-forth negotiations.  (Id. at 20:25-21:8.)

Tutis indicated that he initialed the pen-and-ink changes and

that, with those changes, this is his "complete plea agreement"

and that nobody has promised anything that's different from the

written plea agreement.  (Id. at 21:9-22.)  Likewise, Tutis

testified there was nothing in the agreement he did not

understand, that he accepted the plea agreement, and that it was

his personal decision to accept the final plea agreement.  (Id.

at 22:2-12.)

Tutis responded at length to questions acknowledging his

knowing and voluntary waiver of constitutional rights (id. at

22:13-25:9), and about the sentencing risks and procedures (id.

at 25:10-33:1), which are matters not disputed in the current

motion.

Tutis then proceeded to answer detailed questions (which he

had reviewed with Farrell beforehand, see id. at 33:2-10)

establishing a factual basis for his guilt on Counts 1 and 13 of

the Second Superseding Indictment.  He first admitted he is

guilty of Count 1.  (Id. at 34:13-15.)  Tutis admitted to the

charged conspiracy to distribute drugs in Atlantic County, New

Jersey, from February of 2012 through December 10, 2014

involving 150 to 450 kilograms of cocaine and approximately 26

kilograms of heroin.  (Id. at 34:16-35:17.)

25

A0104

Tutis likewise provided a factual basis for his guilt on Count 13, admitting conspiring with Jazmin Vega to launder money by conducting financial transactions with funds that were the proceeds of drug trafficking. (<u>Id.</u> at 35:18-36:4.) Tutis would go to banks with Vega and exchange small denomination bills for $50's and $100's, and package and ship the larger bills on multiple occasions to Los Angeles, for the purpose of enabling himself and others to purchase more heroin and cocaine for distribution. (<u>Id.</u> at 36:5-37:6.) Tutis admitted he structured the cash transactions through various branch banks to knowingly avoid the bank's $10,000 cash reporting threshold in a 24-hour period. (<u>Id.</u> 37:24 to 38:23.) Tutis also swore that he understood and accepted all the stipulations in Schedule A of his November 1st plea agreement, which repeat many of the incriminating facts of his oral plea colloquy. (<u>Id.</u> at 39:10-40:4.)[6]

---

[6] The lengthy stipulations in Schedule A of the final Tutis plea agreement, Ex. D-14, included many admissions of his factual guilt of conspiracy to distribute drugs and conspiracy to launder drug proceeds. For example, he admitted the Count 1 drug conspiracy offense involved 150 to 450 kilograms of cocaine, and that he possessed a dangerous weapon in connection with it, and that he was an organizer, leader, manager, or supervisor of the relevant criminal activity. (Ex. D-14 at Sch. A, ¶¶ 3(a), (b), and (c).) Similar stipulations covered Tutis' admissions of guilt in the Count 13 money laundering conspiracy. (<u>Id.</u> at ¶¶ 4(a), (b), and (c).)

26

A0105

Accordingly, both attorneys indicated they were satisfied that Tutis' answers established a factual basis for accepting the guilty plea (id. at 40:14-18), and the Government proffered that if the case had gone to trial, it was prepared to prove each essential element of every count of the Second Superseding Indictment beyond a reasonable doubt. (Id. at 40:19-24.)

In the present motion, consistent with his guilty plea, neither Tutis nor his counsel have proffered any factual basis for doubting his guilt. Tutis raises no criticism of the factual bases of his guilty pleas on Counts 1 and 13, above, nor does he suggest any reason whatsoever that he believes himself not to be guilty. This important consideration is addressed further below in Part III. A. 1.

In his November 1st guilty plea hearing, Tutis also acknowledged that he understood and voluntarily agreed to conditionally waive his right to appeal if his sentence is 330 months or less, except that his right to appeal the enumerated pretrial rulings is preserved regardless of the sentence, all as part of his negotiated plea agreement, (id. at 41:2 to 42:8), consistent with the stipulations in his written plea agreement at ¶ 9 and pages 15A and 15B thereof. (Id.)[7] The attorneys

---

[7] The Court similarly reviewed with Tutis his waiver of the right to seek post-conviction relief under 28 U.S.C. § 2255 consistent with his plea agreement, if his sentence is 330 months or less,

again indicated their satisfaction that the record established
Tutis' knowing and voluntary waivers of appeal and post-
conviction relief.  (Id. at 43:20-24.)

The Court asked Tutis additional questions regarding the
forfeiture provisions of the plea agreement at pages 4-11
thereof enumerating the many real properties, accounts,
vehicles, jewelry, and cash that he agreed to forfeit (id. at
45:17 to 50:23), all of which Tutis understood, and he agreed to
forfeit his ownership interest.  (Id.)  He had discussed the
forfeiture provisions in detail with Farrell and these were, as
noted above, the subject of continued hard bargaining by Tutis,
winning additional concessions from the Government on November
1st.  (Id. at 47:7-12.)  Mr. Tutis indicated he had no questions
about his forfeiture obligations (id. at 50:21-23), and both
counsel likewise indicated that no further questions were needed
about forfeiture or any other topic (id. at 50:24 to 51:3), and
that the Court should accept the guilty plea (id. at 51:4-7.)

**H.    Farrell's Attempts to Undermine his Rule 11 Hearing
        Certifications**

---

except that his right to claim ineffective assistance of counsel
in a § 2255 motion is preserved, as also noted in his plea
agreement.  (Id. at 42:9 to 43:19.)  Tutis again indicated he
wished to do so as part of his negotiated plea agreement, after
having discussed the matter with Farrell.  (Id. at 43:4-19.)

In the hearing on the present motion, Farrell testified at some length that, at the conclusion of the Rule 11 hearing, he professed he was surprised that the Court did not ask Tutis questions required by the <u>Hodge</u> case, <u>supra</u>, in cases where there are packaged guilty pleas.  (<u>See</u>, <u>e.g.</u>, Tr. 6/21/17 at 171:24 to 172:24, 175:14 to 179:20.)  He testified that earlier in the week, when the Vega and Tutis plea proposals were tied, he had done legal research and read the <u>Hodge</u> case and discussed it with Tutis to prepare Tutis for a <u>Hodge</u> colloquy about voluntariness.  (<u>Id.</u> at 175:14 to 176:15.)  He discussed with Tutis, during the week before November 1st, the <u>Hodge</u> considerations about packaged or coupled pleas.  (<u>Id.</u> at 180:17 to 181:6.)  Tutis was prepared to answer the <u>Hodge</u> colloquy questions involving his willingness to enter a packaged plea, including "the implicit concerns with respect to tied pleas." (<u>Id.</u> at 175:23-24.)  Farrell never expressed doubt that Tutis acknowledged the special burdens of a packaged plea, accepted them, and would have entered a knowing and voluntary agreement to a packaged plea agreement.

Of course, the pleas were no longer packaged by November 1st, and neither the Government nor the Court considered there was any need for a <u>Hodge</u> colloquy.  Farrell now claims that even though he believed a <u>Hodge</u> colloquy was required to protect his

client's interests in a voluntary plea, he opted to remain
silent and to make no such request of the Court. (<u>Id.</u> at 177:6
to 178:13.)[8]  He claims he chose not to bring <u>Hodge</u> to the
Court's attention, despite knowing the protective purposes of
the <u>Hodge</u> colloquy in a packaged plea, claiming he "chose
loyalty to my client." (<u>Id.</u> at 178:1-2.)  He testified on
direct exam that he essentially wanted to inject such supposed
error into the Court's plea hearing so that it could serve as a
basis for setting his plea aside, and he supposedly did not see
it as his burden to bring up the <u>Hodge</u> requirements. (<u>Id.</u> at
177:12 to 178:13.)  He recalled briefly advising Tutis after the
Rule 11 hearing that "the <u>Hodge</u> component was missing and that
it would affect the voluntariness of his plea." (<u>Id.</u> at 179:6-
8.)

---

[8] In a packaged plea, both the prosecutor and the defense counsel
have the duty to bring the matter to the Court's attention and to
request the Court to conduct the additional colloquy concerning
same.  The <u>Hodge</u> court makes it clear that "the parties" have
those obligations, <u>Hodge</u>, 412 F.3d at 491 ("We therefore hold that
the parties must notify the district court that a package deal
exists and state to the court on the record the specific terms of
the deal.  <u>See</u> Fed. R. Crim. P. 11(c)(2)").  If that wasn't clear
enough, the <u>Hodge</u> court explicitly noted:  "Prescriptively, as
officers of the court, defense counsel have no less of a duty to
follow the rules of disclosure than prosecutors.  This duty
includes disclosing that a plea bargain is a package deal." <u>Id.</u>
at 491 n. 14.  Farrell's contention that a defense attorney who
believes <u>Hodge</u> is implicated can knowingly choose to remain silent
is legal nonsense.  This is another reason Farrell's recollection
of events is not credible.

I do not believe Farrell's testimony in the present motion
in June 2017, that he still believed, on November 1st, that the
pleas were still coupled and that a Hodge colloquy was still
needed.  First, Mr. Archie, who was continuously involved with
Farrell as the negotiations progressed, did not expect any Hodge
questioning to occur because the pleas were uncoupled, and he
was not surprised.  (Tr. 6/26/17 at 142:17 to 143:1.)  Second,
Mr. Farrell's actual conduct at the November 1st hearing was to
assure the Court that nothing was left out of the Rule 11
colloquy and that no further questions regarding Tutis' decision
to plead guilty were needed.  (Tr. 11/1/16, Ex. D-16, at 50:24
to 51:3.) The Court accepts Farrell's assurances on November 1st
as well-founded and accurate, namely, that Farrell actually
believed all proper questions had been asked and answered and
that Tutis' plea should be accepted, because it was knowing and
voluntary and based on his perceptions of his client.  His
testimony on this motion, on the other hand, is a corrupt
attempt to help Tutis' cause seeking to set aside a valid guilty
plea by pretending that he and Tutis understood the pleas to be
coupled or packaged together, forcing his client to plead guilty
involuntarily, even though they weren't, and in any event, any
decision by Tutis was voluntary.  Third, Farrell indicated on
November 1st that Tutis' decision to plead guilty was indeed

knowing and voluntary (id. at 12:20-22), and Farrell's testimony identifies no basis to conclude that Tutis' decision was involuntary; indeed, the record reflects that Tutis rejected earlier plea offers that actually were coupled and would have been more favorable to Jazmin Vega than the final, uncoupled plea which was the result of Tutis' hard bargaining to preserve for himself certain appellate rights by means of a conditional Rule 11(a)(2) plea and to forfeit fewer properties without regard for increasing Vega's exposure to imprisonment as shown above. Fourth, Farrell, having been convicted of felony offenses in January 2017, is less worthy of belief; by the time of his testimony on this motion in June 2017, Farrell had been disbarred, awaited sentencing in the District of Maryland, and no longer jeopardized his law license by lying for a client since he had already lost it. Fifth, observing Farrell's demeanor as a witness, I observed he seemed most uneasy when the subject of the questioning turned to Tutis' voluntariness, as if he was trying to keep his "story" straight. Sixth, Jazmin Vega herself understood that the pleas were no longer packaged and that she would plead guilty under the deal negotiated by Mr. Archie whether or not Tutis ultimately decided to do so. Farrell's testimony amounts to a clumsy and unethical attempt by

32

ex-counsel to "fall on his sword", albeit a fabricated sword, for the benefit of setting aside a conviction.

**I.** **Would Tutis Have Rejected Conditional Plea if He Fully Understood it was not Packaged with Vega's Plea?**

Moreover, even if one assumes (for the sake of argument and contrary to the credible evidence) that Tutis somehow did not understand that his plea agreement was not coupled with Vega's, Defendant Tutis has failed to show that he would not have entered his plea of guilty if he knew it was unpackaged, or that he would have manifested a degree of involuntariness or coercion that would impair his plea. The facts show that Tutis' motivation came from his desire to get the best plea agreement he could by (a) preserving appellate rights as to certain pretrial suppression rulings in a conditional plea, (b) ending the very real and proximate threat of the Government's filing of an enhanced penalty Information under 21 U.S.C. § 851 within the next day if he decided not to plead guilty, and (c) clawing back certain valuable properties that the Government had seized for forfeiture. He had, in fact, rejected the proposed packaged plea agreement of October 27th and persisted in doing so for the next four days of negotiations. When the pleas were unpackaged and his three demands, above, were met, he accepted late on the afternoon of November 1st.

Defendant Tutis' moving brief asserted that Tutis, at the
time of entering his guilty plea, was "overcome by force, fear,
and misapprehension." [Docket Item 443-1 at 6; see also id. at
5 ("he was overcome by force, misapprehension and fear".)]
Insufficient evidence exists that he was motivated in a
meaningful way by fear for his wife's prosecution.  He, of
course, cared about his wife and even told her he was pleading
guilty for her sake [Tr. 10/31/16 (Ex. D-5) at 3:15-20] on
October 31st, but on the morning of November 1st, he rejected the
plea offer of October 31, 2016, that the defense now incorrectly
claims was still "packaged" with hers.  If he truly believed the
pleas were still packaged, it follows that he also knew that his
rejection would force his wife to go to trial even though she
had essentially stated, in her Frye hearing before trial on
October 17th, that she was desirous of reopening her plea
negotiations with the Government before trial commenced.  (Tr.
10/18/16 at 6:22 to 7:8.)  Nowhere in Farrell's testimony does
he offer facts supporting the notion that Tutis would have
chosen to reject the Government's final offer that actually met
his three objectives, above, if it was unpackaged from Vega's
plea.  Nor is there any inference in the record that Tutis would
have given answers in his Rule 11 colloquy demonstrating
involuntariness or coercion.  Regarding the earlier discussions

of a packaged deal, Farrell testified that he thought Tutis'

considerations of the impact on his wife and his daughter Amanda

(as to forfeiture issues) were "all variables in the calculus of

his decision" (Tr. 6/21/17 at 181:17), and there were times in

those discussions when Tutis would be frustrated with the

negotiations and "kind of throw up his hands and indicated that,

well, I'm just going to go to trial.  That would happen during

the course of our dynamic." (Id. at 181:17-20.)  While

Farrell's testimony, if it is believed, indicates Tutis had

plenty of frustration or ambivalence about pleading guilty, such

a situation is far from unusual and hardly gives pause about

voluntariness.  The fact is that the guilty plea happened as

soon as the Government met Tutis' demands, none of which

involved Vega (other than perhaps the non-forfeiture of the

laundromat property that she runs for income).  The defense

never addressed the salient issue of whether Tutis likely would

have rejected the final plea deal if he had understood it to be

unpackaged on November 1st.

Personality-wise, Farrell's assessments of Tutis were that

he was an intelligent person who ran several construction

companies, understood and discussed legal issues and asked

questions, reviewed Farrell's briefs before filing, and was not

particularly easy to persuade (Tr. 6/23/17 at 38-48.)  Again,

there is no evidence that Tutis was not well-informed,
intelligent, and more than capable of making his own decisions
whether or not to plead guilty.  This too cuts against his plea
being involuntary.  This, of course, is consistent with Tutis'
testimony at his Rule 11 hearing on November 1st that it was his
personal decision and not just his attorney's recommendation
that he accept this plea agreement.  (Tr. 11/1/16 at 22:9-12.)
In other words, in light of the credible evidence, it clearly
appears that Tutis would have accepted the final, renegotiated
plea agreement of November 1st, and the benefits it conferred
upon him, whether or not it was packaged with Vega's agreement,
and that Tutis would not have given answers that suggested
concerns of involuntariness or coercion.

### III. <u>LEGAL ANALYSIS</u>

### A. <u>Requirements for Withdrawal of Guilty Plea</u>

Rule 11(d)(2)(B), Fed R. Crim. P., provides in relevant
part that "[a] defendant may withdraw a plea of guilty ... (2)
after the court accepts the plea but before it imposes sentence
if: ... (B) the defendant can show a fair and just reason for
requesting the withdrawal."  Prior to the adoption of Rule
11(d)(2)(B), the Third Circuit had held that withdrawal of a
guilty plea before sentencing should be "freely allowed,"
applying previous Rule 32(d), Fed. R. Crim. P., as in <u>United</u>

States v. Young, 424 F.2d 1276, 1279 (3d Cir. 1970) and United States v. Herrold, 635 F.2d 213, 215 (3d Cir. 1980).  Since 1983, however, when Rule 32(d) was amended to provide a more exacting standard for withdrawal of a guilty plea before sentencing, the defendant must meet a "substantial" burden of demonstrating the "fair and just reason" for withdrawal.  United States v. Siddons, 660 F. 3d 699, 703 (3d Cir. 2011).  Thus, "[o]nce a court accepts a defendant's guilty plea, the defendant is not entitled to withdraw that plea simply at his whim." United States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003).

"When determining whether a defendant has shown a 'fair and just reason' for withdrawing a plea, a district court must consider whether: '(1) the defendant asserts his innocence; (2) the defendant proffered strong reasons justifying the withdrawal; and (3) the government would be prejudiced by the withdrawal.'"  Siddons, 660 F.3d at 703 (quoting United States v. King, 604 F.3d 125, 139 ((3d Cir. 2010)).  We next address these Siddons factors.

### 1. Whether Defendant Asserts his Innocence

Under the first prong in Siddons, supra, we examine whether Defendant Tutis asserts his innocence to the charges to which he has pled guilty, namely Count 1 (drug distribution conspiracy) and Count 13 (money laundering conspiracy).  Under Siddons, any

37

A0116

assertions of innocence "must be buttressed by facts in the record that support a claimed deference," and a defendant must "sufficiently explain the contradictory position he took during the plea colloquy." Siddons, 660 F.3d at 703 (internal quotes omitted). A defendant must make more than a "bold assertion of innocence." United States v. Wilson, 429 F.3d 455, 458 (3d Cir. 2005). After all, a plea of guilty, under oath, upon the record including acceptance of a written plea agreement and its factual stipulations and admissions of guilt as in this case, is a "solemn admission" of guilt. United States v. Isaac, 141 F.3d 477, 485 (3d Cir. 1998). As noted above, Tutis, in his Rule 11 hearing, as in in his final plea agreement and in his Application to Enter Plea of Guilty, not only admitted his guilt on Counts 1 and 13, but also stipulated to committing the factual elements of each crime, in detail.

The present motion is bereft of any proffer of facts in the record casting doubt on Tutis' guilt. Other than a generalized clause that "Mr. Tutis continues to maintain his innocence as to the charges brought against him" [Docket Item 443-1 at 2], there was no proffer that some element of guilt was missing or even debatable. Neither Farrell's testimony nor Vega's testimony at the hearing on this motion discussed anything that questioned Tutis' guilt, the strength of the evidence against him, or some

38

sort of newly discovered exculpatory evidence.  Not surprisingly, defense counsel's closing argument candidly conceded that there is no record evidence that supports Tutis' claim of innocence.  (Tr. 6/26/17 at 179:18-24.)  Although counsel also argued that the defendant's mere assertion of innocence suffices the Rule 11(d)(2)(B) burden under <u>Siddons</u>, Third Circuit precedent calls upon the district court to assess whether the defense has buttressed a generalized assertion of innocence with "facts in the record that support a claimed defense."  <u>Siddons</u> <u>supra</u>, 660 F.3d at 703.

It is, of course, possible that a defendant's detailed admissions of guilt under oath were all perjury, where the individual has other reasons for falsely admitting to the charged crimes.  The purposes of the careful Rule 11 colloquy, under oath or affirmation, are aimed at preventing the conviction of an innocent person.  This is not such a case.[9]

---

[9] Tutis apparently argues that his numerous admissions of guilt in his November 1st plea hearing were false because he was overwhelmed with concern for his wife, as "his only thoughts were of the additional charges that could be brought against his wife and the additional sentence she would face."  (Defendant. Br. Docket Item 443-1 at 4.)  The hearing on the present motion, however, yielded no evidence that the Government threatened additional charges against Vega if Tutis did not plead guilty.  Such additional charges against Vega, where the indictment had already been amended twice and the jury had already been selected, had essentially no possibility of occurring.

39

If Tutis is arguing that he has a meritorious defense to admission of wiretap or other surveillance evidence against him at trial, and therefore wishes to retract his guilty plea to preserve an appeal of those pretrial suppression motion rulings in the event of conviction at trial, that contention is not new nor is it incompatible with his decision to enter a conditional guilty plea.  Preserving appellate rights was an essential demand of his plea negotiations, upon which he succeeded.  Tutis entered into his conditional plea agreement under Rule 11(a)(2), Fed R. Crim. P., preserving his right to raise certain issues on appeal.  This is not a case where he needs to retract a guilty plea to do so.

Accordingly, the first _Siddons_ factor militates against permitting withdrawal of this plea because there is no plausible claim of innocence.

### 2.   **Whether Defendant Presented Strong Reasons Justifying the Withdrawal**

#### a.   **Lack of _Hodge_ Colloquy**

Tutis initially claimed he should be allowed to withdraw his guilty plea because it was packaged with Vega's plea and the Court did not undertake an appropriate Rule 11 colloquy to assure voluntariness under United States v. Hodge, 412 F.3d 479 (3d Cir. 2005).  In Hodge, the Third Circuit addressed a concern about "package deal" pleas where the Government "accepts a

40

A0119

defendant's guilty plea on the condition that his co-defendant(s) also plead guilty." Hodge, 412 F.3d at 490 (citing United States v. Caro, 997 F.2d 657, 658 (9th Cir. 1993)). The Court of Appeals noted that "[f]amilial or fraternal coercion of putative confederates in package deals is a serious concern" and the court warned that "offers of leniency or adverse treatment for some person other than the accused... might pose a greater danger to inducing a false guilty plea by allowing the assessment of the risks a defendant must consider." Id. at 489 (citations omitted). Hodge thus required that the parties inform the district court of the packaged pleas "to insure that the Fed. R. Crim. P. Rule 11 colloquy is thorough and searching as to the defendant's knowing, intelligent, and voluntary waiver of the right, among others, to a jury trial." Id. at 490. These Hodge duties apply to prosecutor and defense attorney alike, who must inform the Court of the packaged plea that triggers the Court's duty to propound the Hodge colloquy questions, as noted above.

Where one plea is conditioned upon another defendant's plea, the district court, as part of its obligations to assure a knowing and voluntary plea, must take special care that the precise terms of the package deal are placed upon the record, including clarity on "how a defendant's plea benefits his

41

A0120

confederate(s)." Id. at 491-92. The Court of Appeals suggested
the topics of the enhanced plea colloquy.[10] In the present case,
as found above, the Tutis plea was not packaged when entered on
November 1st. No Hodge colloquy is triggered when there are not
packaged pleas. That two spouses or family members are
negotiating pleas with the prosecutor simultaneously and enter
them on the same day does not make them "packaged", and no
further inquiry was needed at the Rule 11 hearings of Tutis and
Vega.[11]

Moreover, as discussed above, Defendant Tutis has offered
no evidence for the proposition that, if the Court had asked him
the Hodge colloquy questions, his answers would have given pause
about voluntariness or coercion. Farrell had prepared Tutis for

---

[10] The Hodge court indicated that the additional questions that may
be helpful to ask include: "[w]ho first proposed the package deal,
how extensively defense counsel was involved in developing the
deal, and what benefit the defendant expects to gain from the
deal." Hodge, supra, 412 F.3d at 493. The court should also ask
not only "whether the prosecutor forced, threatened or coerced the
defendant, but whether anyone did so." Id. These constitute the
contours of the Hodge colloquy that Tutis now argues was missing.

[11] Furthermore, as discussed above, even if the two agreements had
congruent forfeiture provisions for various jointly-owned assets,
that speaks to terms that are identical, not one plea being
conditioned upon the other. The defense has not argued that a
Hodge colloquy is triggered merely by similar provisions in in co-
defendants' plea agreements, and no such authority exists. In the
Tutis and Vega final plea agreements, if only one defendant had
pled guilty, that defendant's interest in the named properties
would be forfeited, not contingent on the other defendant's
decision or trial outcome.

a Hodge colloquy and even Farrell's slippery testimony contained no speculation that Tutis would have given indications of involuntariness or coercion if asked. The idea of "package deal" had been initiated by the Government, but Tutis undoubtedly would have acknowledged that he had received no coercion from his wife or other family members and no threats from the prosecutors to add charges against Vega. He was represented throughout the negotiations by Farrell, who was a strong advocate and a buffer against any prosecutorial threats or coercion. Regarding the hypothetical answer Tutis would have given to the question of what benefit he hoped to gain, his answer again would be obvious – he gained, by pleading guilty, a cap on the sentence for which the Government could advocate, elimination of the threat of the penalty enhancement of 21 U.S.C. § 851, dismissal of most counts of the Second Superseding Indictment, preservation of certain appellate rights, points off the Guidelines Total Offense Conduct score due to accepting responsibility under U.S.S.G. § 3E1.1(a), and a compromise for forfeiture of fewer properties than the Government had charged and seized, among other benefits. Tutis has not even suggested that he was "taking the rap" for Vega, nor does he suggest that the Government has it wrong when it sees him as substantially more culpable than Vega.

In short, the Defendant's allegations that his Rule 11 hearing lacked or required Hodge colloquy for packaged pleas, or that he would have raised his involuntariness in truthful answers to a Hodge colloquy, are unavailing and fail to supply a plausible reason for withdrawal of his guilty plea.

**b.  Lack of Understanding Unpackaged Plea**

Defendant Tutis' alternative claim that his plea should be withdrawn because he did not understand that his plea was unpackaged from his wife's plea, and that he might not have chosen to enter an unpackaged plea, fares no better.  For such a ground to have any weight, Tutis would have to show not only that he was ignorant of the true status of his plea as unpackaged from Vega's by November 1st, but more importantly that an unpackaged plea would have been a substantial reason for changing his decision to plead guilty.  The issues are whether the evidence shows a reasonable probability that Tutis was unaware that his plea was unpackaged from Vega's, and second whether he would not have entered his plea of guilty standing alone, uncoupled from Vega's plea, and would have opted to go to trial.  First, as already discussed above, the Court does not believe Farrell's testimony that Farrell himself misunderstood the pleas to be packaged, in light of all the surrounding circumstances to the contrary and Farrell's improper motive to

44

buttress his former client's recent emerging claim of ignorance.
Second, the November 1st statements of Tutis in his final written
plea agreement (Ex. D-14), in the Rule 11 hearing (Ex. D-16),
and in his Application for Permission to Enter Plea of Guilty
(Ex. G-8), discussed at length above, repeatedly indicated that
he had carefully read and reviewed his final plea agreement with
counsel, that he understood and accepted it, and that it was the
complete plea agreement. He specifically acknowledged he was
not coerced to plead guilty to avoid consequences to someone
else, stating: "I hereby declare that I have not been forced,
coerced or threatened in any manner by any person to plead
GUILTY to these charge(s). Nor have I been told that if I
refuse to plead GUILTY, other persons will be prosecuted."
(Tutis' Application for Permission to Enter Plea of Guilty, Ex.
G-8 at ¶ 36.)

Tutis points to his statements from jail in the recorded
conversation with Jazmin Vega on the evening of October 31st as
suggesting that his mindset was to plead guilty only because it
would help Vega. He would have this Court logically infer that
if the pleas were not packaged, he would have rejected the
Government's offer.[12] In fact, the Tutis/Vega conversation of

---

[12] Tutis had not yet seen the Government's revised plea agreement
of October 31, 2016 (Ex. G-4), which made substantial concessions
to Tutis' demands and eliminated the package plea language, because

45

October 31ˢᵗ makes only passing reference to Tutis' thought of pleading to benefit Vega.  (See Ex. D-5.)  After complaining to Vega that the Government was not acceding to his demands regarding forfeitures, exposure to prison time, and preserving the right to appeal, Tutis said, speaking of the stipulated trial that was under negotiation, "I'll take the stipulated joint, you know what I mean, just to get you out of it, you know what I mean, but I'm going, I'm going, man, I'm going...."  (Ex. D-5 at 3:17-20.)  And later Tutis said: "I'm going to end it for you tomorrow.  I'll take a conditional joint.  I mean, not conditional, I'll take the stipulated joint.  The stipulated joint give me the right to challenge all my properties, you know what I mean?  They going to 851 me, go ahead, 851 me," referring to the prospect of the enhanced penalty information if he went to trial.  (Id. at 5:1-5.)  Tutis' predominant, recurring interests, the ones which made him agitated to speak about, concerned his properties, his conditional appellate rights, and going to trial if he couldn't preserve some of the properties for his family's welfare.  (Id. at 5:17 to 6:20; 7:1 to 8:25; 10:16-23.)

---

the Government did not send it to Farrell until 8:29 PM that night (Ex. D-13), as discussed above.

Later in the conversation, Vega was explaining to Tutis that he should not concern himself with her because she didn't want him to risk his rights for her benefit by fighting over the forfeiture of the properties ("VEGA: I don't want you to fuck freedom over some properties .... Honestly, that's how I feel. I want you to come home ... [inaudible] like that," (Ex. D-5 at 8:5-6, 14-16). Vega explained that AUSA Carrig was commenting to Mr. Archie, presumably about Tutis' rejection of the plea offer, that Carrig said "I didn't want it to go this way or whatever, she was like, ... she was saying something about I didn't want it to go this way or whatever the case may be. She was like trying to work something out for her or whatever," (id. at 9:16-21), meaning that AUSA Carrig indicated she was willing to work out a separate plea for Vega. This confirms testimony of Archie and Vega about that interaction with AUSA Carrig as the separate revised plea was being negotiated with Archie, as discussed above. It could not have been lost on Tutis, after hearing this from his wife, that Vega, on the evening of October 31st, was telling him to get the best deal he could for himself because her case was being worked out, and that she would be okay.

Bearing Vega's statement in mind, on November 1st Tutis, through Farrell, rejected the Government's offer again and

pressed the very points that Tutis had dwelled on with Vega, as discussed above.  Knowing that Vega would be worked out, Farrell and Tutis continued to press for, and achieved, a significantly better deal for Tutis.  Moreover, other factors were at play, pressing Tutis to make his best deal and plead guilty.  Everyone has acknowledged the strength of the evidence Tutis would have confronted at trial consisting of many law enforcement officers, other eyewitnesses, and voluminous electronic surveillance directed at him and other conspirators.  Second, the passage of time itself was pressing him and everyone for finality in the plea negotiations as the selected trial jury awaited.  Third, he would not have to go to trial to preserve the right to appeal the pretrial suppression motion decisions that he believed were erroneous, if he could achieve a Rule 11(a)(2) conditional plea. Fourth, going to trial risked a considerably longer mandatory minimum sentence in the event of conviction due to the imminent filing of the § 851 penalty enhancement information, plus risking conviction on numerous other counts of the indictment, including weapons offenses.  Unless Tutis was reasonably confident that the Government could not prove its case against him at trial, there would have been no reason to reject an uncoupled plea and go to trial.  There is no indication in the

record that Farrell or Tutis thought they could achieve an acquittal at trial.

For these reasons, the Court finds, even if Tutis was unaware the pleas were unpackaged, that there is no prospect that he would have decided to reject the final renegotiated conditional plea and go to trial.  This alternative theory does not amount to a substantial reason for withdrawing from the plea agreement.

### 3. Whether the Government Would be Prejudiced by the Withdrawal

Prejudice to the Government, the third factor for consideration, is a neutral value in this motion.  On the one hand, the United States has indicated it would not be curtailed in trying the case if the Tutis plea was withdrawn.  The Government pointed to no witnesses who would be unavailable due to death or infirmity.  (Gov't Opp. Br. at 23-24 (Docket Item 448.))  AUSA Wiener retired, so a new AUSA would have to learn this complicated case (Tr. 6/26/17 at 203), but the Government said that if it could have sufficient time to prepare witnesses again, acclimate a new AUSA, and focus its trial exhibit list on Tutis, it would be ready.

On the other hand, there is a cost to the Government in the previous time expended by its AUSAs and case agents in preparing for trial, selecting a jury, and negotiating Tutis' plea

49

agreements, that would be lost, much of it as wasted time and effort of the prosecution that would have to be repeated by a partly new trial team.  That period of intensive trial preparation through the entry of the November 1st plea was about one month.[13]

### B.   Summary of Analysis

After careful consideration of the record, the Court has thus found that (1) the Defendant does not assert his innocence in any plausible way (see Part III.A.1, above); (2) the Defendant does not present a strong reason justifying the withdrawal of the plea (see Part III.A.2, above); and (3) the Government would not be especially prejudiced by withdrawal of the plea provided the prosecution team is given enough time to prepare a second time for a new trial (see Part III.A.3, above). In the absence of a plausible assertion of innocence and lack of a substantial reason justifying withdrawal, the absence of prejudice to the Government does not constitute a reason to grant this motion under Rule 11(d)(2)(B).  Defendant has failed

---

[13] Although this prong concerns itself with prejudice to the Government, not to the Court, it is worth noting that the Court also invested parallel efforts in trial preparation, summoning a large panel of jurors, selecting jurors for two days, blocking out four weeks for this trial from its schedule, and convening the Tutis Rule 11 hearing.  The Court cancelled the trial and excused the jurors in reliance upon Tutis' decision to plead guilty.

to "show a fair and just reason for requesting the withdrawal."

Rule 11(d)(2)(B), Fed. R. Crim. P.

**IV.** <u>**CONCLUSION**</u>

For the reasons stated above, the Court will deny Defendant

Tutis' motion for leave to withdraw his plea of guilty under

Rule 11(d)(2)(B), Fed. R. Crim. P.  The accompanying Order is

entered.


**November 13, 2018**                          **s/ Jerome B. Simandle**
Date                                                          JEROME B. SIMANDLE
                                                                 U.S. District Judge


51

A0130

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

TOYE TUTIS,

Defendant.

HON. JEROME B. SIMANDLE

Criminal No. 14-699-1 (JBS)

**ORDER**

This matter having come before the Court upon motion [Docket Item 443] of Defendant Toye Tutis for leave to withdraw his plea of guilty pursuant to Rule 11(d)(2)(B), Fed. R. Crim. P.; and

The Court having considered the record in this case including testimony, exhibits, and oral arguments of counsel at an evidentiary hearing; and

For reasons expressed in the Opinion of today's date which constitutes the Court's findings of fact and conclusion of law;

IT IS this **13th** day of **November**, **2018**, hereby

**ORDERED** that the motion of Defendant Toye Tutis to withdraw his plea of guilty [Docket Item 443] shall be, and it hereby is, **DENIED**.

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
U.S. District Judge

A0131

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

TOYE TUTIS,

　　　　Defendant.

HON. JEROME B. SIMANDLE

Criminal No. 14-699-1 (JBS)

**OPINION**

APPEARANCES:

　　Craig Carpenito, United States Attorney
　　By:  Diana Carrig, Assistant U.S. Attorney
　　401 Market Street, 4th Floor
　　P.O. Box 2098
　　Camden, NJ  08101-2098

　　Stanley O. King, Esq.
　　King & King, LLC
　　231 Broad Street
　　Woodbury, NJ  08096
　　　　Attorney for Defendant

SIMANDLE, U.S. District Judge:

　　Presently before the Court is the second motion of Defendant Toye Tutis to withdraw his plea of guilty pursuant to Rule 11(d)(1)(B), Fed. R. Crim. P., filed February 22, 2019.

I.　**BACKGROUND AND PROCEDURAL HISTORY**

　　On November 1, 2016, after his jury had been selected, Defendant Toye Tutis pled guilty under a written plea agreement to being a leader or supervisor of a major drug trafficking conspiracy and an associated money laundering conspiracy.  The sole remaining

co-defendant was Tutis' wife, Jazmin Vega, who also entered her plea of guilty to the money laundering conspiracy charge on November 1, 2016.

Thereafter, Tutis moved to withdraw his guilty plea under Rule 11(d)(1)(B), Fed. R. Crim. P. [Docket Item 443], raising two main contentions. Initially, he claimed he understood his plea agreement to be a package deal with that of his wife, Jazmin Vega, and that this Court conducted a Rule 11 hearing that failed to include the colloquy required by United States v. Hodge, 412 F.3d 479 (3d Cir. 2005) (applicable to joint plea agreements to assure each co-defendant's knowing, intelligent, and voluntary acceptance of the plea and waiver of jury trial rights). Alternately, Tutis argued that even if the pleas were not coupled -- as indeed they weren't -- his decision to plead guilty was nonetheless not knowing or voluntary because he mistakenly thought he had to accept his plea agreement or his wife would not be permitted to plead guilty, which he blamed on his ex-attorney, J. Michael Farrell, whom Tutis had retained as the case moved toward trial in 2016.

The Court conducted three full days of hearings exploring the evolution of Tutis' plea agreement, the conduct and knowledge of Tutis' prior attorney J. Michael Farrell, and the knowledge of Jazmin Vega and her attorney, Troy Archie, Esq., as plea negotiations unfolded, together with detailed analysis of the Rule 11 hearings of Tutis and Vega, the Tutis application for permission

2

A0133

to enter a plea of guilty, the various draft plea agreements, and the final plea agreements of Tutis and Vega. Mr. Farrell, Mr. Archie, and Ms. Vega all testified and were cross-examined. Mr. Tutis declined to testify at the end of those hearings, placing his waiver on the record. (Tr. June 26, 2017 at 147-150.)

This Court held, in a 51-page Opinion filed November 13, 2018 [Docket Item 556] (hereafter "November 13th Opinion"), that Defendant Tutis failed to demonstrate a fair and just reason for requesting the withdrawal of his guilty plea. Namely, the Court found: (1) the Defendant does not assert his innocence in any plausible way (as explained in Part III.A.1 of the November 13th Opinion); (2) the Defendant does not present a strong reason justifying the withdrawal of the plea for lack of a Hodge colloquy because the pleas were not packaged, or because Tutis did not understand the pleas were unpackaged and would not have pled guilty in any event (as explained in Part III.A.2 of the November 13th Opinion). As to the later point, the Court did not credit the testimony of former attorney Farrell that he himself misunderstood the pleas to be packaged, and the Court found that Farrell's testimony and self-confession of being inadequate defense counsel in advising the guilty plea was false and motivated by the corrupt desire to help his former client with untruthful testimony (as explained in Parts II.H and III.A.2.b of that Opinion). Moreover, after considering all the circumstances, the Court found Mr. Tutis

3

had not shown he would have gone to trial and rejected the final plea offer that had achieved the favorable bargaining points that Tutis had demanded as negotiations evolved, including preservation of the right to appeal certain pretrial rulings, dismissal of substantial weapons charges, and dismissal of the prospect of an enhanced penalty under 21 U.S.C. § 851, all in order to confront the mountain of evidence consisting of numerous inculpatory taped conversations, documents, surveillances, and testimony awaiting at trial (as explained in Parts II.(I) and III.B.2.b of the November 13th Opinion). Moreover, the Court rejected Defendant's claim and Farrell's testimony that Farrell had been confused and ineffective as Tutis' counsel in advising him to accept the final plea agreement, finding "Farrell's testimony amounts to a clumsy and unethical attempt by ex-counsel to 'fall on his sword,' albeit a fabricated sword, for the benefit of setting aside a conviction." (November 13th Opinion at pp. 32-33 & 44-45; see Parts II.H & III.A.2).

Having failed in his effort to withdraw his guilty plea on the ground that it was not voluntary, and that he felt coerced to help his wife and would otherwise have gone to trial, and arguing that Farrell was ineffective counsel in the guilty plea process, Tutis now claims that he should be permitted to withdraw his plea on the ground it was not knowing and intelligent, due to the ineffective assistance of his prior counsel J. Michael Farrell who

A0135

mistakenly advised him to accept the plea.  The two claims -- lack
of voluntariness in the 2017 motion to withdraw his guilty plea
and his present motion claiming a mistaken advice from his attorney
causing Tutis' lack of knowledge that he did not have to plead
guilty to "save" his wife -- are directly related.  Both depend on
the essential factual predicate that Tutis and attorney Farrell
were both confused about whether Tutis' plea had to be a package
deal with Vega's plea; similarly, both depend upon determining
whether this mistake or confusion actually mattered, that is,
whether Tutis would have elected to go to trial, facing
substantially increased charges that were otherwise mooted by the
guilty plea, if he understood that his wife's guilty plea no longer
depended on his decision.

Moreover, both the 2017 motion and the current one are motions
to withdraw the plea pursuant to Rule 11(d)(1)(B), which requires
consideration, as a first factor, whether the defendant asserts
his innocence, United States v. Siddons, 660 F.3d 699, 703 (3d
Cir. 2011), which "must be buttressed by facts in the record that
support a claimed defense" and must "sufficiently explain the
contradictory position he took during the plea colloquy."  Id.
Regarding Defendant's 2017 motion, the Court found the motion was
"bereft of any proffer of facts in the record casting doubt on
Tutis' guilt," nor was there any proffer that some element of guilt
was missing or even debatable.  (November 13th Opinion at 38)

5

A0136

[Docket Item 556]. The Court also found that Defendant's initial motion failed to explain how his prior Rule 11 hearing testimony under oath, admitting that he was guilty as an organizer, leader, manager, or supervisor of the charged conspiracy to distribute 150 to 450 kilograms of cocaine and approximately 26 kilograms of heroin, coupled with similar detailed admissions of money laundering, was incorrect or untrue. (Id. at 25-26, 38-40).

The same is true of the present motion, namely, there is not one word about having a viable defense to the charges or an explanation of why his admissions of factual guilt in 2016 should be disregarded now, other than his claim that he lied to the Court when he pled guilty, to be discussed below. Accordingly, Defendant fails to demonstrate any plausible claim of innocence to the charges to which he pled guilty.

This was confirmed by Tutis' testimony upon the present motion at a hearing on April 4, 2019. He admitted he reviewed the wiretap calls from the extensive criminal investigation of the drug distribution conspiracy and heard himself on tape talking about purchasing and selling multi-kilogram quantities of cocaine and shipping drug proceeds to California and arranging for others to receive shipments of the drugs to the locations he arranged in New Jersey. He testified he was aware that a firearm and $62,000 cash as drug proceeds were found in the closet of his premises. He was aware that if he went to trial, the Government's § 851 penalty

A0137

enhancement notice would increase his mandatory minimum penalty to 240 months just for the drug conspiracy in the event of conviction.

When asked why he admitted guilt in the Rule 11 colloquy in his testimony of November 1, 2016, Tutis testified on April 4, 2019 that "[m]y testimony was not truthful," that he basically lied to protect his wife. This time, Tutis testified in effect that he "conspired with nobody," and that while he was "selling drugs," he "didn't conspire." This, of course, makes no sense, in light of his admission, once again, in his April 4, 2019 testimony, that he bought drugs from the alleged co-conspirators, and that this group trafficked in 150 to 450 kilograms of cocaine and 26 kilograms of heroin. He acknowledged he had agreements with the others to buy or sell specified quantities of cocaine and heroin at agreed-upon prices, the essence of the agreement required for conspiracy to distribute drugs. Similarly, concerning the money laundering conspiracy, he again admitted on April 4, 2019, as he had in his Rule 11 colloquy on November 1, 2016, that he conspired with his wife, Jazmin Vega, to engage in their multiple trips to banks for money laundering of drug proceeds, although he added on April 4th that it was "not all drug money" because some portion came from his legitimate businesses. This, of course, is no defense to the charged conspiracies.

His April 4th testimony contained a litany of lies wherein he said he never read or understood his final plea agreement, contrary

A0138

to his November 1st testimony at the Rule 11 hearing and his
Application form for that hearing.  On re-direct testimony on April
4th, Tutis placed the blame on Farrell for allegedly advising him
to lie to the Court at the Rule 11 hearing.

## II. <u>DISCUSSION</u>

### A. <u>Standard for Withdrawal of Guilty Plea</u>

Rule 11(d)(2)(B), Fed. R. Crim. P., provides in relevant part
that "[a] defendant may withdraw a plea of guilty ... (2) after
the court accepts the plea but before it imposes sentence if: ...
(B) the defendant can show a fair and just reason for requesting
the withdrawal."  For withdrawal of a guilty plea before
sentencing, the defendant must meet a "substantial" burden of
demonstrating the "fair and just reason" for withdrawal.  <u>United
States v. Siddons</u>, 660 F. 3d 699, 703 (3d Cir. 2011).  Thus,
"[o]nce a court accepts a defendant's guilty plea, the defendant
is not entitled to withdraw that plea simply at his whim."  <u>United
States v. Jones</u>, 336 F.3d 245, 252 (3d Cir. 2003).

"When determining whether a defendant has shown a 'fair and
just reason' for withdrawing a plea, a district court must consider
whether:  '(1) the defendant asserts his innocence; (2) the
defendant proffered strong reasons justifying the withdrawal; and
(3) the government would be prejudiced by the withdrawal.'"

A0139

*Siddons*, 660 F.3d at 703 (quoting *United States v. King*, 604 F.3d 125, 139 ((3d Cir. 2010)).

Here Defendant Tutis asserts that he should be allowed to withdraw his plea because he received ineffective assistance of counsel and would not have pled guilty but for his prior attorney's confusion and bad advice, in violation of his constitutional right to effective assistance.  He alleges that this supplies a fair and just reason to with draw his plea.

The parties agree that Tutis bears the burden of establishing his former counsel's ineffectiveness under *Strickland v. Washington*, 466 U.S. 668 (1984).  *See* *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *United States v. Davies*, 394 F.3d 182, 189 (3d Cir. 2005).  To meet that burden, Tutis must satisfy *Strickland's* two-part test.  First, Tutis must show that his former counsel's representation was not "within the range of competence demanded of attorneys in criminal cases."  *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (internal quotation marks omitted).  Second, Tutis must show "prejudice" -- i.e., that former counsel's alleged deficiencies "affected the outcome" of the proceedings.  *Id.* at 58-59.  Thus, Tutis "had to demonstrate 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'"  *Premo v. Moore*, 562 U.S. 115, 129 (2011) (quoting *Hill*, 474 U.S. at 59).

B.   Ineffective Assistance of Counsel

9

At the outset, there is no issue of fact in this second motion that was not already presented and decided in the first one, in which Defendant Tutis fully participated.  Nonetheless, the Court will address these issues under the Strickland rubric and make its findings accordingly, drawing from the first motion and the November 13th Opinion.

    1.   Whether Prior Counsel was Ineffective

First, as to Farrell's alleged ineffective assistance of counsel, the issue was already raised, testimony taken, and the issue decided in the first motion.  Tutis' reply brief in the first motion [Docket Item 452] submitted the certification of J. Michael Farrell [Docket Item 452-2], in which Farrell stated, among other things, that he never informed Tutis that the pleas were unpackaged because he did not know.  The Government pointed out, in its surreply [Docket Item 453] that "the inclusion of Mr. Farrell's certification to the Motion has made the Motion akin to a Section 2255 motion based on alleged ineffective assistance of counsel." [Id. at p.2.]  The Government argued that Farrell's statement, if true, was "tantamount to an admission that Farrell did not fully read and/or understand the final plea agreement so as to render appropriate and competent advice to Tutis.  That statement also directly contradicts Mr. Farrell's statements at the Tutis change of plea hearing." [Id. (footnote omitted).]  As the motion would involve probing discussions between attorney and client that were

otherwise privileged, the United States sought a determination that the attorney-client privilege as to plea negotiations and discussions had been waived by Defendant placing the effectiveness of advice and preparation of defense counsel into play and sought leave to question Farrell and to review Farrell's case file. [Id.] All parties agreed with the Government's characterization and also that the attorney-client privilege was waived by Tutis' claim of reliance on advice of counsel that was incorrect. [Docket Item 456, Memorandum Opinion and Order of April 28, 2017 at 1.] Mr. Tutis himself was questioned at the hearing on April 26, 2017 on the Government's claim of waiver of the privilege, and upon the record he waived his attorney-client privilege relating to his claim that Farrell had ineffectively represented him by poor preparation and bad advice when pleading guilty. [Id. at 2, ¶¶ 4, 5.]

Thus, the crucial point is that Tutis (and his current counsel) knew, in April of 2017, two months before the hearings on his motion to withdraw in June of 2017, that he had squarely placed effectiveness of his former counsel, Mr. Farrell, into issue as a basis to withdraw his plea of guilty.

As discussed in the Court's November 13th Opinion denying Tutis' motion to withdraw his guilty plea, ex-attorney Farrell testified on June 21, 2017 and June 23, 2017, including testimony about his own alleged self-confessed inadequate representation of

11

A0142

Tutis at the time of his guilty plea.  As noted, Tutis declined to
testify at the June 2017 hearings regarding any advice Farrell did
or did not provide to him.  Mr. Archie and Ms. Vega also testified,
with Mr. Archie explaining that the pleas were uncoupled before
November 1st and that Mr. Farrell was aware of it.  The Court found
that Farrell's testimony that he didn't understand his client's
plea and its unpackaged nature was not credible.  (Opinion of Nov.
13, 2018 at 31-33, 44.)  The Court further found that Farrell
attempted to manufacture an ineffective assistance of counsel
claim in a corrupt post-plea attempt to help his former client.
(Id. at 32-33, 43, 44-45.)  This Court instead credited Farrell's
assurances from the November 1st plea hearing that his client's
plea was knowing, voluntary, and the product of extensive
conversations and negotiations.  (Id. at 31-32.)

     The current testimony of Tutis on April 4, 2019, changes
nothing about the prior determinations of this Court.  Tutis
introduces no evidence that was unavailable at the time his first
withdrawal motion was heard and adjudicated.  As discussed above,
Tutis' testimony about the advice he received from Farrell is at
a 180° variance from what Tutis testified under oath in his Rule
11 hearing on November 1, 2016.  His new testimony -- that he lied
to this Court on November 1st about reading and understanding his
guilty plea, that Farrell told him to lie, and that he received no
real benefit from his November 1st plea agreement -- is incredible.

The Court analyzed the statements of Farrell and Tutis from the lengthy Rule 11 hearing (see Opinion of Nov. 13, 2018 at 21-28), incorporated herein.  As with Farrell, the Court continues to believe Tutis' testimony in his extensive November 1st plea colloquy and disbelieves this contrived testimony about ineffective assistance.  Tutis and Farrell knew exactly what they were doing on November 1st.

In summary, as to the first prong of the Strickland test, the Court finds that Tutis has failed to show that his former attorney J. Michael Farrell's representation surrounding the negotiations, advice, and entry of Tutis' guilty plea on November 1st was not "within the range of competence demanded by attorneys in criminal cases."  Hill v. Lockhart, supra, 474 U.S. at 56.  This is sufficient reason to reject Defendant's ineffective assistance of counsel claim.

2.   Whether Defendant has Shown Prejudice

We next address the issue of whether, if Farrell was ineffective through lack of preparation and bad advice (which he was not), did Farrell's alleged deficiencies affect the outcome of the proceedings?  Here, Defendant must demonstrate that, but for Farrell's errors, he would not have pled guilty and would have insisted on going to trial.  Premo v. Moore, 562 U.S. 115 at 129 (quotations omitted).

13

This issue -- essentially whether Tutis would have opted for
trial if Farrell had advised that his plea was no longer essential
to his wife's ability to plead guilty -- was likewise litigated
and decided in the first motion.  In Part II.I of the Opinion of
Nov. 13, 2018, entitled "Would Tutis Have Rejected Conditional
Plea if He Fully Understood it was not Packaged with Vega's Plea?"
[Docket Item 556 at 33-36], the Court found that "Tutis has failed
to show that he would not have entered his plea of guilty if he
knew it was unpackaged."  Id. at 33.  The simple facts, as found
in the November 13th Opinion, revealed that Tutis continuously
rejected the earlier packaged plea agreement offers because he
wanted to drive a harder bargain with respect to clawing back some
of the forfeited properties and preserving his right to appeal
certain suppression motion decisions by a conditional plea
agreement under Rule 11(a)(2), Fed. R. Crim. P.   When the
Government acceded in the unpackaged, conditional plea of November
1st, he accepted.  There was no trial strategy then, and there is
none now, by which Tutis would defend against the massive evidence
against him at trial.

His recent testimony of April 4, 2019 does not change this
prospect -- he still has not indicated, nor has his current
attorney, what his strategy might be if his guilty plea was
nullified, and he opted to defend at trial.  His testimony that he
would have opted for trial rather than entering the favorable plea

14

A0145

that he bargained for is not logical or credible.  Thus, whatever former attorney Farrell's conduct or advice was on November 1, 2016, Defendant Tutis has failed to establish the second <u>Strickland</u> element, namely, that Tutis was prejudiced by it.

    C.   <u>"Fair and Just Reason" for Withdrawal</u>

Defendant Tutis, in this second motion to withdraw his plea of guilty, has proffered that the ineffective assistance by prior counsel, Mr. Farrell, supplies "fair and just cause" to withdraw his plea under Rule 11(d)(2)(B), Fed. R. Civ. P.  Because the Court has now twice rejected that ground, Defendant has failed to meet his "substantial" burden under <u>United States v. Siddons</u>, 660 F.3e at 703.

Further, as found in the November 13th Opinion and repeated today, the Court finds Defendant Tutis fails to assert his innocence in any plausible way.

Finally, under the third <u>Siddons</u> factor, the Court finds the Government would be somewhat prejudiced by the passage of time from the October 2016 trial start date and today, two and one-half years later, due to fading memories of persons testifying about events in the indictment going back to 2010.  The Government had conceded in the first motion, in early 2017, that its only prejudice would accrue from having to re-prepare for trial and to replace one of the trial attorneys who retired (see Opinion of Nov. 13, 2018 at 49-50), but overall, it was not claiming undue

A0146

prejudice.  Now, in addition to those lesser types of prejudice that are still present, the Government points out that at any trial in late 2019, three years after this guilty plea was entered and the evidence was put into boxes, witnesses would be called upon to accurately recall events from the 2010-2014 period central to these charges.  The Court recognizes this as an undue prejudice to the Government, although not as weighty as the first two <u>Siddons</u> factors -- that Defendant Tutis does not assert his innocence in some meaningful way, and that Defendant has not proffered a substantial reason justifying the withdrawal.  Thus, Defendant falls short on all three <u>Siddons</u> factors.

**III. <u>CONCLUSION</u>**

For these reasons, and for those stated in the Court's Opinion of November 13, 2018, Defendant Tutis ha failed to demonstrate that he should be permitted to withdraw his plea of guilty, or that his former attorney was constitutionally ineffective under <u>Strickland</u>.  The motion will again be denied, and the accompanying Order is entered.

**April 26, 2019**                    **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      U.S. District Judge

A0147

Case 1:19-2406-JBS Document 74 Page: 213 Date Filed: 06/04/2020

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 14-699-1 (JBS) |
| TOYE TUTIS, | |
| Defendant. | **ORDER** |

This matter is before the Court upon the Second Motion to Withdraw Plea of Guilty by Defendant Toye Tutis [Docket Item 568], by his attorney Stanley O. King, Esq., and opposed by the United States Attorney (by AUSA Diana Carrig); and

The Court convened a hearing on April 4, 2019 and received testimony and exhibits into evidence, and heard the arguments of counsel; and

For reasons stated in the Opinion of today's date, as well as in the Opinion of November 13, 2018 [Docket Item 556], having again determined that this motion to withdraw the plea of guilty pursuant to Rule 11(d)(2)(B), Fed. R. Crim. P. should be denied;

IT IS this __26th__ day of __April__ , **2019**, hereby

**ORDERED** that Defendant Tutis' Second Motion to Withdraw Plea of Guilty shall be, and it hereby is, **DENIED.**


__s/ Jerome B. Simandle__
JEROME B. SIMANDLE
U.S. District Judge

A0148

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Judge: Hon. Jerome B. Simandle, U.S.D.J. |
| | : | |
| | : | |
| v. | : | Docket No.: Cr. 14-699-01 (JBS) |
| | : | |
| | : | |
| TOYE TUTIS | : | **Notice of Appeal** |
| | : | |

Notice is hereby given that Toye Tutis, defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the final judgment of the United States District Court for the District of New Jersey entered in this action on May 6, 2019.

Dated: May 14, 2019        /s/Stanley O. King
STANLEY O. KING, ESQUIRE
Attorney for Defendant pursuant to CJA 20
KING & KING, LLC.
231 S. Broad Street
Woodbury, NJ 08096
(856) 845-3001

A0149

Stanley O. King, Esquire
KING & KING, LLC
231 S. Broad Street
Woodbury, NJ 08096
(856) 845-3001
Attorney for Defendant, Toye Tutis

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jerome B. Simandle, U.S.D.J. |
| | : | |
| | : | |
| v. | : | Criminal No.: Cr. 14-699-01 (JBS) |
| | : | |
| TOYE TUTIS | : | **CERTIFICATE OF SERVICE** |

Stanley O. King, Esquire, certifies that on the 14th day of May 2019, he served a true and correct copy of the attached Notice of Appeal electronically *via* PACER/ECF, and by regular mail as follows:

**The Honorable Jerome B. Simandle**
United States District Judge
Mitchell H. Cohen/U.S. Courthouse
1 John F. Gerry Plaza
Camden, NJ 08101

**Mark E. Coyne**
Chief, Appeals Division
United States Attorney's Office
970 Broad Street, Suite 700
Newark, NJ 07102

**Diana Carrig, AUSA and**
**Peter Gaeta, AUSA**
Camden Federal Building & US Courthouse
401 Market Street, 4th Floor
Camden, NJ 08102

*/s/ Stanley O. King*
STANLEY O. KING, ESQUIRE
Attorney for Defendant, Toye Tutis

A0150

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 14-699-1 (JBS) |
| TOYE TUTIS, | **OPINION** |
| Defendant. | |

APPEARANCES:

Craig Carpenito, United States Attorney
By: Diana Carrig, Assistant U.S. Attorney
401 Market Street, 4th Floor
P.O. Box 2098
Camden, NJ 08101-2098

Stanley O. King, Esq.
King & King, LLC
231 Broad Street
Woodbury, NJ 08096
    Attorney for Defendant

**SIMANDLE, District Judge:**

## I. INTRODUCTION

The Defendants, Toye Tutis and Jazmin Vega, are charged in a Second Superseding Indictment (filed September 14, 2016) with various offenses related to the distribution of drugs and money laundering in the Atlantic City, New Jersey area.

Presently before the Court is the motion of Defendant Tutis to suppress evidence obtained as a result of a court-authorized wiretap of Defendant Tutis' cell phone approved by a New Jersey

state court judge on September 26, 2014. (See Omnibus Motion of Toye Tutis (hereinafter "Def.'s Renewed Mot.") [Docket Item 322].)[1] This motion rests on three principal grounds.

First, the defense argues that the September 26, 2014 Order authorized an unlawful roving wiretap of any telephone Tutis may come to use and thus was a general warrant.

Second, Defendant Tutis alleges that the wiretap order, obtained by an Atlantic County Prosecutor's Office ("ACPO") Detective was based on false information about Toye Tutis' involvement, as well as material omissions, which the detective knowingly, intentionally, and/or recklessly made in his affidavit; accordingly, Defendant Tutis sought a hearing under Franks v. Delaware, 438 U.S. 154 (1978).[2] This Court convened a Franks hearing on October 17, 2016, and the evidence obtained will be discussed herein.

---

[1] Defendant Vega appears to join in Defendant Tutis' present motion; counsel for Defendant Vega engaged in a brief cross examination of Detective Dorn during the Franks hearing described, supra, but did not provide any briefing or oral argument regarding the motion. (See 10/17/16 Tr. [Docket Item 414], 175:7-176:23.)

[2] The Court previously had denied prior counsel's motion for a Franks hearing because Defendant made an insufficient showing that Detective Dorn, the affiant, acted knowingly, intentionally, or recklessly in presenting an affidavit with false information. United States v. Tutis, 2016 WL 885044 at *11 (D.N.J. Mar. 8, 2016) [Docket Item 264]. This renewal of that motion was accompanied by the Declaration of Toye Tutis and further information developed in recent months, discussed below. For reasons expressed at a hearing on October 13, 2016, the Court agreed that a Franks hearing should be convened.

Third, Defendant Tutis argues that the Government is barred from using evidence collected as a result of the September 26, 2014 Order, because such evidence was collected by state authorities in violation of the Fourth Amendment, and therefore is subject to the "Silver Platter" Doctrine, and must be excluded from trial under Elkins v. United States, 364 U.S. 206 (1960).[3]

The Court previously filed an Order on October 21, 2016 [Docket Item 388] denying "Defendant Toye Tutis' motion to suppress

---

[3] Defendant Tutis also argues that the Court should suppress evidence obtained by electronic surveillance and/or consensual electronic interceptions of Defendant Ivan Cuellar Naranjo where such communications involved Defendant Tutis. Because the Court has found that Judge DeLury had a substantial basis for authorizing the Tutis wiretaps, which also intercepted the same conversations the Government intends to use at trial, the basis for this suppression motion is moot.

Additionally, due to the complex nature of this case's history, the Court may not previously have issued a ruling with regard to, Defendant Tutis' contention that the ACPO used a special technology "which transforms an ordinary cell phone into a bug," and that it would have needed, but did not obtain, authorization to use such technology. (Def. Br. at 36.) In support of this assertion, Tutis refers to a "Friday Report" dated October 3, 2014, which advised Judge DeLury that the actual conversations intercepted included background conversations and traditional telephone conversations. (Def. Br. at 36). The Government argues in response that "there is utterly no evidence that law enforcement used such technology." (Opp'n at 13). The Court agrees. Moreover, in response to the Court's inquiry at the Sept. 8, 2016 hearings [Sept. 8, 2016 Tr. at 51: 14-19], the Government reconfirmed that the CSS was not used to turn another device into an eavesdropping device or "bug," and that no such evidence was obtained in this case other than duly wiretapped conversations and consensually recorded conversations. [Id. at 52: 1-6.] Without further evidence that the Government used a roving bug in this case, the Court cannot consider suppression of any evidence.

evidence intercepted as a result of the September 26, 2014 Wiretap Order," including Defendant Tutis' <u>Franks v. Delaware</u> motion. The present Opinion memorializes the Court's reasons for that Order.[4]

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. General Case and Investigation Background

The charges contained in the Indictment stem from a long-running investigation conducted jointly by federal, state, and local law enforcement officers, targeting an alleged drug-trafficking organization in Atlantic City and the surrounding southern New Jersey region. (<u>See</u> Walsh Aff. at ¶¶ 5-6.)[5] The fruits of this investigation purportedly revealed, overall, that Defendant Tutis sourced supplies of heroin and cocaine from the Mexican Sinaloa cartel (with the help of alleged cartel broker, Defendant Ivan Cuellar Naranjo), through contacts in Los Angeles, California, and relied upon his network of alleged drug-traffickers in this region (namely, Defendants Tozine Tiller, Jewell Tutis, and Atiba, among others) to distribute and sell the

---

[4] The present Opinion amplifies and explains the Court's October 21, 2016 denials of these motions and is entered pursuant to L.A.R. 3.1, which gives the trial court an opportunity, for 30 days after the notice of appeal is filed, to explain a prior ruling that is a subject of the appeal.

[5] An affidavit of FBI Special Agent Timothy M. Walsh was submitted as Exhibit 1 to the Government's opposition brief to Defendant Tutis' first Motion to Suppress [Docket Item 234]. Neither the Government's opposition to that motion, nor the exhibits thereto were filed on the docket.

A0154

drug products. (See id. at ¶¶ 6-7.) Defendant Tutis, with his wife Defendant Jazmin Vega, then allegedly "launder[ed]" the proceeds of this drug conspiracy through cash deposits into various bank accounts, high-end purchases, and by comingling the drug-trafficking proceedings with the proceeds of his legitimate business (namely, Ta'Ja Construction, LLC, Ta'Ja Construction I, LLC, Real Estate Investors, LLC, Ta'Ja Laundromat, Dave's Grocery, and Integrity Heating & Cooling, LLC). (Id. at ¶¶ 7-9.)

During the course of the investigation, state and federal law enforcement officials learned of the nature of the alleged drug-trafficking conspiracy through a series of drug purchases (namely, controlled buys by confidential sources), package intercepts, trash pulls, authorized property searches and seizures, as well as court authorized "roving wiretaps" of telephones known to be used by various defendants. (Id. at ¶¶ 10-11.) Indeed, the genesis of the electronic-surveillance aspect of this case dates back to an initial federal wiretap obtained on November 21, 2013, and supported by a probable cause affidavit that identified a number of "'target interceptees,'" including Tozine Tiller and Toye Tutis.[6] (Brief in Support of Tutis' First Motion to Suppress (hereinafter, "First Tutis Br.") [Docket Item 234], 1-2; see also

---

[6] Defendants mount no challenge to the propriety of the various federal wiretaps.

A0155

Gov't Opp'n to Tutis' First Motion to Suppress (hereinafter, "Gov't First Opp'n") at 6.)

**B.    State Wiretap Authorizations**

As relevant here, the Atlantic County Prosecutor's Office (hereinafter, the "ACPO") obtained a series of wiretaps, authorized by the Honorable Bernard E. DeLury (hereinafter, "Judge DeLury") and supported by the affidavits of Detective Jason E. Dorn (hereinafter, "Detective Dorn"), on cellular telephones known to be used by Defendants Jewell Tutis, Toye Tutis, and Ivan Cuellar Naranjo. (See Gov't First Opp'n at 7; see also Dorn Sept. 19, 2014 Aff. (Ex. 2 to Gov't First Opp'n); Dorn Sept. 26, 2014 Aff. (Ex. 3 to Gov't First Opp'n).)

On September 19, 2014, the ACPO obtained its first "roving" wiretap authorization (BED-ATL-21-WT-2014) to intercept communications over the cellular telephone of Jewell Tutis (609-626-4283) (hereinafter, the "Jewell wiretap"). (See Ex. 2 to Gov't First Opp'n.) In support of this initial authorization, Detective Dorn informed Judge DeLury of the federal wiretaps targeted at Toye Tutis (among other investigative techniques used in relation to Defendant Tutis) and explained that an ongoing investigation into Toye Tutis had identified Jewell E. Tutis as "an operator/partner of an ongoing criminal narcotics distribution organization." (Dorn Sept. 19, 2014 Aff. at ¶¶ 11, 19.) More specifically, the affidavit stated that a confidential informant

A0156

(hereinafter, "CI #607/CS-2")[7] had a conversation with Toye Tutis in July 2014, during which time Tutis advised CI #607/CS-2 that he could supply the individual with cocaine, marijuana, and heroin in an array of quantities. (Id. at ¶ 21.) Toye then purportedly instructed CI #607/CS-2 to refer to him as "'Santana'" over the telephone and provided CI #607/CS-2 with "a series of code phrases"[8] to use when contacting his brother, Jewell, to purchase drugs. (Id.) CI #607/CS-2, in turn, met with Jewell, who reiterated that he and his brother, Toye, could provide narcotics, and other "'hardware.'" (Id. at ¶ 22.)

Following these initial exchanges, on August 5, 2014, Detective Dorn met with CI #607/CS-2 at a predetermined location "to place a recorded telephone call to Toye Tutis." (Id. at ¶ 23.) At that time, CI #607/CS-2 handed Detective Dorn a Ta'Ja Construction Real Estate Investor's LLC "business card" he claimed

---

[7] The ACPO materials refer to this confidential source as CI #607, while the Government identified the same confidential source as CS-2. (See Gov't First Opp'n at 12 n.8.) In order to avoid any ambiguity, this Court will refer to the confidential informant by both identifiers.

[8] These phrases and their claimed meanings included: (1) "'come to work early,'" which meant that the confidential source needed additional drugs; (2) "'bring me a cup of coffee in the morning,'" which indicated that the informant needed marijuana, (3) "'[b]ring me a box of doughnuts in the morning,'" which meant that the source wanted an ounce of cocaine, and (4) a "whole 'bird,'" which indicated that the informant desired a kilogram of cocaine. (Dorn Sept. 19, 2014 Aff. at ¶ 21.)

to have received from Defendant Tutis on August 4, 2014,[9] and on which someone had handwritten (on the back) "the name 'Jewel' and a telephone number of (609)626-4684, and the name 'Santana' with a telephone number of (609)431-2044."[10] (Id.; see also Ex. 4 to Gov't First Opp'n.)[11] In the presence of Detective Dorn, the confidential informant then dialed the number for "'Santana,'" 609-431-2044, and requested "'a box of doughnuts'" (i.e., an ounce of cocaine). (Dorn Sept. 19, 2014 Aff. at ¶ 23.) A voice which Detective Dorn recognized as the voice of Toye Tutis instructed CI #607/CS-2 to "call [his] brother."[12] (Id.) CI #607/CS-2, in turn, placed a call to the number for "'Jewel,'" 609-626-4684, again in the presence of Detective Dorn, and requested a "'box of doughnuts.'" (Id.) The following day, August 6, 2014, CI #607/CS-2 met with Jewell Tutis (i.e., Defendant Tutis' brother) and

---

[9] The business card itself provides, on its face, only the contact information for "Toye." (Ex. 4 to Gov't First Opp'n.)

[10] The affidavit provides no detail concerning the source of the writing on the business card. On the oral argument record, however, the Government explained that CI #607/CS-2 revealed, during a subsequent interview, that the source had inscribed the contact information on the business card.

[11] The business card itself does not specifically disclose the area code associated with these telephone numbers, but no party takes issue with Detective Dorn's inclusion of "609," the area code that, in any event, prevails in Atlantic City, New Jersey.

[12] In latter portions of his affidavit, Detective Dorn claimed that he had familiarity with the voice of Toye Tutis, as explained below. (See Dorn Sept. 26, 2014 Aff. at ¶ 54.)

completed the first in a lengthy series of controlled drug purchases. (Id. at ¶ 24)

Aside from these early encounters, Detective Dorn detailed and recounted the additional drug involvement evidence against Jewell Tutis as provided by the confidential informant through subsequent recorded conversations,[13] and through additional controlled purchases. (See id. at ¶¶ 11, 20-48.) Indeed, the affidavit documents no fewer than nine completed drug transactions between CI #607/CS-2 and Jewell Tutis, all of which the ACPO affirmatively identified as drug substances through field tests.[14] (See, e.g., id. at ¶¶ 26, 28, 30, 34, 36, 39, 41, 44, 47, 52.)

As a result, Detective Dorn expressed his opinion that the evidence gathered at that time demonstrated probable cause that Jewell E. Tutis utilized the cellular device to communicate between co-conspirators in furtherance of an illicit narcotics distribution conspiracy, and that an electronic interception of the communications would enable the state investigators to (1) understand the nature of Jewell Tutis' relationship with his co-conspirators, (2) identify the suppliers of the controlled

---

[13] These recorded conversations include a number of calls to Jewell Tutis, related to purchases of drugs, fraudulent drivers' licenses, and firearms. (See Dorn Sept. 19, 2014 Aff. at ¶¶ 24-53.)

[14] The Government claims that these controlled buys totaled "29 ounces of crack cocaine and 10 pounds of marijuana" from August 6, 2014 through September 30, 2014. (Gov't First Opp'n at 16.)

substances, and (3) determine the location(s) of the drug substances and their proceeds.[15] (See id. at ¶¶ 49-50.)

After a few days of intercepting communications pursuant to the Jewell wiretap, Detective Dorn (and others) determined that Toye Tutis had used a specific cellular telephone in connection with his alleged drug distribution, 424-646-1761. (See Dorn Sept. 26, 2014 Aff. at ¶¶ 3-5.) As in the affidavit submitted in connection with the Jewell wiretap,[16] Detective Dorn acknowledged the wide scope of the investigation into Toye Tutis' drug activity, as well as the use of federal wiretaps that identified Toye Tutis as the target interceptee. (See id. at ¶ 11.) Nevertheless, Detective Dorn explained that the probable cause for "the present wiretap application" stemmed only from his state-based

---

[15] Judge DeLury authorized two extensions of this original wiretap authorization (BED-ATL-21-WT-2014X (October 9, 2014) and BED-ATL-21-WT-2014XX (October 17, 2014)), and on October 27, 2014, authorized a wiretap order designating Jewell Tutis as a leader of a drug trafficking organization. (See Gov't First Opp'n at 8.) In sum, these electronic interceptions began on or about September 22, 2014 and continued through on or about November 24, 2014. (See id.)

[16] The second affidavit of Detective Dorn restates and builds upon the evidence and information described in his first affidavit. (Compare Dorn Sept. 19, 2014 Aff., with Dorn Sept. 26, 2014 Aff.) In other words, in seeking the wiretap authorization against Toye Tutis, the ACPO continued to rely upon the confidential informant's statements concerning the initial meeting with Defendant Tutis in July 2014, as well as the contents of the recorded telephone call on August 5, 2014, and the subsequently completed drug transactions. (See Dorn Sept. 26, 2014 Aff. at ¶¶ 21, 23.)

A0160

investigations,[17] including the evidence recited in the affidavit supporting the Jewell wiretap, together with the fact that the Jewell wiretap had captured conversations and text messages between Jewell and Toye allegedly concerning their attempts to obtain fraudulent drivers' licenses (and that supposedly confirmed Toye Tutis as the owner of the cellular telephone).[18] (See id. at ¶¶ 54-55; see also Ex. A to Dorn Sept. 26, 2014 Aff. (line sheets of recorded telephone calls concerning fraudulent drivers' licenses).)

As a result, Detective Dorn again expressed his belief that the evidence gathered at that time demonstrated probable cause

---

[17] In other words, Detective Dorn specifically declined to detail the fruits, if any, of the federal investigation, given the somewhat greater latitude afforded federal law enforcement in conducting investigations.

[18] As noted by Defendant Toye Tutis, these conversations did not, at least on the surface, delve into the acquisition of illegal narcotics, nor did they make mention of any controlled sales to the confidential informant (i.e., CI #607/CS-2). (See First Tutis Br. [Docket Item 234], 5; see also Ex. A to Dorn Sept. 26, 2014 Aff.) Rather, in the conversations most cited by the parties (i.e., call sessions 131 & 138 on September 24, 2014), a person believed to be Toye Tutis referenced the purchase of fraudulent California drivers' licenses for Jewell Tutis, and then stated that "' all [they] need[ed] to do [was] go in and open up boxes.'" (Dorn Sept. 26, 2014 Aff. at ¶ 54.) Despite the brevity of these exchanges, Detective Dorn explained how drug traffickers, in his experience, "utilize fraudulent out-of-state driver[s'] licenses to retrieve packages of suspected contraband through the United States mail." (Id.) In that way, the affidavit of Detective Dorn plainly connects the conversation concerning fraudulent drivers' licenses to the overall allegations concerning Toye Tutis' alleged role in a drug trafficking operation.

that Toye Tutis continued to be involved in the sale of controlled dangerous substances, and that an electronic interception of the communications of his identified cellular device would enable the state investigators to (1) further understand the nature of Tutis' relationship with his co-conspirators, (2) identify the suppliers of the controlled substances, and (3) determine the location(s) of the drug substances and their proceeds. (See id. at ¶¶ 56-58.) In view of the contents of the affidavit, Judge DeLury issued the requested wiretap on September 26, 2014 (BED-ATL-22-WT-14 & BED-ATL-153-CDW-14) (hereinafter, the "Toye wiretap").[19]

### C.    December 9, 2014 Search Warrants, December 10, 2014 Indictment, and Arrests

On December 9, 2014, federal law enforcement agents obtained federal search warrants for approximately seven properties throughout southern New Jersey, all of which bore some claimed relation to the alleged drug trafficking organization. (See Gov't First Opp'n at 32; see also Walsh Aff. at ¶ 7.)

Then, on December 10, 2014, a federal grand jury returned a two-count Indictment charging certain defendants with conspiring to traffic in cocaine, heroin, and crack cocaine, and select others

─────────────

[19] On the oral argument record with respect to Defendant Tutis' first motion to suppress, counsel for the Government raised the prospect that Judge DeLury may have questioned Detective Dorn on the contents of his affidavit in advance of his wiretap authorization. Nevertheless, the relevant record on the issue of suppression contains no support for this assertion, and so the Court has not considered it.

A0162

with conspiring to conceal and/or disguise the proceeds of this unlawful activity. (See generally [Docket Item 1].) More specifically, and as relevant here, the Indictment charges Defendants Tutis and Atiba with perpetrating a drug-trafficking conspiracy in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (hereinafter, "Count I"), and then charges Defendants Tutis and Vega with perpetrating a money-laundering conspiracy in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(1)(B)(ii), and (h) (hereinafter, "Count II").

During the execution of the search and arrest warrants, officers seized additional evidence of drug trafficking and money laundering, including more than one kilogram of crack cocaine, lesser amounts of powder cocaine and heroin, eight firearms, two tasers, more than forty cellular telephones, a bulletproof vest, and in excess of $100,000 in cash. (See Gov't First Opp'n at 32-33.)

**D.   Defendant Tutis' First Motion to Suppress**

This Court, in its March 8, 2016 Opinion addressing Defendants' first set of pretrial motions, denied Defendant Tutis' motion to suppress the wire and electronic conversations captured under the September 26, 2014 wiretap because it found that Judge DeLury had a substantial basis to find that Detective Dorn's Affidavit, viewed in its entirety, demonstrated a "fair probability" of Toye Tutis' involvement in criminal activity. See

13

A0163

_Tutis_, 2016 WL 885044, [Docket Item 264], at *11. The undersigned
also denied Defendant Tutis' request that the Court conduct a
_Franks_ hearing regarding omissions in Detective Dorn's September
26, 2014 Affidavit, because Defendant Tutis made no showing that
Detective Dorn knowingly, intentionally, and/or recklessly made a
false statement. _Id._ at *12.

**E.  Defendant Tutis' Renewed Motion to Suppress**

On July 29, 2016, Defendant Tutis, then represented by J.
Michael Farrell, Esq., filed a second omnibus pretrial motion,
including renewed requests to suppress the September 26, 2014
Wiretap Order and a renewed request for a _Franks_ hearing. (_See_
Def.'s Renewed Mot. [Docket Item 322], 7-31.)

The Court reconsidered its earlier decision denying a _Franks_
hearing during hearings on September 27, 2016 and October 13, 2016,
and a _Franks_ hearing commenced on October 17, 2016. (_See_ Order
Concerning Various Pretrial Motions [Docket Item 377].) On October
21, 2016, after the conclusion of the _Franks_ hearing, the Court
filed an Order denying Defendant Tutis' renewed motion, [Docket
Item 322], insofar as it sought to "suppress evidence intercepted
as a result of the September 26, 2014 Wiretap Order." (Order
[Docket Item 388].) The present Opinion sets forth the reasons for
that denial.

# III. <u>STANDARD OF REVIEW</u>

## A.   Standard for Suppression

The traditional Fourth Amendment principles that apply to property searches govern probable cause determinations under the federal and/or state wiretap statutes. See <u>United States v. Tehfe</u>, 722 F.2d 1114, 1118 (3d Cir. 1983); <u>see also</u> 18 U.S.C. § 2518(3) (federal wiretap statute); N.J.S.A. § 2A:156A-10 (state wiretap statute). Under these principles, a finding of probable cause requires a "'fair probability'" of criminal activity, based upon the totality of the circumstances. <u>United States v. Bond</u>, 581 F.3d 128, 139 (3d Cir. 2009) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)). Stated differently, the issuing court must "make a practical, common-sense decision" concerning whether the circumstances set forth in the supporting affidavit, "including the 'veracity' and 'basis of knowledge' of the persons supplying the hearsay information," demonstrate "a fair probability" that the authorization will result in evidence of a crime. <u>Id.</u> at 238-39.

A reviewing court must afford great deference to the probable cause finding of an issuing court. See <u>United States v. Hodge</u>, 246 F.3d 301, 305 (3d Cir. 2001); <u>United States v. Jones</u>, 994 F.2d 1051, 1055 (3d Cir. 1993). As a result, the probable cause determination of an issuing court will be upheld so long as the supporting documents provided a substantial basis for the initial

A0165

probable cause decision.[20] See Hodge, 246 F.3d at 305; Jones, 994
F.2d at 1055. This deferential standard "does not mean that

---

[20] Title III of the Omnibus Crime Control and Safety Street Act of
1968 empowers a judge to enter an ex parte order to authorize
interception of wire communications, if the judge determines on
the basis of the facts submitted by the application that:

> (a) there is probable cause for belief that an
> individual is committing, has committed, or is
> about to commit [a drug-trafficking offense];
> (b) there is probable cause for belief that
> particular communications concerning that
> offense will be obtained through such
> interception; (c) normal investigative
> procedures have been tried and have failed or
> reasonably appear to be unlikely to succeed if
> tried or to be too dangerous; (d) except as
> provided in subsection (11), there is probable
> cause for belief that the facilities from
> which, or the place where, the wire, oral, or
> electronic communications are to be
> intercepted are being used, or are about to be
> used, in connection with the commission of
> such offense, or are leased to, listed in the
> name of, or commonly used by such person.

18 U.S.C. §§ 2518(3)(a)-(d). The New Jersey Wiretapping and
Electronic Surveillance Control Act, which governed the wiretap at
issue here, contains analogous provisions, and specifically
authorizes the issuance of a wiretap, if the judge finds probable
cause to believe that:

> a. [t]he person whose communication is to be
> intercepted is engaging or was engaged over a
> period of time as a part of a continuing
> criminal activity or is committing, has or had
> committed or is about to commit an offense as
> provided in section 8 of P.L.1968, c.409
> (C.2A:156A-8); b. [p]articular communications
> concerning such offense may be obtained
> through such interception; c. [n]ormal
> investigative procedures with respect to such
> offense have been tried and have failed or
> reasonably appear to be unlikely to succeed if
> tried or to be too dangerous to employ; d.

reviewing courts should simply rubber stamp" the authorizing judge's conclusions," Tehfe, 722 F.2d at 1117 (citing United States v. Ventresca, 380 U.S. 102, 108 (1965)), but it does counsel that "resolution of doubtful or marginal cases . . . be largely determined by the preference . . . accorded to warrants." Jones, 994 F.2d at 1055 (citing Ventresca, 380 U.S. at 109). In other words, the standard encourages that slight doubts concerning the propriety of the wiretap authorization be resolved in favor of the issuing court. See generally id.

> [e]xcept in the case of an application meeting the requirements of subsection g. of section 9 of P.L.1968, c.409 (C.2A:156A-9), the facilities from which, or the place where, the wire, electronic or oral communications are to be intercepted, are or have been used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by, such individual; e. [t]he investigative or law enforcement officers or agency to be authorized to intercept the wire, electronic or oral communication are qualified by training and experience to execute the interception sought; and f. [i]n the case of an application, other than a renewal or extension, for an order to intercept a communication of a person or on a facility which was the subject of a previous order authorizing interception, the application is based upon new evidence or information different from and in addition to the evidence or information offered to support the prior order, regardless of whether such evidence was derived from prior interceptions or from other sources.

N.J.S.A. § 2A:156A-10.

### B. Standard for Determining Whether a Warrant is an Unconstitutional General Warrant

The prohibition against general warrants stems directly from the text of the Fourth Amendment to the Constitution, which requires that all warrants describe "particularly . . . the place to be searched, and the persons or things to be seized." As interpreted by the Supreme Court, this language prohibits a "'general, exploratory rummaging in a person's belongings.'" Andresen v. Maryland, 427 U.S. 463, 480 (1976) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)). "The particularity requirement 'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another.'" United States v. Christine, 687 F.2d 749, 752 (3d Cir.1982) (quoting Marron v. United States, 275 U.S. 192, 196 (1927)). On the other hand, "'no tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision.'" United States v. Conley, 4 F.3d 1200, 1208 (3d Cir. 1993) (quoting Christine, 687 F.2d at 760). The terms of a search warrant must be read in context and not in isolation, in order to determine whether the warrant is sufficiently specific. Id.

## IV. DISCUSSION

### A. The Wiretap Order Was Not a General Warrant

Tutis first claims that the evidence obtained from the state roving wiretap of his cell phone should be suppressed because the

September 26, 2014 wiretap order signed by Judge DeLury was an unconstitutional general warrant in that it authorized a tap of "up to five phones 24 hours a day, 7 days a week." (Reply Br. [Docket Item 331], 7.)

General warrants violate the Fourth Amendment because they authorize "a general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). For a warrant to be invalidated as general, it must "vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." United States v. Christine, 687 F.2d 749, 753 (3d Cir. 1983). Whereas a regular wiretap involves tapping a particular phone, a roving wiretap "authorizes the government to, in effect, tap a person, 'intercept[ing] any and all identified telephones used by that person.'" United States v. Shannon, 766 F.3d 346, 349 n.4 (3d Cir. 2014).

As a threshold matter, the Government's argument that Defendant Tutis's motion to suppress the wiretap evidence is actually a motion for reconsideration is not persuasive. A motion for reconsideration may be granted only if "(1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. Interfaith Community Organization v. Honeywell Int'l, Inc., 215 F.

Supp. 2d 482, 507 n. 12 (D.N.J. 2012). Tutis argues that these are "new motions based on separate and distinct grounds," and even if the Court construes it as a motion for reconsideration, Tutis has received additional discovery that was not available during his first set of pretrial motions. (Reply Br. [Docket Item 331], 4.) The Court agrees, as Tutis makes arguments based on evidence not previously available – notably, the line sheets and Friday reports describing wiretap updates from ACPO to Judge DeLury had not yet been provided to the Defendant. (Id. at 5.) As a result, the Court will proceed to the merits of the motion.

Tutis argues that the September 26, 2014 wiretap order was defective because state and federal law require the applicant to show that a defendant's purpose in switching phones was to thwart law enforcement. Tutis claims that he merely used multiple phones, not that he used one, terminated it, and moved on to another one. (Id. at 7.) As a result, he argues that Judge DeLury actually authorized a roving warrant that essentially permitted the tapping of multiple phones simultaneously even though the warrant identified only one target phone. In other words, the Government used a simple order as to one target phone to "simultaneously rummage" five at a time, 24 hours a day, seven days a week. (See Sept. 8, 2016 Oral Arg. Tr. 24:1-5). Tutis further argues that the simultaneous interception of more than one phone exceeds the scope of the original warrant. (Id. at 22:15-24).

A0170

Under federal law, applicants for a roving wiretap must show that "there is probable cause to believe that the person's actions could have the effect of thwarting interception from a specified facility." 18 U.S.C. § 2518 (11)(b)(ii). Under New Jersey law, which is a "stricter standard" than the federal law, the state must show that the target has a "purpose . . . to thwart interception by changing facilities." N.J.S.A. 2A:156A-9(g)(2)(b); see State v. Feliciano, 224 N.J. 351, 370 (2016) (explaining the distinction between the federal roving wiretap statute and the New Jersey statute).

Tutis argues that the Government's September 26, 2014 warrant only contains "boilerplate language" and "conclusory allegations" regarding Tutis's purpose to thwart a law enforcement investigation. (Def.'s Renewed Mot. [Docket Item 322], 11.) He argues that "the affidavit is required to show with specificity and particularity the facts upon which the affiant relies in order to show the specifically intended purpose of the target to thwart interception." (Id. at 11, n.4.) But Tutis omits portions of the September 26, 2014 Affidavit, which states:

> As set forth herein, this investigation has established that Toye Tutis is a prominent significant member of a narcotics distribution operation within the City of Somers Point and City of Atlantic City, New Jersey. Toye Tutis, during the investigation, has changed his prepaid wireless telephone facility number on three (3) occasions, and told [a confidential informant] that he, Toye Tutis, changes his

A0171

> phone number often, including the latest
> change to a [new number], the telephone
> facility number that [Detective Dorn had]
> probable cause to believe and do believe Toye
> Tutis is currently using in furtherance of the
> specific crimes.

(Ex. B., ¶ 13 to Gov't Opp'n.) This language is far from boilerplate and conclusory, as it explains that investigators already knew that Tutis was a significant member of the drug operation, that Tutis changed his number three times, and that a confidential informant said that his latest change was to the number that Tutis was currently using.

Tutis argues that the recent New Jersey Supreme Court case State v. Feliciano, 224 N.J. 351 (2016), supports his argument that Detective Dorn did not show that he had a "specific purpose to thwart interception" of law enforcement. (Def.'s Renewed Mot. [Docket Item 322], 10.) In that case, in order to track alleged participants in a large-scale heroin trafficking scheme in Camden, law enforcement applied for a series of roving wiretap orders. Feliciano, 224 N.J. at 357. In many of these applications, affiants noted that the defendants had "abruptly ceased" or "abandoned" a particular number and moved to another one. Id. at 359. The court proceeded to outline a series of new procedures that law enforcement must employ to avoid the constitutional questions regarding "continued interception of a newly identified phone, without court involvement, under the [New Jersey] roving wiretap

provision." <u>Id.</u> at 376. Tutis argues that "[u]nlike the officers in <u>Feliciano</u>, the wiretaps on each of the phones were kept active as the officers added additional phones to the tap;" as a result, the officers were allegedly "tapping all, or most of, the phones believed to be associated with Toye Tutis simultaneously." (Def.'s Renewed Mot. [Docket Item 322], 12.) Tutis argues that for a roving wiretap to pass muster under the U.S. and New Jersey Constitutions, "the affiant must make the required showing of the specific purpose to thwart interception of that phone <u>by abandoning the use of that phone and switching to another</u>," and this "simultaneous tapping" is an unconstitutional general warrant. (<u>Id.</u> at 10, 12) (emphasis added).

This Court finds that nothing in <u>Feliciano</u>, either explicitly or implicitly, supports Defendant's argument that the Government must have shown that Tutis had <u>completely</u> abandoned a prior phone and was only using a new phone. As the Government noted in its briefing, the <u>Feliciano</u> court did not apply its holding retroactively and it was decided after all of the wiretaps and surveillance had been conducted in this case. (Gov't Opp'n at 4 n.5.)[21] Thus, Defendant's reliance on <u>Feliciano</u> is misplaced, as

_____

[21] The court in <u>Feliciano</u> also noted that it did "not fault the experienced, specially designated wiretap judge who oversaw this investigation for not anticipating today's ruling and expressly making [the] findings" the Court was now requiring to be made in roving wiretap cases. 224 N.J. at 377. As the Government noted in oral argument, there is no "requirement under the statute

A0173

Judge DeLury could not have anticipated the additional procedures regarding roving wiretaps over eighteen months before the Feliciano decision was handed down, and even if he could, the case does not support Defendant's argument that the Government must show that a defendant completely abandoned a prior phone. Further, there was, in any event, probable cause to believe that Tutis had changed his phone three times and that his current number represented merely the latest change, as stated in the Dorn Affidavit, supra. This information from the Confidential Informant gave Judge DeLury a substantial basis to find probable cause that Tutis was in the habit of changing his cell phones often to avoid detection of his illegal activities. It is also a reasonable inference that one who is involved as a principal participant in drug dealing, who conducts drug business over the phones and who changes phones frequently is doing so for the purpose of avoiding detection. No one would announce that he is changing phones often to avoid detection of criminality and it would be illogical to erect such a requirement of proving this by direct evidence, rather than by reasonable inferences from reliable evidence as is the standard for showing probable cause.

---

authorizing roving wiretaps that a roving wiretap can only be used where there is a clear sequential dropping phones with no overlap." (9/8 O/A Tr. at 29: 17-20).

A0174

Finally, to support the argument that "simultaneous tapping" is a general warrant, Tutis relies on the 1986 U.S. Senate Report regarding the Electronic Communications Privacy Act, which noted that "[i]t would be improper to use this expanded specificity order to tap a series of telephones, intercept all conversations over such phones then minimize the conversations collected a result." (Id. at 12 (quoting S. Rep. No. 99-541, at 5, 31 (1986)).) But Tutis omits other language from the same Report, also quoted in Feliciano, that the roving wiretap provision is "necessary to cover circumstances under which law enforcement may not know, until shortly before the communication, which telephone line will be used by the person under surveillance." Feliciano, 224 N.J. at 373 (quoting S. Rep. No. 99-541 at 31). Defendant's argument regarding the Senate Report is therefore not persuasive to the Court. In sum, neither federal and state wiretap law nor caselaw interpreting it require law enforcement to avoid simultaneous tapping of the target's cell phones under a roving wiretap.

**B.    The Wiretap Order Was Not Obtained in Violation of <u>Franks v. Delaware</u>**

Tutis argues that there were misstatements and omissions in the wiretap application of September 26, 2014 that require suppression of any fruits, in violation of <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). The Court denied Tutis' first request for a <u>Franks</u> hearing and fully explained its reasoning. See <u>United States v.</u>

A0175

Tutis, 167 F. Supp. 3d 683 (D.N.J. 2016). However, in light of the Government's October 6, 2016 disclosure and Defendant's October 10, 2016 letter, (see [Docket Items 361 and 368]), discussing the Government's recent disclosure that Jewell Tutis told CI #607/CS-2 that he was "Santana," not Toye Tutis, the Court convened a Franks hearing with regard to Detective Dorn's alleged misstatements in his September 26, 2014 application to Judge DeLury on October 17 and 19, 2016. (See generally 10/17/16 Tr. [Docket Item 413]; 10/19/16 Tr. [Docket Item 415].) During the Franks hearing, the Court received live testimony from Detective Dorn and from Defendant Tutis and received into evidence numerous pieces of documentary, audio, and video evidence. (See generally id.)

Defendant Tutis argues that Detective Dorn intentionally or recklessly made a number of false statements and material omissions in his affidavit submitted to Judge DeLury and that in the absence of those statements the affidavit does not contain sufficient probable cause to justify the issuance of the requested warrant. For the reasons outlined below, the Court finds Detective Dorn did not make any incorrect statements knowingly, intentionally, or with reckless disregard for the truth. Additionally, the Court finds that Detective Dorn's alleged false statements or omissions were not necessary to the finding of probable cause for the September 26, 2014 Wiretap Order and that there was a reasonable

A0176

basis for Detective Dorn's representation that CI #607/CS-2 was a "reliable" informant.

The Government opposes Defendant Tutis' motion, arguing that (1) the affidavit contains a more than sufficient reliable factual basis for probable cause, (2) Defendant Tutis fails to consider the affidavit in its entirety, ignoring detailed allegations, (3) a drug trafficking conspirator does not have to make sales to be liable for conspiracy, (4) a two month gap between one recorded call and the application for a wiretap does not undermine probable cause, (5) the misspelling of Jewell Tutis' name on the business card is not dispositive, (6) the omission of additional possible facts does not undermine probable cause, (7) CI #607/CS-2, Detective Dorn, and other investigators were familiar with Toye Tutis' voice, (8) the lack of other evidence regarding the code name "Santana" is not significant, (9) the fact Defendant Tutis was not intercepted speaking explicitly about drugs does not undermine probable cause, and (10) Judge DeLury could consider Detective Dorn's experience and conclusions he drew from the evidence in finding probable cause. (See Gov't First Opp'n at 35-51.) Additionally, the Government argues that Defendant Tutis' claims regarding allegedly false assertions in the affidavit are meritless and that suppression is unwarranted where the Government relied in good faith on Judge DeLury's Wiretap Order. (Id. at 52-59.)

A0177

> 1. **Alleged Incorrect Statements and Omissions Were Not Made Knowingly and Intentionally, or With Reckless Disregard for the Truth**

At the close of the Franks hearing, after both Detective Dorn and Defendant Tutis testified and after the Court accepted into evidence a number of documents, audio recordings, and video recordings regarding the statements made in Detective Dorn's affidavit, counsel for Defendant Tutis identified the alleged incorrect statements or omissions therein which Defendant Tutis contends justify relief under Franks. (See 10/19/16 Tr. [Docket Item 416], 66:9-80:20.) These are:

- Detective Dorn allegedly failed to acknowledge that the eighteen-month-long federal investigation into Defendant Tutis had not gathered any incriminating evidence against him at the time Detective Dorn applied for the wiretap with Judge DeLury.
- Detective Dorn knew or should have known that Jewell Tutis, and not Defendant Tutis went by the nickname "Santana."
- Detective Dorn should have informed Judge DeLury that the video of the confidential drug purchase at Dave's Grocery contradicts CI #607/CS-2's version of events.

(See id.)

Additionally, counsel for Defendant Tutis offered a number of arguments in attempting to undermine Detective Dorn's credibility. (See 10/19/16 Tr. [Docket Item 416], 69:22-78:3.) These are:

- The claim that the federal investigation did not gather any evidence against Defendant Tutis for eighteen months, but that he then engaged in explicit discussions of criminal behavior with CI #607/CS-2, a known informant, is not believable.
- The claim that Detective Dorn's investigation could not afford to set up a controlled purchase of a kilogram of

A0178

cocaine, in order to come into direct contact with Defendant Tutis, is not believable.

(See id.)

The Court shall first evaluate Detective Dorn's credibility as a witness and then address the alleged false statements or material omissions.

  a. Detective Dorn's credibility.

The Court had ample opportunity to observe Detective Dorn's demeanor and assess his credibility as he testified and was cross-examined at the Franks hearing. Defendant Tutis first attempts to impeach Detective Dorn's credibility by arguing that it is not believable that Defendant Tutis would engage in incriminating behavior in the vicinity of CI #607/CS-2, because Defendant Tutis already knew that CI #607/CS-2 had operated as an informant in the past. (See 10/19/16 Tr. [Docket Item 416], 69:22-70:7.) However, as the Court noted on the record during the Franks hearing, there is significant evidence, described in Detective Dorn's affidavit and supported by documentary evidence received during the Franks hearing that Jewell Tutis was uninhibited regarding discussions of criminal behavior in the presence of and the sale of drugs to CI #607/CS-2 during this time. (See id. at 70:8-23.) That calls into question whether the Tutises knew of CI #607/CS-2's previous or contemporaneous status as an informant and whether knowledge of such status would have impacted the Tutises' behavior toward CI

#607/CS-2.[22] Therefore, the Court does not find this theory to be a basis for discounting Detective Dorn's testimony.

Defendant Tutis further asserts that Detective Dorn's claim that the ACPO investigation could not afford a confidential purchase of a kilogram of cocaine is not believable. (See id. at 77:13-78:3.) However, Detective Dorn credibly testified repeatedly during the Franks hearing that the purchase of a kilogram of cocaine would have cost the investigation approximately $30,000 and that while investigators may be able to secure that level of funding to support a number of confidential purchases, it would have been unrealistic for the ACPO to have secured that much money in order to set up a single transaction. (See, e.g., id. at 141:4-146:2.) Counsel for Defendant Tutis intimated that ACPO's federal partners may have had access to greater sums of money, and pointed out that the ACPO's overall budget for this investigation was over $30,000, but did not provide any credible evidence or persuasive argument that it would have been possible for the ACPO investigation to have secured the funds necessary to purchase a

---

[22] Additionally, Defendant Tutis testified at the Franks hearing that he knew of CI #607/CS-2's reputation in the community as an informant, and that he had been familiar with CI #607/CS-2 since the 1990's, but that he had never personally met with or spoke to CI #607/CS-2 on or before July 15, 2014. (See id. at 7:12-8:21.) However, the inquiry at a Franks hearing is into the state of mind of the affiant, in this case: Detective Dorn. Defendant Tutis did not provide any testimony regarding Detective Dorn's state of mind, therefore Defendant Tutis' testimony is not directly relevant to this inquiry.

A0180

kilogram of cocaine. (See generally id.) Therefore, the Court does not find this to be a basis for discounting Detective Dorn's testimony.

Detective Dorn testified that at the time he signed his affidavit, he believed all the statements contained therein to be truthful and accurate, including the information provided to him by CI #607/CS-2. (See 10/17/16 Tr. [Docket Item 414], 177:13-20.) Detective Dorn's testimony at the Franks hearing was clear, internally consistent, and consistent with the documentary record. The Court finds he was credible in all material respects. The Court rejects Defendant Tutis' arguments attempting to impeach Detective Dorn's credibility and finds Detective Dorn's testimony to be highly credible and worthy of significant weight.

b. Omitting mention of the federal investigation.

Defendant Tutis asserts that Detective Dorn should have mentioned in his affidavit that the parallel federal investigation of Defendant Tutis had not produced any incriminating evidence against him, and that failing to do so constitutes a material omission. (See 10/19/16 Tr. [Docket Item 416], 67:3-14.) As an initial matter, Defendant Tutis has not provided any evidence that this premise is true; there was no evidence entered into the record to establish that prior to Detective Dorn signing his affidavit that a federal investigation into Defendant Tutis and been ongoing for eighteen months, that the investigation had not uncovered any

A0181

incriminating evidence against Defendant Tutis, and that Detective Dorn knew this to be the case. However, even if such evidence had been placed on the record, Defendant Tutis has not directed the Court's attention to any legal authority to support the proposition that the inability of a federal investigation to uncover incriminating evidence against a particular target impacts the legal standard for a state investigation into that same target to show probable cause for a search warrant, when such warrant application is based solely on information gathered by that state investigation.

In this case, Detective Dorn's affidavit explicitly states that no information from the federal investigation was used in preparing the affidavit. (See Dorn Aff. at ¶ 11.) Defendant Tutis does not claim that Detective Dorn was aware of exculpatory information collected by the federal investigation, only that Detective Dorn should have informed Judge DeLury that the federal investigation into Defendant Tutis had been thus far fruitless. Defendant Tutis does not explain why this should impact Judge DeLury's probable cause analysis. The Court has no reason to conclude that a federal investigation's lack of evidence would somehow prevent or preclude a state investigation from successfully uncovering evidence by different means. The Court also has no evidence presently before it that the federal

investigation into Defendant Tutis actually was fruitless at the time Detective Dorn signed his affidavit.

> c.  Stating that "Santana" was a nickname used by Defendant Tutis.

Defendant Tutis further asserts that Detective Dorn knowingly, intentionally, or recklessly stated incorrectly in his affidavit that "Santana" was a nickname used by Defendant Tutis. Defendant Tutis argues that Detective Dorn knew or should have known that the nickname "Santana" was used to refer to Jewell Tutis, not Defendant Tutis. (See 10/19/16 Tr. [Docket Item 415], 68:12-69:21.) In support of this argument, Defendant Tutis introduced into evidence copies of phone calls captured by the ACPO's investigation wherein Jewell Tutis referred to himself as "Santana" and "little Santana." (See 10/17/16 Tr. [Docket Item 413], 104:17-113:7.)

In his testimony at the Franks hearing, Detective Dorn testified that CI #607/CS-2 told him that Defendant Tutis had given CI #607/CS-2 a business card containing two names and telephone numbers: "Jewel [sic] (609) 626-4684" and "Santana (609) 431-2044." (See id. at 55:9-20.) Detective Dorn also testified that the two separate names implied to him that there were two separate people and that CI #607/CS-2 told him that "Santana" referred to Defendant Tutis. (See id.) As described, supra, when Detective Dorn witnessed CI #607/CS-2 call the number associated with

A0183

"Santana" on the business card, he recognized Defendant Tutis as the individual who answered and responded to the name "Santana."

Detective Dorn admitted that he knew prior to signing his affidavit that Jewell Tutis had sometimes referred to himself as "Santana" or "little Santana," but that he did not include that information in the affidavit because he thought that the term "Santana" may have generally referred to the whole Tutis drug ring, or that the term "little Santana" referred to Jewell Tutis, while Defendant Tutis may have been called "big Santana." (See id. at 80:11–82:4, 104:17–113:7.)[23]

Defendant Tutis emphasizes that Detective Dorn later filed a report, dated February 18, 2016 but based on an interview he had with CI #607/CS-2 on February 10, 2016, which contains inconsistencies relative to Detective Dorn's affidavit in support of the September 26, 2016 Wiretap Order. (See, e.g., 10/17/16 Tr. [Docket Item 414], 95:13–97:5, 129:24–131:19.) Specifically,

---

[23] Defendant Tutis also raises the issue of a conversation between CI #607/CS-2 and Jewell Tutis wherein Jewell Tutis tells CI #607/CS-2 to contact a person named "Casper" in order to buy bus passes. (See 10/17/16 Tr. [Docket Item 413], 110:10–113:7.) Defendant Tutis asserts that because Jewell Tutis tells CI #607/CS-2 to identify him/herself to "Casper" as "Santana's cousin," that Jewell Tutis must be "Santana." (See id.) Detective Dorn testified that he found the conversation confusing but believed that the conversation may rather indicate that Jewell Tutis is not "Santana," because if he were, then in this conversation he would be referring to himself in the third-person. (See id.) The Court finds that the meaning of this particular conversation is unclear and therefore cannot say that it should have put Detective Dorn on notice regarding the identity of "Santana."

A0184

Detective Dorn testified that his February 18, 2016 report contains two inaccuracies: (1) the February 18, 2016 report states CI #607/CS-2 received a business card on July 25, 2014; however CI #607/CS-2 actually received it on August 4, 2014 and gave it to Detective Dorn on August 5, 2014; (2) the February 18, 2016 report states CI #607/CS-2 received that business card from Jewell Tutis, however, CI #607/CS-2 actually received the card from Defendant Tutis. (See 10/17/2019 Tr. [Docket Item 414], 84:12-85:19.) Defendant Tutis argues that the February 18, 2018 report is the more accurate document and that Detective Dorn's original affidavit was incorrect. However, Detective Dorn testified at length, and very credibly, that the errors were made in the February 18, 2018 report, and that the errors were the result of his own carelessness.

Additionally, the October 6, 2016 letter from the Government to counsel for Defendant Tutis indicated that, in the course of a trial preparation meeting on October 4, 2016, CI #607/CS-2 revealed that later on in the ACPO investigation into the Tutises, Jewell Tutis indicated to CI #607/CS-2 that he was the person who went by "Santana." (See id. at 77:25-80:10.) Detective Dorn testified that the October 4, 2016 meeting was the first time that he learned of this information. (See id.) Detective Dorn also testified that, during that meeting, CI #607/CS-2 clarified that he had been given the business card by Defendant Tutis who told CI #607/CS-2 the

extra names and numbers to write on it. (See id.) Detective Dorn indicated that this narrative of events was consistent with CI #607/CS-2's prior descriptions of the origins of the business card. (See id.)

While evidence has been presented that Detective Dorn had seen evidence that Jewell sometimes referred to himself as "Santana" or "little Santana" prior to signing the affidavit,[24] the Court credits Detective Dorn's testimony that he believed that the nickname referred primarily to Defendant Tutis, but that it may at other times have been used by Jewell Tutis or used as shorthand for the entire drug ring. The Court does not find that Detective Dorn knowingly, intentionally, or recklessly misstated or omitted facts related to the identity of "Santana."

d.    The drug purchase at Dave's by Ta'Ja.

Defendant Tutis also asserts that Detective Dorn knowingly, intentionally, or recklessly stated incorrectly in his affidavit that Defendant Tutus was present when CI #607/CS-2 made a confidential drug purchase from Jewell Tutis at the grocery store

---

[24] Defendant Tutis also testified that he never went by the nickname "Santana," (see 10/19/16 Tr. [Docket Item 416], 59:15-21), however the inquiry at a Franks hearing is focused on the state of mind of the affiant, in this case: Detective Dorn. Therefore the question before the Court is whether or not Detective Dorn acted knowingly, intentionally, or recklessly in falsely stating in his affidavit that Defendant Tutis went by the nickname "Santana." The inquiry is not whether or not Defendant Tutis actually went by the nickname "Santana."

A0186

owned by Defendant Tutis: Dave's by Ta'Ja. Defendant Tutis argues
that Detective Dorn knew or should have known that Defendant Tutis
was not present at this event. (See 10/19/16 Tr. [Docket Item 415],
70:14-76:21.) The parties appear to agree that the portion of
Detective Dorn's affidavit describing this event accurately
reflects what was contained in CI #607/CS-2 debriefing, and the
issue remaining for the Court to determine is whether CI #607/CS-
2 made an incorrect statement during the debriefing that Detective
Dorn should have corrected in his affidavit by reference to the
video recording of the event made by way of a body camera placed
on CI #607/CS-2. (See id. at 73:8-74:11.)

Defendant Tutis argues that the video establishes that he was
not present during the event,[25] rather that CI #607/CS-2 saw
Defendant Tutis' brother Joseph in the store and confused the two.
(See id. at 60:15-61:13, 70:14-76:21.) However, as the Court
described on the record during the Franks hearing, the video of
this event is "totally unclear"[26] and displayed upside down, and

---

[25] There is evidence on the record that, contrary to CI #607/CS-
2's debriefing statements, Jewell Tutis may have been the one to
offer CI #607/CS-2 a free cup of coffee, rather than Defendant
Tutis offering CI #607/CS-2 something free from the store, however
Defendant Tutis never explained the materiality of this confusion
beyond the mere evidence of Defendant Tutis' presence in the store
at the time of the confidential drug purchase.

[26] The Court notes that the images in the video are so difficult
to discern, that it appears from the record that counsel for
Defendant Tutis initially thought that one individual had a
distinctive hairstyle and later in the hearing determined that the

the audio quality is similarly compromised, being obscured by
background conversations and music. (10/17/16 Tr. [Docket Item
414], 167:12-171:4; see also 10/19/16 Tr. [Docket Item 416], 61:11-
23.) Additionally, the camera and microphone are up against a wall
for a significant portion of the relevant clip, therefore negating
any value in potential visual identification and hampering the
ability of the microphone to pick up the conversations taking place
in the store. Therefore, there is not of much value in using this
video to corroborate or challenge CI #607/CS-2's version of events.

Furthermore, Detective Dorn's affidavit clearly states that
he was relaying information provided to him by CI #607/CS-2, rather
than independently verifying claims made by CI #607/CS-2. (See
Dorn Aff. at ¶ 44.) As the parties appear to agree that Detective
Dorn's summation of CI #607/CS-2's debriefing is accurate, and as
the video that Defendant Tutis seeks to use to undermine CI
#607/CS-2's debriefing statements is of too low of quality to
definitively determine the accuracy of CI #607/CS-2's debriefing
statements, the Court does not find that Detective Dorn knowingly,
intentionally, or recklessly misstated or omitted facts related to

---

individual was actually wearing a hat. (See 10/17/16 Tr. [Docket
Item 414], 167:12-171:4.)

Defendant Tutis' alleged presence during CI #607/CS-2's drug purchase at Dave's by Ta'Ja.[27]

    2.   <u>Detective Dorn's Alleged False Statements or Omissions Were Not Necessary to the Finding of Probable Cause for the September 26, 2014 Wiretap Order</u>

Defendant Tutis has specifically requested that the Court excise Paragraphs 19, 21, 23, and 44 from Detective Dorn's affidavit in support of the September 26, 2014 Wiretap Order. (<u>See</u> 10/19/16 Tr. [Docket Item 416], 66:9-82:2.) For the reasons stated above, the Court shall deny this request. However, even if the Court were to find that those paragraphs contained incorrect statements that were made knowingly, intentionally, or recklessly, and that those paragraphs should therefore be excised from Detective Dorn's affidavit, the remainder of the affidavit contains sufficient averments to establish probable cause for the issuance of the Wiretap Order.

As stated, <u>supra</u>, a finding of probable cause requires a "'fair probability'" of criminal activity, based upon the totality

---

[27] Defendant Tutis testified in some detail that he would never wear an orange shirt or hat like the individual in the video; however, the inquiry at a <u>Franks</u> hearing is focused on the state of mind of the affiant, in this case Detective Dorn. Therefore, the question before the Court is whether or not Detective Dorn acted knowingly, intentionally, or recklessly and falsely stated in his affidavit that CI #607/CS-2 told him that Defendant Tutis was present during the confidential drug purchase at Dave's by Ta'Ja. The inquiry is not whether or not Defendant Tutis actually was present during the confidential drug purchase at Dave's by Ta'Ja.

A0189

of the circumstances. <u>Bond</u>, 581 F.3d at 139 (quoting <u>Gates</u>, 462 U.S. at 238). In this instance, once the paragraphs identified above have been extracted from Detective Dorn's affidavit, what remains are the following assertions regarding Defendant Tutis and the phone number in question, (424) 646-1761, summarized below:

- Defendant Tutis is a prominent member of a narcotics distribution operation in and around Atlantic City, New Jersey. Defendant Tutis changed his phone number on three (3) occasions and that he changed his phone number often, in a deliberate effort to thwart detection by law enforcement. (<u>See</u> Dorn Aff. at ¶ 13.)

- Defendant Tutis held himself out as a legitimate businessperson, meanwhile he was a "a multi-kilogram distributor of cocaine, and the leader of a large narcotics trafficking network." (<u>Id.</u> at ¶ 20.)

- Jewell Tutis told CI #607/CS-2 that he worked under his brother Defendant Tutis and that they trafficked in narcotics and in weapons. (<u>Id.</u> at ¶ 22.)

- Between August 6 and September 23, 2014, CI #607/CS-2 coordinated and engaged in numerous drug purchases from Jewell Tutis, often using the code language communicated to him by Defendant Tutis and often occurring at the apartment complex where Defendant Tutis' company was contracted to do maintenance. (<u>Id.</u> at ¶¶ 24-52.)

- Jewell Tutis told CI #607/CS-2 that he and Defendant Tutis are able to obtain and sell fraudulent driver's licenses from any state and CI #607/CS-2 had a fraudulent Georgia driver's license made for himself. (<u>Id.</u> at ¶¶ 40, 53.)

- Numerous conversations were recorded between a phone number that was the subject of a separate wiretap on Jewell Tutis and the target number in this application, (424) 646-1761, regarding the trafficking of fraudulent driver's licenses. Investigators believed that the individual using (424) 646-1761 was Defendant Tutis, Jewell Tutis' brother, who they identified by the character of his voice and the vocabulary that he used, including references to their "mom" and references to "the mat," which investigators took to refer to the Ta'Ja Laundromat owned by Defendant Tutis. (<u>Id.</u> at ¶ 54.)

A0190

- Through Detective Dorn's training and experience, he believed that the Tutises were utilizing the fraudulent driver's licenses to open post office boxes under false names that they could then use to deliver packages of narcotics. (Id.)

Based on the above averments, Detective Dorn's affidavit in support of obtaining the September 26, 2014 Wiretap Order continues to show that there is a "fair probability" that the target phone number, (424) 646-1761, was being utilized in the furtherance of the drug trafficking crimes that Detective Dorn was investigating at the time. The portions of Detective Dorn's affidavit described above show that Jewell Tutis had admitted to being in a drug and weapon trafficking ring with his brother, Defendant Tutis, that part of this criminal enterprise included the production of a fraudulent driver's license, which may have been utilized to facilitate the shipping of contraband, that Jewell Tutis discussed this aspect of the trafficking ring with the individual utilizing the target phone number, (424)646-1761, and the investigators determined that that individual was likely Defendant Tutis due to the character of his voice and the content of the conversations had with Jewell Tutis.

Therefore, probable cause for issuance of the September 26, 2014 Wiretap Order would clearly be present, even if the Court were to have determined that Paragraphs 19, 21, 23, and 44 from Detective Dorn's affidavit in support of the September 26, 2014 Wiretap Order should be excised, which it has not.

A0191

### 3. Detective Dorn's Representation that CI #607/CS-2 was "Reliable" had a Reasonable Basis

Additionally, Detective Dorn's affidavit describes CI #607/CS-2 as a "reliable confidential informant" in Paragraph 59C, though the affidavit does not articulate why Detective Dorn felt the informant to be "reliable." (Dorn Aff. at ¶ 59C.) Defendant Tutis argues that Detective Dorn should not have regarded CI #607/CS-2 as reliable because the informant was being paid, because there was insufficient evidence that Toye Tutis was on the phone during the August 5, 2014 call, because CI #607/CS-2 must have received the phone number 609-742-6335 from Jewell Tutis, because the affidavit lacks any information about CI #607/CS-2's prior reliability, and because the undercover purchases of drugs from Jewell Tutis do not corroborate CI #607/CS-2's information with respect to Toye Tutis. (See 10/19/16 Tr. [Docket Item 416], 67:15-68:4, 80:10-82:2.)

Detective Dorn credibly indicated during his testimony that he considered CI #607/CS-2 to be a reliable source in part due to his prior work as an informant with ACPO and due to his production of verified intelligence in this investigation. (See 10/17/16 Tr. [Docket Item 414], 86:11-93:18.) Such intelligence included providing investigators with code words used by members of the Tutis drug ring to conceal discussions of types and quantities of certain drugs offered for sale by the ring. (See id.) CI #607/CS-

A0192

2 also successfully coordinated certain controlled purchases of drugs as part of this investigation. (See id.) Additionally, Detective Dorn testified at length that he did not include more detail regarding CI #607/CS-2's reliability in the affidavit because he thought it could risk exposing CI #607/CS-2's confidential identity and that he was prepared to opine further on CI #607/CS-2's reliability had Judge DeLury asked him for such further information at the time. (See, e.g., id. at 137:9-140:3.)

The Court finds that Detective Dorn's testimony was highly credible and that his prior experiences with CI #607/CS-2, both in relation to this investigation and prior ones, were sufficient for Detective Dorn to indicate to Judge DeLury that he found CI #607/CS-2 to be a reliable source of information, and for him to rely on information provided by CI #607/CS-2 in crafting his affidavit.

For the foregoing reasons, the Court finds that the September 26, 2014 Wiretap Order was not obtained in violation of Franks v. Delaware, and therefore the evidence gained therefrom shall not be suppressed.

### C.   The Silver Platter Doctrine Does Not Apply

Finally, Tutis argues that the wiretap evidence should be suppressed because of the "silver platter" doctrine. Tutis argues that under N.J.S.A. 2A:156A-4, the application for a roving wiretap should have been approved by the Attorney General of New Jersey or

A0193

his designee, including a County Prosecutor, or under 18 U.S.C. § 2515, by the U.S. Attorney General. (Def.'s Renewed Mot. [Docket Item 322], 25-31.) Tutis claims that the decision to transfer the investigation to the state was an intentional attempt to make an end run around the federal statutory requirements. (Id.) Tutis further notes that it is "at least suspicious" that investigators chose to seek a wiretap order from Judge DeLury at the state level, instead of a federal judge. (Reply Br. [Docket Item 331], 14.)

As stated by the Honorable Judge Garrett E. Brown, Jr. in the case of In re Application of Telfair, 745 F. Supp. 2d 536 (D.N.J. 2010):

> The rationale of [Defendant Tutis' motion] based on the "silver platter doctrine" escapes this Court. Half-a-century ago, the Supreme Court adopted the term by ruling, in Elkins v. United States, 364 U.S. 206 (1960), that evidence obtained by state officers in violation of the Fourth Amendment could not be introduced against a defendant in a federal criminal trial. That position was a broadening of the holding reached in Weeks v. United States, 232 U.S. 383 (1914), where the Court held that evidence obtained by federal officials in violation of the Fourth Amendment cannot be used against a defendant in a federal criminal proceeding; that rule eventually became part of Fourth Amendment concepts and policies jointly comprising the exclusionary rule which, in turn, gives base to suppression motions. See, e.g., United States v. Crandell, 554 F.3d 79, 83 (3d Cir. 2009) (quoting Terry v. Ohio, 392 U.S. 1, 12 (1968), for clarification that the term "exclusionary rule" implicates, "[i]n the evidentiary context of the defendant's criminal trial, [a determination as to] the

> admissibility against a defendant of the
> evidence uncovered by the search and
> seizure"); United States v. Berry, 369 F.2d
> 386, 387 (3d Cir. 1966) ("[t]he ground for the
> motion to suppress [might be] the well
> established rule that evidence obtained as the
> result of an illegal arrest or search is
> inadmissible in a prosecution for a criminal
> offense").

Telfair, 745 F. Supp. 2d at 579 n.37.

As in Telfair, Defendant Tutis has failed to establish that the September 26, 2014 Wiretap Order was obtained in violation of the Fourth Amendment, and therefore he cannot state a claim under the "silver platter" doctrine. See id. Mere speculation of "rubber stamp[ing]" wiretap orders by judges and "forum shopping" by the Government without articulable facts supporting those allegations, (Reply Br. [Docket Item 331], 14-15), is insufficient to obtain suppression for an alleged Fourth Amendment violation. The Court therefore denies Defendant's motion to suppress based on the "silver platter" doctrine.

## V.   CONCLUSION

For the foregoing reasons, "Defendant Toye Tutis' motion to suppress evidence intercepted as a result of the September 26, 2014 Wiretap Order" has been denied, along with Defendant Tutis' requests to suppress evidence obtained by electronic surveillance and/or consensual electronic interceptions of Ivan Cuellar Naranjo where communications involved Defendant Toye Tutis and Defendant Tutis' motion to suppress evidence intercepted as a result of the

A0195

ACPO's alleged use of a special technology "which transforms an ordinary cell phone into a bug." The accompanying Order shall be entered.


**May 23, 2019**                          **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          U.S. District Judge

A0196

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>TOYE TUTIS and JAZMIN VEGA,<br><br>Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>Criminal Action Nos.<br>14-699-1 (JBS)<br>14-699-11 (JBS)<br><br>**ORDER** |

This matter comes before the Court upon several motions of Defendant Toye Tutis,[1] as part of Defendant's Omnibus Pretrial Motions filed July 29, 2016 [Docket Item 322], seeking to suppress evidence obtained pursuant to a September 26, 2014 Wiretap Order on grounds that:

- The Wiretap Order was an unconstitutional general warrant and unlawful roving wiretap;

- The Wiretap Order was obtained in violation of <u>Franks v. Delaware</u>;

- The Government has violated the "Silver Platter" Doctrine; and

---

[1] As described in the Opinion of today's date, it appears to the Court that Defendant Vega joins in Defendant Tutis' present motions, though she did not provide separate briefing or oral argument.

A0197

Upon the part of Defendant Tutis' Omnibus Pretrial Motions [Docket Item 322] asserting that evidence obtained by electronic surveillance and/or consensual electronic interceptions of Ivan Cuellar Naranjo where communications involved Defendant Toye Tutis; and

Upon the part of Defendant Tutis' Omnibus Pretrial Motions [Docket Item 322] asserting that the Government inappropriately turned Defendant Tutis' cell phone into a "roving bug"; and

The Court has considered the parties' submissions in support and opposition, including the parties' arguments at hearings on September 8, 2016; September 27, 2016; October 13, 2016; and October 17 and 19, 2016 (<u>Franks</u> hearing), and having received testimony, documentary evidence, and arguments at the <u>Franks</u> hearing; and

The Court finding for the reasons forth its Opinion of today's date,

IT IS this __**23rd**__ day of __**May**__, **2019**, hereby

**ORDERED** that Defendant Toye Tutis' motion to suppress evidence intercepted as a result of the September 26, 2014 Wiretap Order shall be, and hereby is, **DENIED**; and it is further

**ORDERED** that that Defendant Toye Tutis' motion to suppress evidence intercepted as a result of electronic surveillance and/or consensual electronic interceptions of Defendant Ivan Cuellar

A0198

Naranjo where such communications involved Defendant Tutis shall be, and hereby is, **DENIED as moot**; and it is further

   **ORDERED** that that Defendant Toye Tutis' motion to suppress evidence intercepted as a result of the ACPO's alleged use of a special technology "which transforms an ordinary cell phone into a bug" shall be, and hereby is, **DENIED**.


                                    **s/ Jerome B. Simandle**
                                    JEROME B. SIMANDLE
                                    U.S. District Judge

A0199

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

United States of America,
      Appellee/Cross-Appellant,

             v.

Toye Tutis,
      Appellant/Cross-Appellee.

Hon. Jerome B. Simandle, U.S.D.J.

Criminal No. 14-699 (JBS)

**Notice of Cross-Appeal**

Notice is hereby given that, pursuant to 18 U.S.C. § 3742(b)(3), the United States of America hereby cross-appeals to the United States Court of Appeals for the Third Circuit from the judgment entered on May 6, 2019, which Defendant-Appellant/Cross-Appellee Toye Tutis appealed on May 14, 2019. This notice of cross-appeal is being filed so that the United States may determine whether to request a remand for resentencing before a different district judge if Tutis pursues any issue in this appeal that is either beyond those reserved through his conditional guilty plea or foreclosed by his appellate waiver. *See United States v. Erwin*, 765 F.3d 219 (3d Cir. 2014).

Respectfully submitted,

CRAIG CARPENITO
UNITED STATES ATTORNEY

By:   Mark E. Coyne
       Assistant U.S. Attorney
       Chief, Appeals Division

June 13, 2019
Newark, New Jersey

A0200

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2019, I caused the foregoing Notice of Appeal to be electronically filed with the Clerk of the United States District Court for the District of New Jersey through the Court's CM/ECF system.

I also certify that on June 13, 2019, I caused to be served on opposing counsel, Stanley O. King, Esq., a copy of the Notice of Appeal through the Notice of Docketing Activity issued by the Court's electronic filing system.

Mark E. Coyne
Assistant U.S. Attorney
Chief, Appeals Division

Newark, New Jersey
June 13, 2019

A0201